## IN THE DISTRICT COURT OF ROGERS COUNTY
## STATE OF OKLAHOMA

FILED IN THE DISTRICT COURT
ROGERS COUNTY OKLAHOMA

**JUN 02 2021**

CATHI EDWARDS, COURT CLERK

DEPUTY

(1) **ASHLEY MYERS,**
**individually and as Co-**
**Personal Representative of**
**the Estate of Lorri Gayle**
**Tedder,**
(2) **COURTNEY VAUGHN,**
**individually and as Co-**
**Personal Representative of**
**the Estate of Lorri Gayle**
**Tedder,**

        **Plaintiffs,**

  **v.**

Case No.

CJ-2021-152

**ATTORNEY LIEN CLAIMED**

(1) **BOARD OF COUNTY**
**COMMISSIONERS OF**
**ROGERS COUNTY,**
(2) **SCOTT WALTON,**
**individually and in his**
**official capacity as the Sheriff**
**of Rogers County,**
(3) **KELLIE GUESS, individually**
**and in her official capacity as**
**Jail Administrator,**
(4) **TURN KEY HEALTH**
**CLINICS, LLC, an Oklahoma**
**limited liability corporation,**
(5) **SHAWN ZANDBERGEN,**
**individually,**
(6) **DANIEL ELLENBURG,**
**individually,**
(7) **HALEY HAMES, individually,**
(8) **ISAAC SHIELDS,**
**individually,**
(9) **KYLEE FOSTER,**
**individually,**
(10) **M. FERGUSON,**
**individually,**
(11) **B. HUBBARD, individually,**
(12) **W. EMERY, individually,**

1

**EXHIBIT**

**1**

**(13) K. KENNELL, individually,**
**and**
**(14) S. MORGAN, individually.**

**Defendants.**

## COMPLAINT

COME NOW Plaintiffs Ashley Myers and Courtney Vaughn, individually and as

Co-Personal Representatives of the Estate of Lorri Gayle Tedder, for their cause of

action against Defendants Board of County Commissioners of Rogers County

("County"); Scott Walton ("Walton"); Kellie Guess ("Guess"); Turn Key Health Clinics,

LLC ("Turn Key"); Shawn Zandbergen ("Zandbergen"); Daniel Ellenburg

("Ellenburg"); Hailey Hames ("Hames"); Isaac Shields ("Shields"); Kylee Foster

("Foster"); M. Ferguson ("Ferguson"); B. Hubbard ("Hubbard"); W. Emery ("Emery");

K. Kennell ("Kennell"); and S. Morgan ("Kennell"), state as follows:

## THE PARTIES

1. Plaintiffs, Ashley Myers and Courtney Vaughn, are and were citizens and
   residents of Wagoner County, Oklahoma.

2. Lorri Gayle Tedder ("Tedder") was a citizen and resident of Wagoner County,
   Oklahoma at the time of the incident hereinafter described.

3. Defendant County is and was at all times relevant hereto responsible for the
   training and supervision of Defendants Zandbergen, Ellenburg, Hames, Shields,
   Foster, Ferguson, Hubbard, Emery, and Kennell. Defendant County, at all times
   relevant hereto, delegated to Defendant Walton and/or Guess the responsibility
   to establish and implement policies, procedures, practices, and customs used by

2

Rogers County deputies and jailers regarding the use of force against pre-trial detainees. At all times relevant hereto, Defendant County and its officers were acting under color of state law.

4.    Defendant Walton was, at all times relevant hereto, Rogers County Sheriff, employed by and working for the Board of County Commissioners for Rogers County ("County"). Defendant Walton engaged in conduct complained of under color of law and within the scope of his employment as agent and representative of County. County delegates final decision-making authority to Defendant Walton to establish policy with regards to operation of the Amos G. Ward Detention Center, including the detention and medical care for intoxicated and/or mentally ill detainees. The policies, practices and customs, promulgated, created, implemented and/or utilized by Defendant Walton represent the official policies and/or customs of County with regards to operation of the Amos G. Ward Detention Center.

5.    Guess is and was, at all times relevant to this action, the Jail Administrator of County, and is responsible for the operation of the Amos G. Ward Detention Center. Kellie Guess is sued in both her individual capacity and in her official capacity for acts performed while she was the Jail Administrator of Rogers County. At all times relevant herein, Kellie Guess was acting under the color of law and within the course and scope of her employment with Rogers County, Oklahoma.

6.   Defendant Turn Key is a private Oklahoma Limited Liability Company that is independently contracted by Defendant Walton and/or Guess to provide medical services at the Amos G. Ward Detention Center.

7.   Defendant Zandbergen was, at all times relevant hereto, a jailer at Amos G. Ward Detention Center, employed by and working for County, Defendant Walton, and/or Defendant Guess. Defendant Zandbergen engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of County, Defendant Walton, and/or Defendant Guess.

8.   Defendant Ellenburg was, at all times relevant hereto, a jailer at Amos G. Ward Detention Center, employed by and working for County, Defendant Walton, and/or Defendant Guess. Defendant Ellenburg engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of County, Defendant Walton, and/or Defendant Guess.

9.   Defendant Hames was, at all times relevant hereto, a jailer at Amos G. Ward Detention Center, employed by and working for County, Defendant Walton, and/or Defendant Guess. Defendant Hames engaged in the conduct complained of under color of law and within the scope of her employment as agent and representative of County, Defendant Walton, and/or Defendant Guess.

10.  Defendant Shields was, at all times relevant hereto, a jailer at Amos G. Ward Detention Center, employed by and working for County, Defendant Walton, and/or Defendant Guess. Defendant Shields engaged in the conduct complained of under

4

color of law and within the scope of his employment as agent and representative of County, Defendant Walton, and/or Defendant Guess.

11. Defendant Ferguson was, at all times relevant hereto, a jailer at Amos G. Ward Detention Center, employed by and working for County, Defendant Walton, and/or Defendant Guess. Defendant Ferguson engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of County, Defendant Walton, and/or Defendant Guess.

12. Defendant Hubbard was, at all times relevant hereto, a jailer at Amos G. Ward Detention Center, employed by and working for County, Defendant Walton, and/or Defendant Guess. Defendant Hubbard engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of County, Defendant Walton, and/or Defendant Guess.

13. Defendant Emery was, at all times relevant hereto, a jailer at Amos G. Ward Detention Center, employed by and working for County, Defendant Walton, and/or Defendant Guess. Defendant Emery engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of County, Defendant Walton, and/or Defendant Guess.

14. Defendant Foster was, at all relevant times, a Licensed Practical Nurse, employed by and working for Defendant Turn Key. Defendant Foster engaged in the conduct complained of under color of law and in the scope of her employment as agent and representative of Defendant Turn Key.

15. Defendant Kennell was, at all times relevant hereto, a jailer at Amos G. Ward Detention Center, employed by and working for County, Defendant Walton, and/or Defendant Guess. Defendant Kennell engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of County, Defendant Walton, and/or Defendant Guess.

16. Defendant Morgan was, at all times relevant hereto, a jailer at Amos G. Ward Detention Center, employed by and working for County, Defendant Walton, and/or Defendant Guess. Defendant Kennell engaged in the conduct complained of under color of law and within the scope of his employment as agent and representative of County, Defendant Walton, and/or Defendant Guess.

## JURISDICTION AND VENUE

17. Plaintiffs incorporate all previous allegations as if restated herein.

18. This action arises from the events that occurred during the detention of Tedder at the Amos G. Ward Detention Center which resulted in her death.

19. At all material times mentioned herein, the individual jailers and jail medical staff involved in this incident were acting under color of state law and within the scope of their employment and/or authority as employees, agents, and/or servants for County, the Rogers County Sheriff's Department, Walton, Guess, and/or Turn Key.

20. In the alternative, Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were acting outside the scope of their employment, such that the Oklahoma Governmental Tort Claims Act, 51

O.S. § 153(C) does not exempt them from personal liability for their tortious conduct.

21.  In the alternative, Defendant Turn Key was acting outside the scope of its employment, such that the Oklahoma Governmental Tort Claims Act, 51 O.S. § 153(C) does not exempt Defendant Turn Key from liability for his tortious conduct.

22.  This court has jurisdiction over the parties hereto, jurisdiction over the subject-matter hereof, and venue is proper.

## COMPLIANCE WITH THE OKLAHOMA GOVERNMENTAL TORT CLAIMS ACT, 51 O.S. § 151, *et seq.*

23.  On September 9, 2020 Plaintiffs sent a Notice of Tort Claim to Jeanne Heidlage, County Clerk of Rogers County; Scott Walton, Rogers County Sheriff; and Turn Key each via certified mail with return receipt requested.

24.  Plaintiffs' Notice of Tort Claim was received by the County Clerk of Rogers County on September 16, 2020, in accordance with 51 O.S. § 156.

25.  Plaintiffs' Notice of Tort Claim was received by the Rogers County Sheriff's Department on September 16, 2020, in accordance with 51 O.S. § 156.

26.  Plaintiff's Notice of Tort Claim was received by Turn Key on September 15, 2020, in accordance with 51 O.S. § 156.

27.  Plaintiffs' Notice of Tort Claim was deemed denied on December 14, 2020 as to Defendant Turn Key.

28.  Plaintiffs' Notice of Tort Claim was deemed denied on December 15, 2020, as to Defendant County.

29. Plaintiffs are filing this Complaint within 180 days of the deemed denial of the Notice of Tort Claims in accordance with 51 O.S. § 157.

30. Plaintiffs have complied with all requirements under the Oklahoma Governmental Tort Claims Act 51 O.S. § 151 et seq.

## FACTUAL BACKGROUND AND ALLEGATIONS COMMON TO ALL CLAIMS

31. Plaintiff incorporates all prior allegations and statements as if fully restated herein.

32. On November 7, 2019, Tedder was taken into custody by the Catoosa Police Department for non-violent but erratic behavior at the Hard Rock Casino.

33. Tedder was taken to the Catoosa Police Department and taken through the booking process there.

34. Tedder was ultimately taken to the Amos G. Ward Detention Center in Rogers County.

35. Tedder was booked into the Amos G. Ward Detention Center around 8:00 a.m. on November 7, 2019.

36. During all material times while at the Amos G. Ward Detention Center, Tedder was a pretrial detainee.

37. During all material times while at the Amos G. Ward Detention Center, Tedder had not been convicted of a crime or incarcerated for a crime.

38. During all material times while at the Amos G. Ward Detention Center, Tedder was not being held in custody for trial or sentencing.

8

39. During all material times while at the Amos G. Ward Detention Center, Tedder was not on probation or parole.

40. During the intake process for Tedder at the Amos G. Ward Detention Center, jail employees and/or employees of Defendant Turn Key asked Tedder "Hey what'd you take? Pills? Drink?," evidencing their acknowledgement that her behavior was abnormal and she was showing signs of intoxication and/or mental health concerns.

41. As a part of the intake process, jailers took Tedder to shower, where Defendant Jailers and Turn Key employees discovered that she had soiled herself and was covered in feces.

42. Despite this obvious sign of severe intoxication and/or severe mental crisis, jailers and jail medical staff did nothing to evaluate Tedder's medical and/or mental condition.

43. Jailers continued making statements evidencing their belief that Tedder was intoxicated, telling her "...when you sober up, you'll want shoes," and "We're going to put you in a cell so you can sleep some of this off."

44. At the same time Defendant Jailers believed that Tedder was on drugs, she was showing signs of intoxication and/or mental health crisis that would have put a reasonable jailer on notice of her need for urgent medical evaluation.

45. Upon information and belief, Tedder exhibited numerous signs of serious mental illness, including inability to speak coherently along with numerous other readily observable signs of distress.

9

46. Tedder's need for medical care was so obvious that even a lay person would recognize her need for medical attention.

47. Tedder's condition was so severe and obvious that a reasonable jailer in Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames' positions would have sought medical attention for Tedder.

48. While performing the book-in process, Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames chose not to conduct the required initial health screening or determine whether medical treatment was necessary for Tedder's severe mental health crisis or severe intoxication, contrary to state law and Rogers County policies.

49. On November 7, 2019, while Tedder was in custody at the Amos G. Ward Detention Center, Tedder did not receive proper medical/mental health screenings.

50. Prior to Tedder being placed in a restraint chair, Tedder's medical record was not reviewed by medical personnel for any medical condition that may affect the use of the restraint chair.

51. In the alternative, if Tedder's medical record was reviewed by medical personnel before confinement in the restraint chair, findings which did or should have made medical personnel aware of a substantial risk of serious harm to Tedder if she was confined in the restraint chair were disregarded..

52. If Tedder's medical record was reviewed by medical personnel before confinement in the restraint chair, no such medical condition or review was documented in the medical/clinical record.

53. The policies and procedures of the State of Oklahoma and Rogers County related to the use of the restraint chair required that medical personnel evaluate the detainee (in this case, Tedder) to give medical approval as to the use of the restraint chair, and also required such personnel to exercise supervision while Tedder was in the restraint chair.

54. Prior to Tedder being placed in the restraint chair, a medical recommendation or approval of the restraint chair for use on Tedder was not issued or obtained.

55. At all times material to this action, the policies and procedures of the Amos G. Ward Detention Center related to the use and implementation of a restraint chair on a detainee required that the detainee be under direct and constant supervision while in the restraint chair.

56. Over the course of the day of November 7, 2019, Tedder's obvious and readily apparent symptoms of mental illness and/or intoxication or overdose had not abated. Defendants Foster, Ellenburg, Hames, Morgan, Ferguson, Emery, Hubbard and Shields disregarded the substantial and obvious risk that Tedder would suffer serious harm or death and chose to continue detaining Tedder in custody without completion of a medical assessment or proper medical attention.

57. At approximately 6:15, p.m. on November 7, 2019, jailers at the Amos G. Ward Detention Center/Rogers County Jail removed Tedder from the restraint chair where she had been located.

58. After removing Tedder from the restraint chair, Defendants Hames, Ellenberg, and Zandenberg took Tedder to the ground and restrained her by use of force including an officer placing his knee on the back of Tedder's back and/or neck.

59. While Tedder was restrained on the ground, Defendants Hames, Ellenberg, Morgan, and Zandenberg placed a "spit mask" on Tedder.

60. The spit mask was improperly placed over Tedder's face.

61. The placement of the spit mask impaired Tedder's breathing, impaired her vision, and made her disoriented.

62. This made Tedder more distraught and agitated.

63. When Defendants Hames, Ellenberg, Morgan and Zandenberg began to move again Tedder, they slammed Tedder's head into a glass window hard enough to leave a deep laceration on her forehead and blood on the glass.

64. After hitting her head, Tedder told Defendants she could not breathe.

65. After taking Tedder to the ground again, Defendants Hames, Ellenberg, Morgan and Zandenberg placed Tedder in a prone position.

66. Defendants knew or should have known that while Tedder was on the ground in a prone position, she was at a heightened risk of being unable to breathe.

67. Despite this knowledge, Defendants Hames, Ellenberg, Morgan, Ferguson and Zandenberg exerted excessive and dangerous physical force on Tedder including

a jailer placing his knee and body weight on Tedder's back while forcefully holding her head down toward the floor, during the same time that two other officers were exerting pressure on Tedder's legs and ribcage.

68. In placing a substantial amount of weight and force on Tedder's back, Defendants made it difficult for Tedder to breathe.

69. Defendants Hames, Ellenberg, Morgan, Ferguson and/or Zandenberg proceeded to place handcuffs on Tedder, wherein Tedder's hands were cuffed behind her back.

70. Defendants knew or should have known that while Tedder was on the ground in a prone position with her hands cuffed behind her back, she was at a heightened risk of being unable to breathe.

71. Despite this knowledge, Defendants Hames, Ellenberg, Morgan, Ferguson and/or Zandenberg continued to keep her in a prone position and exerted excessive and dangerous physical force on Tedder including a jailer placing his knee and body weight on Tedder's back while forcefully holding her head down toward the floor, during the same time that two other officers were exerting pressure on Tedder's legs and ribcage continuing to make it difficult for Tedder to breathe all while wearing the spit mask in an improper manner that further reduced Tedder's ability to breathe.

72. Serious bodily injury and/or death is substantially certain to result from an officer compressing a person's veins, arteries, nerves, & muscles of the neck, regardless of whether direct pressure is applied to the front or back of the neck.

73. Defendants Hames, Ellenberg, Morgan, Ferguson and/or Zandenberg knew or should have known that serious bodily injury and/or death is substantially certain to result from an officer compressing a person's veins, arteries, nerves, & muscles of the neck, regardless of whether direct pressure is applied to the front or back of the neck.

74. Defendants County, Walton, and/or Guess failed to provide their officers with proper policy guidance and training on how to properly observe and attend to the medical needs of persons at a heightened risk of positional asphyxiation due to being held down in a prone position while handcuffed.

75. As a result of the failure of Defendants County, Walton, and/or Guess to provide their officers with proper policy guidance and training on how to properly observe and attend to the medical needs of persons at a heightened risk of positional asphyxiation due to being held down in a prone position while handcuffed, Defendant Jailers continued to pin Tedder down in a manner that was substantially certain and at least reasonably foreseeable to cause breathing problems and potential positional asphyxiation.

76. Defendants Hames, Ellenberg, Morgan, Ferguson and/or Zandenberg subsequently placed leg restraints on Tedder.

77. After Tedder was pinned down while improperly wearing a spit mask, handcuffs, and leg restraints and had jailer's knee and body weight on her back during the same time that two other officers were exerting pressure on Tedder's legs and ribcage, Tedder could be heard struggling to breathe.

78. Tedder told officers that she could not breathe.

79. Defendant Foster was present through these actions. Defendant Foster witnessed and was actually aware that Tedder was being held in a prone position with handcuffs behind her back.

80. Defendant Foster witnessed and was aware that Tedder was struggling to breathe.

81. Defendant Foster witnessed and was aware that Tedder suffered a head injury.

82. Defendant Foster disregarded the substantial risk of serious harm to Tedder by failing to provide Tedder any medical assistance, despite the obvious signs and symptoms Tedder exhibited which Foster knew or should have known would increase Tedder's likelihood of serious injury or death.

83. Defendants Hames, Ellenberg, Morgan, Ferguson, Zandenberg, and Foster knew or should have known from visible and audible indications that Tedder was no longer able to breath.

84. It is well known throughout the law enforcement, correctional, and medical communities that holding a subject in a position of prone restraint for prolonged periods of time can be deadly.

85. Compressing a detainee in a prone position with weight on their back and/or abdomen restricts their ability to breathe and can result in asphyxiation.

86. Deaths caused by this form of asphyxiation are often interchangeably referred to as deaths from positional, mechanical, or compression asphyxia, even if technical distinctions exist.

87. The United States Department of Justice has warned law enforcement for decades about the dangers of prone restraint and as early as 1995: "The risk of positional asphyxiation is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restrain includes behind-the—back handcuffing combined with placing the subject in a stomach-down position." National Law Enforcement Technology Center, *Positional Asphyxia – Sudden Death* at *2 (June 1995).

88. Due to the well-known risks associated with prone restraint, it has long been national best practice that once a subject is controlled, it is imperative that they be moved from the prone position, and that their breathing be assessed.

89. It is an accepted scientific fact that the ability to speak does not imply that someone is getting sufficient air to survive.

90. The process of breathing in is accomplished by increasing the size of one's chest.

91. The process of breathing in by increasing the size of one's chest is done in two (2) ways: First, by raising one's ribs and second, by contracting one's diaphragm.

92. When a person is face down, in order to raise their ribs they have to lift the weight of their body.

93. If, in addition to one's own weight, a person has someone else kneeling or lying on their back, the person must not only lift the weight of their body but also the additional weight caused by the person kneeling or lying on their back.

16

94.  The greater the weight resting on the individual's back and the more severe the degree of compression is, the more difficult it is for the person to breathe in.

95.  As a result of this weight, compression and subsequent inability to breathe, the person will begin to suffer from "air hunger" and oxygen deficiency.

96.  The natural reaction to "air hunger and oxygen deficiency is to struggle more in order to be able to breathe.

97.  A reasonable jailer or jail medical staff member would know, among other things alleged herein, the facts set forth in paragraphs 90-96, supra.

98.  A reasonable jailer would not leave a handcuffed person in a prone position, especially with weight on her back and/or neck; but would allow that person to either lay on their side or in a seated position.

99.  After placing Tedder in handcuffs and leg restraints, Tedder was adequately controlled and posed no imminent threat to any jailer or jail medical staff.

100. As a result of the position that Tedder was forcibly held in, she was unable to breathe, something the jailers and jail medical staff knew or should have known from their training on positional asphyxia.

101. At the time that jailers had Tedder securely handcuffed and placed in leg restraints, Tedder did not pose an immediate threat of serious bodily injury and/or death to any of the jailers or jail medical staff.

102. At the time that jailers had Tedder securely handcuffed and placed in leg restraints, Tedder was unable to move, roll over, or physically stand up without the assistance of others.

103. Despite having Tedder adequately controlled, Defendants Hames, Ellenberg, Morgan, Ferguson, and/or Zandenberg kept Tedder in a prone position with direct pressure being placed on her back, body and head.

104. Although the jailers had Tedder securely handcuffed and placed in leg restraints, none of the Defendants made any effort to assist Tedder from the prone position into a seated position.

105. At all times during the restraint of Tedder, each of the jailers and jail medical staff knew that leaving a person in a prone position in handcuffs and leg restraints posed a risk of positional asphyxiation.

106. Ultimately, Tedder ceased moving and urinated in the floor.

107. At the time Tedder lost consciousness, the jailers and jail medical staff were well aware of the risk of loss of consciousness and death associated with positional asphyxiation from Tedder being placed in a prone restrained position.

108. Despite knowing the risk of death to Tedder from positional asphyxiation, Defendants Hames, Ellenberg, Morgan, Ferguson and/or Zandenberg continued to press down on Tedders back and legs and continued to place pressure of their weight down on Tedder.

109. Despite knowing the risk of harm to Tedder, no jailer or jail medical staff attempted to move Tedder from the prone restrained position to a seated position.

110. In total, Tedder was left lying face down on the ground with pressure on her ribcage and pressure on her legs and a jailer's knee in her back with his body

18

weight pressing down on her and his hands pushing her head down toward the ground for approximately four minutes and thirty-two seconds.

111. No jailer even stopped to check if Tedder was breathing or able to breathe until after she had been pinned down for approximately four minutes and one (1) second.

112. Nearly eight (8) minutes passed from the time Tedder urinated in the floor and became unconscious to the time any Defendant began cardiopulmonary resuscitation (CPR).

113. When a jailer attempted to check if Tedder was breathing and/or had a pulse, it was done improperly and below the standard of care by simply touching the back of her neck, through her hair and stating "I think so."

114. Even after Tedder was non-responsive, had urinated in the floor, and was being checked for breathing, jailers still stated that she was "just playing games."

115. Tedder was not "playing games."

116. Tedder was dying.

117. During the time that Tedder was non-responsive, had urinated in the floor, and was being checked for breathing, officers remained positioned on top of her exerting pressure and body weight on her chest, ribcage, and legs.

118. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were subjectively aware that Tedder had not moved and appeared to be unconscious.

119. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were aware of and disregarded clear and obvious signs that Tedder was unconscious, in severe distress, or was dead.

120. A reasonable jailer under the circumstances would have confirmed that Tedder was breathing, not in distress, and alive.

121. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames acted in reckless disregard of obvious signs of the substantial risk that Tedder would suffer considerable harm by failing to check to see if Tedder was alive and not in distress before continuing to exert force on her.

122. Despite these obvious signs of medical distress, Defendants did not seek immediate, appropriate medical care for Tedder.

123. Despite the obvious need for medical attention, the jailers and jail medical staff delayed in proving medical attention and instead continued to keep Tedder in a position that rendered her unable to breathe.

124. None of the jailers or jail medical staff came to Tedder's aid or assistance at any time while Tedder was held forcibly held in the restrained prone position.

125. The Defendants knew or should have known, and it is well known throughout the law enforcement and medical communities, that holding a subject in a position of prone restraint for prolonged periods of time can be deadly.

126. Compressing a person in a prone position with weight on their back, body, and/or head restricts the ability to breathe and can result in asphyxiation.

127. When Defendants Hames, Ellenberg, Morgan, Ferguson and/or Zandenberg finally let Tedder up out of the floor, she was unable to stand on her own.

128. Rather than check her consciousness or examine her during these signs of obvious medical and mental distress, Defendants Hames, Ellenberg, Morgan, Ferguson and/or Zandenberg yelled at her to stand up and then placed her in a concrete cell.

129. During the entire time Tedder was in the Amos G. Ward Detention Center, her symptoms were so objectively obvious that a lay person would recognize the need for medical attention.

130. At the time that jailers placed Tedder in the concrete cell, she was limp and nonresponsive.

131. When jailers removed the spit mask, which had been improperly pulled up over Tedder's face, there was a bloody gash visible on Tedder's head.

132. Additionally, Tedder's eyes were not moving and she appeared to be unconscious or deceased.

133. While Tedder was laying on the concrete bed in the cell, with her eyes not moving or blinking, and blood visible on her forehead, the only medical attention provided by Defendant Turn Key and its employee, was to attempt to check Ms. Tedder's pulse on her foot.

134. At no point during this episode did the Turn Key nurse on duty check for Tedder's breathing.

135. This attempt at checking her pulse was done incorrectly and negligently, with the medical staff not checking for a pedal pulse in the right location or for an appropriate amount of time.

136. This improper attempt at checking Tedder's pulse evidenced lack of proper qualifications and/or training and led to a delay in providing CPR and/or oxygen and other necessary medical care.

137. After attempting to check Tedder's pulse via her foot, the on-duty nurse then left the cell without giving any instructions or explanations to medically untrained jailers.

138. Nearly two minutes after the spit mask was removed and Tedder was visibly unconscious with no eye movement or blinking, a jailer finally pointed out that Tedder "hasn't blinked in a hot minute."

139. Nearly a minute goes by after that statement before jail medical staff or any jailer attempted to administer CPR.

140. Ultimately, an ambulance arrived and Tedder was transported to the hospital.

141. Tedder stayed in the hospital until November 9, 2019, when she died.

142. Jail staff gave inaccurate and untruthful accounts of what transpired which further delayed medical care to Tedder and increased the likelihood of her death.

143. Tedder's death was the result of deprivation of oxygen caused by three officers exerting continued pressure – including near full body weight – on her back, ribcage and legs, while in a prone restraint position and having the officer who

was on her back pushing her head and shoulder down toward the ground. This pressure lasted for approximately four minutes and thirty-two seconds.

144. The use of such force – and the extent of the force used – described above was objectively unreasonable under the circumstances at issue, especially given that Tedder was a pretrial detainee who had not been adjudged guilty of any crime.

145. Despite the knowledge of the risks of asphyxia associated with prone restraint, the jailers and jail medical staff employed with Defendant County were not provided official training on the dangers of positional, mechanical, or compression asphyxia associated with prone restraint.

146. Upon information and belief, Defendants County, Walton, and/or Guess routinely train jailers to place handcuffed arrestees or detainees in a prone position without proper training on putting arrestees or detainees in a recovery position and monitoring their breathing and consciousness.

147. Jailers and jail medical staff within the Amos G. Ward Detention Center should know the risks of asphyxiation associated with prone restraint.

148. At all times relevant hereto, the jailers exerting pressure on Tedder while in the prone restraint position did not have a reasonable fear of imminent bodily harm when they kneeled and pressed on Tedder's back, head, and body, nor did they have a reasonable belief that any other person was in danger of imminent bodily harm from Tedder.

149. Every reasonable officer would have known that using force against a handcuffed, leg shackled individual who was no longer resisting constitutes excessive force in violation of the Fourteenth and Eighth amendments.

150. The Defendant Jailers' use of deadly force in applying direct pressure and kneeling on Tedder who was in a prone, restrained position was objectively unreasonable and violated clearly established law.

151. It was objectively unreasonable for jailers to maintain Tedder in a prone restrained position without properly monitoring her breathing, pulse or otherwise properly assessing her medical condition.

152. It was a violation of Tedder's Fourteenth and Eighth Amendment rights for jailers and jail medical staff to fail to render medical aid following Tedder's complaints she could not breathe and Tedder's loss of consciousness and urination in the floor, each of which demonstrated serious medical need.

153. In addition to the use of unjustified, excessive, illegal, and deadly uses of force, each of the jailers and jail medical staff had a duty to intervene on behalf of a citizen whose constitutional rights were being violated in their presence by another jailer.

154. The jailers and jail medical staff defendants each observed and were in a position to intervene to stop jailers' use of constitutionally unreasonable deadly force against Tedder.

155. The actions against Tedder, as described above, while Tedder was restrained were objectively unreasonable, unnecessary, excessive, and without a legitimate law enforcement purpose.

156. While the jailers engaged in the objectively unreasonable acts described above, each of the jailers and jail medical staff had the opportunity to observe the actions of the other and had the opportunity, duty and ability to prevent this excessive use of force.

157. The jailers each knew or should have known that the other individual jailers were using excessive force in placing Tedder facedown, placing pressure on her back and head while her hands were handcuffed despite the fact that she was restrained and there was no objective to continue to keep her in this position.

158. By holding down Tedder as described above, and in failing to provide assistance, the jailers and jail medical staff acted in conspiracy amongst themselves to inflict excessive force upon Tedder in a manner that was unnecessary, excessive, and without a legitimate law enforcement purpose.

159. The actions of the jailers and jail medical staff described above caused extreme pain and suffering to Tedder prior to her loss of consciousness and death.

160. None of the individual jailers had a reasonable fear of imminent bodily harm, nor did they have a reasonable belief that any other person was in danger of imminent bodily harm from Tedder after she was handcuffed and placed in leg restraints.

161.   It was apparent to all Defendants who came into contact with Tedder from the period of her arrest until her death that she was suffering a severe mental health crisis.

162.   In fact, prior to the struggle which led to Tedder's death, jailers had been informed by one of Tedder's daughters that Tedder had severe mental health issues.

163.   The total failure of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, to provide Tedder with medical assistance given the clear of the severity of Tedder's symptoms during her arrest and detention violated her fundamental rights guaranteed under the U.S. Constitution to be free from deprivation of medical care constituting cruel and unusual punishment.

164.   No citizen should have to endure the treatment and conduct exhibited by Defendants against Tedder.

165.   The aforementioned acts and/or omissions of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, in light of their awareness and knowledge of Tedder's condition and serious medical needs, were deliberate, indifferent, callous, outrageous, unreasonable, and negligent and denied Tedder access to needed medical care.

166.   As a result of the aforementioned acts and/or omissions of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, Tedder suffered physical and mental pain and anguish and a tragic, preventable death.

167.   The aforementioned acts and/or omissions of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, in light of their awareness and knowledge of Tedder's condition and serious medical needs, displayed deliberate indifference to the substantial likelihood that depriving Tedder of medical care would result in her injury and/or death.

168.   The aforementioned acts and/or omissions of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, establish that they were not properly trained to adequately identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of mental health crisis; or, in the alternative, that they failed to follow such training and that the other named Defendants failed to properly enforce such policies.

169.   The above-described wrongful acts are proof of a policy in which Defendants deny citizens the rights, privileges, and immunity guaranteed to them by the United States Constitution, the laws of the United States, and the laws of Oklahoma.

170.   The policy has no justification or excuse under the law but instead is improper, illegal, deliberately indifferent, and negligent and is unrelated to any activity in which law enforcement officers properly and legally carry out their sworn duty to enforce laws, protect persons and property, and ensure civil order.

171. Walton and/or Guess, as Rogers County Sheriff and Rogers County Jail Administrator, respectively, were aware or reasonably should have been aware of this policy and did not act to correct it, constituting negligent supervision and training.

172. Walton and/or Guess, as Rogers County Sheriff and Rogers County Jail Administrator, respectively, were negligent in the selection, appointment, training, supervision, and retention of their agents and employees, in that Walton and/or Guess knew or should have known their agents and employees were carrying out these policies. Walton and/or Guess directly or indirectly allowed an attitude that encouraged detention officers to wrongfully detain and seize citizens and to use tactics and procedures violating citizens' right to life, liberty, and property in a manner that is reckless, irresponsible, dangerous, and negligent to the community at large and to Tedder and, in fact, had a policy of denying citizens of necessary medical attention.

173. Despite Walton's and/or Guess's knowledge that they had, or reasonably should have had, that this policy was being carried out, Defendants failed to remove the individual Defendants from their positions, to take any disciplinary action, or provide redress for citizens, such as Tedder, who have been injured by such deputies, and most importantly, put an end to the denial of medical care against the community.

174. Upon information and belief, County, Walton, and/or Guess routinely train their officers to place handcuffed detainees in a prone position without proper training on putting detainees in a recovery position and monitoring their breathing and consciousness.

175. Officers within the Amos G. Ward Detention Center should be trained to know the risks of asphyxiation with prone restraint.

176. The actions of Defendants were negligent, intentional, reckless, willful, and deliberate and showed gross and reckless disregard for Tedder's rights.

177. Defendant's acts and omissions were a direct and proximate cause of the harm to Tedder and her injuries.

178. The actions of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, were done willfully, maliciously, unlawfully, and with callous and reckless indifference in total disregard of Tedder's safety and continued health. Therefore, Plaintiffs are entitled to compensatory and punitive damages along with their attorney's fees.

179. Turn Key and its executives have a business model that generates revenue through governmental contracts. Through these contracts, Turn Key assumes responsibility for the government's obligation to provide healthcare services to people who are not free to seek out healthcare for themselves.

180. To obtain these contracts, Turn Key and its executives submit bids to government vendors. If awarded the contract, Turn Key and the executives provide Healthcare Services in return for payment by the government vendor.

181. To achieve net profits, Turn Key and the executives implemented policies, procedures, customs, or practices to reduce the cost of Healthcare Services in a manner that would maintain or increase their profit margin.

182. There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services.

183.   Turn Key's contract incentivizes cost-cutting measures in the delivery of healthcare services at the Amos G. Ward Detention Center to benefit Turn Key's investors in a manner that deprives arrestees at the Amos G. Ward Detention Center from receiving adequate medical care.

## COUNT I: NEGLIGENCE

184.   Defendant Turn Key and its on-site medical personnel were negligent and reckless in the medical assessment, diagnosis, and treatment administered to Tedder. The conduct of Turn Key and its on-site medical personnel fell below the acceptable standards of medical care and treatment.

185.   Defendant Turn Key and its on-site medical personnel negligently and recklessly failed to perform their duty to protect Tedder from injury. Their repeated disregard of Tedder's medical needs caused and exacerbated Tedder's pain and suffering and her emotional distress.

186.   At all material times mentioned herein, Defendant Turn Key and its on-site medical personnel were acting within the scope of their employment and/or authority as employee, agent and/or servant for Defendant Turn Key and/or Defendant County.

187.   In the alternative, Defendant Turn Key and/or its on-site medical personnel failed to act in good faith in carrying out the duties of their employment and abused their power, while still acting under the pretense and color of state law. As such, Defendant Turn Key and/or its on-site medical personnel were outside the scope of their employment, such that they can be held individually liable notwithstanding

30

the limitations, exemptions or exclusions in the Oklahoma Governmental Tort Claims Act.

188.   The injuries and damages sustained by Tedder, more particularly described below, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendants' violation of the above-described independent duties of ordinary care for the safety of Tedder.

## COUNT II: NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION

189.   Defendant Turn Key was negligent in failing to hire and employ competent medical personnel, including the nurse on-site at the times of the events described herein.

190.   Defendant Turn Key knew or should have known of their employee's carelessness, recklessness, and incompetence.

191.   Defendant Turn Key negligently failed to train and supervise their employee on how to assess, diagnose, and treat patients like Tedder.

192.   The injuries and damages sustained by Tedder, more particularly described below, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendants' violation of the above described independent duties of ordinary care for the safety of the Tedder.

## COUNT III: DELIBERATE DISREGARD OF SERIOUS MEDICAL NEEDS IN VIOLATION OF 42 U.S.C. § 1983

193.   Under the Eighth Amendment of the United States Constitution, inmates held in American prisons have a fundamental right to prison conditions that do not

constitute "cruel and unusual punishment."

194.   An arrestee and pretrial detainee, such as Tedder, who has not been convicted of a crime is at least "entitled to the degree of protection against denial of medical attention which applies to convicted inmates" under the Eighth Amendment. *Martinez v. Begg*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985); *Howard v. Dickerson*, 34 F.3d 978, 981 (10th Cir. 1994)).

195.   The Tenth Circuit Court of Appeals applies the Eighth Amendment's "deliberate indifference" standard to determine whether a pretrial detainee has been deprived of medical attention to such a degree that his or her constitutional rights are violated. See *Id.*

196.   In *Martin v. Board of County Commissioners of County of Pueblo*, 909 F.2d 402 (10th Cir. 1990), the Tenth Circuit denied qualified immunity as a defense to an alleged violation of this standard, holding that *Garcia* had clearly established that pretrial detainees share the same protection from deliberate indifference to serious medical needs as convicted inmates.

197.   The Tenth Circuit has recognized that mental health issues fall under "serious medical needs" and that the failure to provide mental health services can constitute deliberate indifference to serious medical needs. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002); *Blackmon v. Sutton*, 734 F.3d 1237 (10th Cir. 2017).

198.   The total failure of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, to provide Tedder with medical assistance given the clear of the severity of Tedder's symptoms during her arrest and detention violated her fundamental rights guaranteed under the U.S. Constitution to be free from deprivation of medical care constituting cruel and unusual punishment.

199.   It was apparent to all Defendants who came into contact with Tedder during the period of her detention until her death that she was either very severely intoxicated or suffering an extremely severe mental health crisis.

200.   The severity of Tedder's symptoms of mental health crisis at the time she was first encountered by police, to when she was booked into the Amos G. Ward Detention Center and up to the point she was found unresponsive were so great in magnitude that even a lay person would have recognized the fact that she required treatment by a medical professional.

201.   Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were all personally present during Tedder's detention and restraint and failed to intervene to prevent or remedy Defendants' failure to provide a proper health evaluation, proper classification of Tedder's severe mental health crisis, and adequate or timely medical attention.

202.   Depsite Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames' knowledge and awareness as jailers and/or

medical professionals of typical signs and symptoms of a mental health crisis and repeatedly failed to obtain proper medical care for Tedder.

203. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames knew with substantial certainty that Tedder was experiencing a severe mental health crisis because of Tedder's own statements and behavior or because of their personal observations and knowledge of the numerous symptoms that she exhibited.

204. Despite their awareness of Tedder's heightened risk of injury, suffering, and death, Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames chose to detain Tedder without access to medical care and instead of obvious and less burdensome alternatives including evaluation and treatment by mental health professionals.

205. The aforementioned acts and/or omissions of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were a direct and proximate cause of Tedder's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of life, and all other damages alleged herein.

206. The aforementioned acts and/or omissions of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, were the direct and proximate cause of damages suffered by Tedder's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain, and suffering.

## COUNTY IV: EXCESSIVE FORCE IN VIOLATION OF THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE IN VIOLATION OF 42 U.S.C. § 1983

207.     Plaintiffs incorporate all previous allegations and statements as if fully restated herein.

208.     The Due Process Clause of the Fourteenth Amendment protects a pretrial detainee from the use of excessive force that amounts to punishment. *See Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 1923 L.Ed.2d 416 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 395, n.10., (1989).

209.     The conduct of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames described above was objectively unreasonable and constitutes excessive force and is a deprivation of Tedder's rights secured under the U.S. Constitution.

210.     A reasonable corrections officer would know that the use of excessive force under these circumstances is a violation of constitutionally guaranteed rights and that a citizen's right not to be subjected to excessive force which constitutes punishment without an adjudication of guilt for a crime was clearly secured and established at the time of the events herein described. *See Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 1923 L.Ed.2d 416 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 395, n.10., (1989).

211.     Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames had a duty to refrain from violating Tedder's constitutional rights.

212.     Any reasonable corrections officer would have been aware that the conduct of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, as described herein, would violate Tedder's constitutional rights.

213.     The force that Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames use was excessive and unnecessary under the totality of the circumstances.

214.     The excessive force used by Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames was not justified or privileged under clearly established law.

215.     No legitimate pretrial detention objective was accomplished by the degree of such force utilized by Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames.

216.     The jailers' acts of placing Tedder face down while restrained placing pressure on her back and head, and failing to relent despite Tedder's obvious medical distress was an objectively unreasonable, unnecessary, and excessive use of force that constituted punishment and was not rationally related to a legitimate nonpunitive governmental purpose or was excessive in relation to such purpose.

217.     Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames' use of force was objectively unreasonable, as well as intentional, willful, wanton, and in gross and reckless

and negligent disregard of Tedder's rights under the Fourteenth Amendment of the United States Constitution.

218.    The use of force by Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames posed a substantial risk of causing death or serious bodily harm that was known to Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames at the time and did in fact cause great bodily harm, mental and emotional injury, and dignitary injury.

219.    Tedder was aware that she was dying and needed the officers to get their weight off of her upper body and ribcage. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames' actions were indecent, inhumane, traumatic, and completely unacceptable in a civilized society.

220.    The above-described conduct of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames was a direct and proximate cause of the deprivation of Tedder's clearly established Fourteenth Amendment rights, as well as the resulting injuries and damages described below.

221.    The jailers acted under color of law to deprive Tedder of her right to be free of excessive force that amounts to punishment under the Fourteenth and Eighth Amendments.

222.    As a direct and proximate result of the acts of the jailers described in this Complaint, Tedder suffered severe mental and physical pain and suffering and injury prior to her death.

223.    The jailers are jointly and severally liable for the excessive force use on Tedder because they acted jointly and in conspiracy with one another to affect the harms which constituted excessive force.

224.    Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames under color of law, unjustifiably used excessive force and thus violated Tedder's constitutional rights and are therefore, "liable...in an action at law, suit in equity, or other proper proceeding for redress..." as per 42 U.S.C. § 1983.

## COUNT V: NEGLIGENCE

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

225. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames had a duty to act reasonably when detaining pre-trial detainees, in an effort to prevent harm to Tedder and others.

226. On November 7, 2019, Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames acted unreasonably and negligently when they exerted unreasonable force on Tedder.

227. As a result of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames' choices and actions on November 7, 2019, Tedder suffered physical and mental injuries and damages.

228. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were acting within the scope of their employment at all relevant times, such that Defendant County is liable for the damages caused to Tedder under the Oklahoma Governmental Tort Claims Act.

229. In the alternative, Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were acting outside the scope of their employment at all relevant times, such that Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames are personally liable for the damages caused to Tedder.

230. The injuries and damages sustained by Tedder, more particularly described below, were produced in a natural and continuous sequence from and as a foreseeable result of the Defendants' violation of the above-described independent duties of ordinary care for the safety of the Tedder.

### CLAIM VI: DELIBERATELY INDIFFERENT POLICIES, PRACTICES AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983

231. Plaintiffs incorporate all previous allegations and statements as if fully restated herein.

232. The above-described conduct reflects an established policy, practice, custom, or decision, officially adopted or informally accepted, ratified, or condoned by

Defendant County, Walton, and/or Guess, and their officials and employees, that consists of detaining individuals suffering a severe mental health crisis without proper training and supervision as to how to interact with those citizens and avoid unnecessary and unreasonable force.

233. During all times relevant hereto, there were no policies, procedures or guidelines, or wholly inadequate policies, procedures and guidelines, in place as to the standard of care specific to detainee's/arrestees' physical and mental health. It is common knowledge that mental illness is prevalent in citizens who encounter police officers and jailers and it is vital that police departments and detention facilities have policies in place establishing a constitutionally permissible standard of care for their officers to follow in order to address this crisis.

234. County delegates final authority to establish county policy regarding detainee health and safety to Defendant Walton and/or Defendant Guess.

235. In the alternative, County retains final authority to establish county policy regarding detainee health and safety.

236. It is clearly established law that Defendant County, Walton, and/or Guess must train and supervise Sheriff's deputies and jailers about proper procedure for the use of force on pretrial detainees, including but not limited to, excessive force, to reduce the pervasive and unreasonable risk of grave constitutional injury.

237. Defendant County, Walton, and/or Guess has an affirmative duty to take action to properly train and supervise its employees or agents and prevent their unlawful actions.

238. Defendant County, Walton, and/or Guess, as decisionmaker with final authority to establish municipal policy regarding arrestee's health and safety, deprived Tedder of rights and freedoms secured by the Eighth and Fourteenth Amendments of the U.S. Constitution—specifically freedom from deprivation of medical care constituting cruel and unusual punishment and freedom from excessive force.

239. The policies, practices and customs, promulgated, created, implemented and/or utilized by County, Walton, and/or Guess represent the official policies and/or customs of Defendant County with regards to detainee/arrestee health and safety.

240. Such policies, practices, and/or customs include, but are not limited to:

  a. The failure to promulgate, implement, or enforce adequate policies responsive to the serious medical and mental health needs of arrestees/detainees like Tedder;

  b. Deliberate indifference to Turn Key's negligent, reckless and incompetent medical care;

  c. Inadequate medical triage screening that fails to identify arrestees/detainees with serious medical or mental health needs;

  d. Severe limitation of or failure to utilize off-site medical, mental health, and diagnostic service providers, even in emergent situations;

  e. Untimely medical and mental health examinations and treatment;

  f. Untimely response to emergent medical or mental health crises;

  g. Detention of severely mentally unstable arrestees/detainees without medical attention.

241. Upon information and belief, Defendant County, Walton, and/or Guess has a policy, custom, and procedure of not ensuring that jailers like Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were appropriately and adequately trained under what circumstances and how to properly use force on a pretrial detainee.

242. Upon information and belief, Defendant County, Walton, and/or Guess has a policy, custom, and procedure of not ensuring that jailers like Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were appropriately and adequately trained as to when and under what circumstances to obtain medical care for detainees who Defendants would foreseeably encounter.

243. Upon information and belief, Defendant County, Walton, and/or Guess acting through their subordinate officers, had a persistent, widespread practice of depriving detainees of their constitutional rights, that it was sufficiently common and well established as to constitute municipal policy or custom.

244. Upon information and belief, these customs or policies of unconstitutional conduct, as shown by the acts and omissions of other subordinate officers, permitted or condoned actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of such conduct.

245. Defendant County, Walton, and/or Guess understood that detention officers, such as Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames:

   a.  could and would exceed constitutional limitations on the use of force;

   b.  that the use of force may arise under circumstances that constitute a usual and recurring situation with which officers such as Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames must manage;

   c.  that providing inadequate training or failing to enforce existing policies under such circumstances demonstrates deliberate indifference on the part of the Defendants toward persons with whom Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames would come into contact;

   d.  and that failing to provide such training or to enforce policies and procedures to ensure that Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames n followed such training would be a direct causal link between the constitutional deprivation to which detainees, such as Tedder, would be exposed—in other words, when Defendants placed Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames in positions of authority within their jail, it was obvious that failing to adequately train them or enforce policies and procedures would

equate to deliberate indifference to the rights of pretrial detainees with whom they came into contact.

246. Defendant County, Walton, and/or Guess was or should have been aware that Defendant Turn Key has a pattern and practice of providing constitutionally insufficient medical care, including but not awareness of Turn Key's extensive history of being sued for incompetent medical care prior to this incident:

    a. *Waddell v. Cleveland County*, U.S. District Court for the Western District of Oklahoma, Case No. 5:11-cv -1037 (as ESW Correctional Healthcare) - Lacee Danielle Marez was detained at the Cleveland County Jail in 2009. ESW Correctional Healthcare, now Turn Key Health Clinics, LLC, was the jail medical provider at the time. Marez, then 21, was taken into custody for missing a court appearance and allegedly struck her head on a concrete floor during a struggle with jail staff, causing a traumatic brain injury. Left in a holding cell for three days, Marez went into a coma and also suffered a heart attack, leading her to live in a permanent vegetative state. Marez repeatedly asked for medical treatment over a period of several days. She began vomiting, urinating on herself, and laying lethargic on her cell bed. A critical care physician at Norman Regional Hospital wrote in a report filed with the court that jail medical staff neglected to treat Marez after a head injury. "Lack of medical care during this time indicates either direct disregard

or inadequate recognition of this woman's progressive and ultimately nearly fatal illness," the doctor wrote.

b. *Pruett v. Cleveland County*, U.S. District Court for the Western District of Oklahoma, Case No. 5:12-cv-947 (as ESW Correctional Healthcare) - In 2011, when Turn Key was known as ESW Correctional Healthcare, Curtis Gene Pruett, 36, died in a holding cell in October 2011 after jail staff allegedly ignored his repeated pleas for emergency medical attention. Pruett was booked into the jail after police arrested him on suspicion of public intoxication. Pruett told jail staff that he had high blood pressure and that he was in severe pain, but they ignored his requests. Surveillance video showed Pruett doubled over and clutching his chest at the jail, but an ESW nurse told him he was faking his condition. Pruett died of a heart attack, according to a medical examiner's report.

c. *Autry v. Cleveland County Sheriff's Department*, U.S. District Court for the Western District of Oklahoma, Case No. 15-CV-1167-D, wherein Turn Key was alleged to have been deliberately indifferent by allowing a sinus infection to remain untreated until it caused a brain infection leading to multiple emergency brain surgeries. Ultimately, the plaintiff was alleged to have been in a permanently incapacitated state as a result of his known, yet untreated condition.

d.  *Jordanoff v. Turn Key Health,* et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-15-940-HE, wherein Turn Key was alleged to violate "HIPAA," in which Turn Key employees coerced Jordanoff, a detainee at Cleveland County Jail, into signing a release of "sensitive documents" directly related to Plaintiff's ongoing criminal legal proceedings in which Plaintiff claims he was not in his right mind to consent due to the medications he was under and in which he also expressed his wish for the medical staff to contact his attorney before he signed the release, but was pressured into signing the release instead. Turn Key was also alleged to have neglected Plaintiff's medical needs in which they denied to schedule a psychological appointment with a doctor for Plaintiff for over two months, in order for Plaintiff to regulate his medication.

e.  *Mayfield v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 16-cv-736-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

f.  *Moore v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-115-BRW, wherein Turn Key was alleged to have ignored an inmates' worsening hip pain and disfunction for eleven months, leading to difficulty walking and constant severe pain.

g. *Wedsted v. Lowerily*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-263-BSM, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

h. *Sawyers v. Edwards,* et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-17-52-HE, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of Sawyers, a plaintiff whom had underwent emergency back surgery after an auto accident who had been transported to the Canadian County Detention Center. The Turn Key staff received the medical records including Plaintiff's prescriptions and was also informed of the required two-week follow-up appointment, but failed to correctly administer Plaintiff's medications and failed to take Plaintiff to the required two-week follow-up appointment—which resulted in Plaintiff removing his own original dressing from surgery after five weeks. Plaintiff filed multiple requests for grievances and after two transfers saw his doctor for the follow-up visit eighty-nine days after surgery.

i. *Sam v. Virden,* et al., U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-415-TCK-FHM, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Sam, a detainee at Osage County Jail, who shattered his patella. Turn Key staff only provided ibuprofen and a medical request form to Sam two days later. After being detained at the Osage County Jail, Sam

shattered his patella in a jail cell and then he was placed in isolation in order for the jail staff to "keep an eye on him." Three days later he received an x-ray and received no medical attention for ten days in which then only receives a knee brace. This was proceeded by another sixteen days of no medical attention, which resulted in the transfer of custody and led to an ultimate knee surgery.

j.   *Smith v. Board of County Commissioners of Muskogee County*, U.S. District Court for the Eastern District of Oklahoma, Case no. 17-CV-90-KEW, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Smith, a cancer patient who had prostate cancer that had metastasized to his spine and pelvic bone causing him to undergo intensive and aggressive radiation and other treatments. After being detained at the Muskogee County Jail, Smith developed symptoms such as severe pain in his back and chest, numbness and a frost-bite feeling in his chest that spread down to his feet, ultimately turning into numbness and permanent paralysis. Despite the obvious symptoms of severe medical distress, Turn Key failed and refused to provide adequate medical care or transport Smith to a hospital. Only upon bonding out of the jail did Smith receive adequate treatment; however, his paralysis was permanent.

k.   *Foutch v. Turn Key Health, LLC*, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-431-GKF-mjx, wherein Turn Key

was alleged to have failed and refused to provide access to a physician for Foutch and failed and refused to place him under medical observation despite shortness of breath, difficulty breathing, and coughing up blood. Turn Key was further alleged to have failed to provide Foutch with the prescribed number of breathing treatments from an examining physician, and to have failed to provide any medical care as Foutch's condition obviously worsened over several days until Foutch was found unresponsive in his cell after foaming at the mouth and coughing up blood. Foutch was pronounced dead 2 minutes after arrival at a hospital.

l.  *Sanders v. Creek County Board of County Commissioners,* U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-492-JHP-FHM, wherein Turn Key was alleged to have ignored and failed to provide medical care to decedent Sanders despite noting that she had been suffering from diarrhea and her mental state had been rapidly declining for two to three weeks. Turn Key failed to seek appropriate medical care for Sanders until the 35th day after she entered the Creek County Jail, when they transported her to the hospital fully incapacitated and on the brink of death. At the hospital, Sanders was diagnosed with severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, and other serious conditions. Sanders died the day after arrival at the hospital.

m. *Allen v. Maruf,* et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-00863-SWW-JTR, wherein Turn Key was alleged to have refused to provide Allen, a jail detainee in Pulaski County Regional Detention Center, with medications that he had took since February of 2017 for degenerative bones, knee problems, disc problems, and also to keep the Plaintiff's arms, hands, legs, and feet from going numb that was prescribed by the Plaintiff's Doctor at the VA Hospital. Turn Key also denied the approval of a walking cane to prevent the plaintiff from falling.

n. *Davis v. Canadian County Board of County Commissioners*, U.S. District Court for the Western District of Oklahoma, Case No. 17-CV-807-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the behaviors that clearly and unambiguously showed the inmate was suffering from severe and acute mental and physical distress, including screaming and shouting, seizures and defecating in his cell. On the date of his death, the inmate was allegedly found lying naked on the floor, unresponsive, suffering from observable external injuries and covered in human feces.

o. *Williams v. Cleveland County Board of County Commissioners*, U.S. District Court for the Western District of Oklahoma, Case No. 17-CV-1051-C, wherein the inmate was arrested after being found dancing in the streets and hallucinating. The inmate was then allegedly hooded and

restrained in a chair for an unknown amount of time. The officers allegedly used force on the inmate which caused him to exhibit symptoms of excited delirium. As a result of Turn Key's alleged deliberate indifference to the inmate's serious medical needs, the inmate died of cardiac arrest.

p. *Ellis v. Brown*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-545, wherein Turn Key was alleged to have denied medications for the plaintiff's diagnosed neuropathy, instead only providing medication for heartburn based on the Turn Key nurse's statements that she knew that was all the plaintiff's condition was.

q. *Yancy v. Turn Key Health*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-455, wherein Turn Key was alleged to have denied access to appropriate medical care with existing medical condition involving internal bleeding despite obvious signs of medical need including significant amount of blood in stool causing the plaintiff prolonged pain from his conditions.

r. *Alexander v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-0046-BSM, wherein the inmate was alleged to have been 100% disabled, and suffered sickle cell anemia, asthma, and rheumatoid arthritis, conditions which were alleged to have been disclosed to Turn Key. The inmate was alleged to have been cold, shaking and had been throwing up. Turn Key's nurse

51

was alleged to have disregarded calls for medical help by the inmate and deputies, including denying plaintiff her "asthma pump." On December 14, 2016, allegedly as a result of Turn Key's deliberate indifference to the inmate's medical needs, the inmate began convulsing and having difficulty breathing. The inmate died as a result.

s. *McDonald v. Carpenter*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's anxiety medication needs, leading to elevated anxiety and an attempted suicide.

t. *Royston v. Board of County Commissioners of the County of Bryan*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-265-RAW, wherein Turn Key was alleged to have failed to provide 24-hour access to a physician or midlevel provider for the Bryan County jail, failed to conduct a medical intake screening, failed to provide any care from a mental health provider, physician, midlevel provider, or a registered nurse despite obvious signs of medical distress, and failed to provide medical care after Royston hit her head against a concrete wall and despite obvious signs of injury all over Royston's body. Royston ultimately fell into a coma for several days.

u. *Bowen v. Ring*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein plaintiff alleged he was severely beaten by an officer during his arrest. At the jail, Turn Key was alleged

to have been deliberately indifferent to obvious signs of severe brain injury and to have delayed medical care which was alleged to have resulted in permanent brain damage. Turn Key was alleged to have poorly trained and equipped its LPN to deal with critical, but predictable medical emergencies, commonly encountered in a jail setting.

v. *Thompson v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5092-PKH, wherein Turn Key was alleged to have refused to administer plaintiff's prescription medications and refused to treat plaintiff's broken bones.

w. *Buchanan v. Turn Key Health Clinics, LLC*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-171-RAW, wherein Turn Key was alleged to have failed and refused to provide medical observation, evaluation or access to medical care despite Buchanan's paralysis in his left arm beginning the day after his arrival at the Muskogee County Detention Center. Four days later Buchanan developed paralysis in his right arm. Despite these obvious signs of medical distress, Turn Key did not move him to medical observation, schedule an appointment with a physician, or even check his vitals. Turn Key was alleged to essentially have provided no care to Buchanan even days later when Buchanan suffered paralysis of both legs as well. Turn Key medical staff was alleged to have failed and refuse to provide appropriate and immediate medical assistance when a Turn Key nurse

finally evaluated Buchanan and noted his paralysis. Nine hours after that evaluation, another Turn Key nurse evaluated Buchanan and finally sent him to the hospital where he was diagnosed with quadriplegia and a cervical epidural abscess. Buchanan suffered permanent injury and paralysis as a result of Turn Key's failures.

x.  *Graham v. Garfield County Detention Center*, U.S. District Court for the Western District of Oklahoma, Case No. 18-CV-634-SLP, wherein Turn Key was alleged to have failed to conduct an initial health assessment and the inmate was booked without prescribed medications for heart disease, hypertension, coronary artery disease and depression. As a result, the inmate started experiencing hallucinations and exhibiting delusions. Instead of appropriate medical treatment, the inmate was placed in a restraint chair where he remained until his death two days later.

y.  *Avery v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5075-PKH, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

z.  *Sanders v. Gifford, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-712, wherein Turn Key was alleged to have repeatedly given Sanders another inmate's medication, resulting in seizures, vomiting, and pain to the Plaintiff.

aa. *Nabors v. Humphrey, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-664, wherein Turn Key was alleged to have given inmate wrong amount of seizure medication, resulting in seizures and a busted lip. Inmate was ultimately taken to hospital twice, and had physical therapy prescription for trouble walking. Turn Key was alleged to have only provided a cane with no physical therapy.

bb. *Lee v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication  and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

cc. *Price v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of

the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

dd. *Davis v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-643-JM, wherein Turn Key was alleged to have deliberately disregarded plaintiff's severe medical condition by failing to provide plaintiff with necessary insulin causing a significant drop in plaintiff's blood sugar which caused plaintiff injuries, including a broken ankle which had to be surgically repaired with hardware.

ee. *Thompson v. Board of County Commissioners for Cleveland County*, U.S. District Court for the Western District of Oklahoma, Case No. 5:19-cv-113-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of an inmate who was brought in by police officers, allegedly sweating profusely, unable to speak or walk, with elevated blood pressure and pulse and delusional after overdosing on his prescribed medications and methamphetamine. The inmate died hours later from cardiac arrest.

ff. *Causey v. Pulaski County Medical, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-305, wherein Turn Key was alleged to have denied proper prescribed pain medications to partially paralyzed inmate with multiple injuries and chronic conditions. Turn Key was alleged to have failed to provide corrective

footwear for inmate with injury to left foot, resulting in a fall and his left foot healing improperly.

gg. *Winningham v. Roberts, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-706, wherein Turn Key was alleged to have failed to provide treatment to inmate reporting a separated shoulder joint and/or broken clavicle after falling out of bunk bed.

hh. *Bowlds v. Turn Key Health*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-726-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Bowlds, a pretrial detainee at the Logan County Detention Center, when they refused to allow him access to the dentist—which resulted in acute pain. Bowlds experienced an extreme headache which lasted twenty-four hours due to a chipped tooth which allegedly left an exposed nerve. Turn Key only gave Bowlds the option to complete several treatments of medication prior to even being considered to see a dentist—which can take up to ninety days, unless Bowlds paid for the dentist visit with his own money, which he did not have the means to do. Turn Key was also alleged to have violated the 8th Amendment ban against cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

247. Defendant County, Walton, and/or Guess's decision to contract with Turn Key to provide medical services at the jail was in deliberate disregard of Defendant

County, Walton, and/or Guess's awareness that Turn Key had a pattern and practice of providing constitutionally insufficient medical care that foreseeable put its inmates and pretrial detainees at risk of severe injury or death.

248. The aforementioned policies, practices and/or customs of Defendant County, Walton, and/or Guess permitted or condoned the violation of Tedder's rights, demonstrated deliberate indifference to the constitutional rights of persons within Rogers County and were the cause of the injuries and damages suffered by Tedder.

249. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendants County, Walton, and/or Guess, and thereby the official policies, practices and/or customs of Defendant County, were the direct and proximate cause of Tedder's deprivation of medical care which resulted in her death.

250. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendants County, Walton, and/or Guess, and thereby the official policies, practices and/or customs of Defendant County, were the direct and proximate cause of the use of excessive force on Tedder which resulted in her death.

251. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendants County, Walton, and/or Guess, and thereby the official policies, practices and/or customs of Defendant County, were the direct and proximate cause of Tedder's avoidable and unnecessary physical pain, severe

emotional distress, mental anguish, loss of her life, and all other damages alleged herein.

252. The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendants County, Walton, and/or Guess, and thereby the official policies, practices and/or customs of Defendant County, were the direct and proximate cause of damages suffered by Tedder's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain, and suffering.

253. Defendants County, Walton, and/or Guess also failed to adequately train and/or supervise subordinates, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames in relation to tasks they must perform pursuant to those policies, practices, and/or customs outlined above.

254. As noted previously, Defendant County delegated policy-making authority to Defendant Walton and/or Defendant Guess and therefore the training and supervision policies and/or customs adopted by Defendants Walton and/or Guess are the official municipal policies and/or customs of Defendant County.

255. In the alternative, Defendant County retained policy-making authority and therefore the training and supervision policies and/or customs described herein are the official municipal policies and/or customs of Defendant County.

256. Defendant County, Walton, and/or Guess knew or should have known that Rogers County jailers and jail medical staff, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames

frequently encounter and/or detain individuals experiencing mental health crises requiring emergency medical assistance.

257. Defendants County, Walton, and/or Guess knew or should have known that Rogers County jailers and jail medical staff, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames frequently encounter and/or detain individuals at heightened risk of injury or death.

258. Defendants County, Walton, and/or Guess knew or should have known that jailers and jail medical staff, under their exercise of control, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames require training and supervision in order to adequately identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe mental health crisis.

259. Defendants County, Walton, and/or Guess knew or should have known that their failure to adequately train and/or supervise jailers and jail medical staff under their exercise of control, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames posed a substantial and excessive risk to the health and safety of Tedder and would inevitably result in unconstitutional deprivation of medical care of the type that Tedder suffered.

260. Defendants County, Walton, and/or Guess knew or should have known that their failure to adequately train and/or supervise jailers and jail medical staff under their exercise of control, including Defendants Zandbergen, Ellenburg, Ferguson,

Shields, Foster, Hubbard, Emery, Kennell and Hames posed a substantial and excessive risk to the health and safety of Tedder and would inevitably result in unconstitutional use of excessive force of the type that Tedder suffered.

261. Defendants County, Walton, and/or Guess failed to adequately train and/or supervise jailers and jail medical staff, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames in how to identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe mental health crisis.

262. Defendants County, Walton, and/or Guess's failure to train and/or supervise jailers and jail medical staff, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames exhibited deliberate disregard for the known and obvious excessive risk such policy posed to Tedder's health and safety.

263. Defendants County, Walton, and/or Guess's failure to train and/or supervise jailers and jail medical staff, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames in reckless disregard to inevitable constitutional violations that would likely result constitutes the official policy and/or custom of Defendant County.

264. Defendants County, Walton, and/or Guess's failure to train and/or supervise subordinate jailers and jail medical staff, and thereby the official policies and/or custom of Defendant County, was the direct and proximate cause of the deliberate indifference to Tedder's serious medical needs which contributed to her death.

265. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames received no form of discipline or reprimand from Defendant County, Walton, and/or Guess for their above-described use of force against Tedder.

266. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames received no form of discipline or reprimand from Defendant County, Walton, and/or Guess for their above-described denial of medical care to Tedder.

267. Defendant County, Walton, and/or Guess ratified the conduct of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames in concluding that the conduct was consistent with the policies, procedures, and training of Defendant County, Walton, and/or Guess.

268. Plaintiffs assert the claims stated in this section against Defendant Walton in both his official and individual capacity, to the extent he had final policy-making authority.

269. In the alternative, Plaintiffs assert the claims stated in this section against Defendant Guess in both her official and individual capacity, to the extent she had final policy-making authority.

270. Defendants County, Walton, and/or Guess's failure to train and/or supervise subordinate jailers and jail medical staff, and thereby the official policies and/or custom of Defendant County, was the direct and proximate cause of the excessive force exerted upon Tedder which contributed to her death.

271. Defendants County, Walton, and/or Guess's failure to train and/or supervise subordinate jailers and jail medical staff, and thereby the official policies and/or custom of Defendant County, was the direct and proximate cause of Tedder's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of her life, and all other damages alleged herein.

272. Defendants County, Walton, and/or Guess's failure to train and/or supervise subordinate jailers and jail medical staff, and thereby the official policies and/or custom of Defendant County, was the direct and proximate cause of damages suffered by Tedder's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain and suffering.

## COUNT VII – DELIBERATELY INDIFFERENT POLICIES, PRACTICES AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

273. During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care specific to detainees/arrestees' physical and mental health. It is common knowledge that or mental illness is prevalent in citizens who encounter jail medical personnel and it is vital that jail medical providers have policies in place establishing a constitutionally permissible standard of care for jail medical personnel to follow in order to address this crisis.

274. Defendants County, Walton, and/or Guess delegate final authority to establish municipal policy regarding detainee health and safety to Defendant Turn Key.

63

275. Defendant Turn Key, acting on behalf of Defendants County, Walton, and/or Guess, as decisionmaker with final authority to establish municipal policy regarding arrestee/detainee's health and safety, deprived Tedder of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution—specifically freedom from deprivation of medical care constituting cruel and unusual punishment.

276. The policies, practices and customs, promulgated, created, implemented and/or utilized by Defendant Turn Key represent the official policies and/or customs of Defendants County, Walton, and/or Guess with regards to detainee/arrestee health and safety.

277. Such policies, practices, and/or customs include, but are not limited to:

   a. The failure to promulgate, implement, or enforce adequate policies responsive to the serious medical needs of arrestees/detainees like Tedder;

   b. Inadequate medical triage screening that fails to identify arrestees/detainees with serious medical or mental health needs;

   c. Severe limitation of or failure to utilize off-site medical, mental health, and diagnostic service providers, even in emergent situations;

   d. Untimely medical and mental health examinations and treatment;

   e. Untimely response to emergent medical or mental health crises;

   f. Detention of mentally unstable arrestees/detainees without medical attention.

278.    The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Turn Key, and thereby the official policies, practices and/or customs of Defendants County, Walton, and/or Guess, were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and were the direct and proximate cause of Tedder's deprivation of medical care which contributed to her death.

279.    The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Turn Key, and thereby the official policies, practices and/or customs of Defendants County, Walton, and/or Guess, were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and constitutional violations and were the direct and proximate cause of Tedder's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

280.    The aforementioned policies, practices and/or customs promulgated, created and/or utilized by Defendant Turn Key, and thereby the official policies, practices and/or customs of Defendants County, Walton, and/or Guess were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and constitutional violations and were the direct and proximate cause of damages suffered by Tedder's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain and suffering.

65

281.     Defendant Turn Key also failed to adequately train and/or supervise subordinates, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, in relation to tasks they must perform pursuant to those policies, practices and/or customs outlined above.

282.     As noted previously, Defendants County, Walton, and/or Guess delegated policy-making authority to Defendant Turn Key and therefore the training and supervision policies and/or customs adopted by Defendant Turn Key are the official policies and/or customs of Defendants County, Walton, and/or Guess.

283.     Defendant Turn Key knew or should have known that jailers and medical personnel, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames frequently encounter, arrest, and/or detain individuals experiencing mental health crises requiring emergency medical assistance.

284.     Defendant Turn Key knew or should have known that jailers and medical personnel, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, frequently encounter, arrest, and/or detain individuals at heightened risk of injury or death.

285.     Defendant Turn Key knew or should have known that jailers and medical personnel, under its exercise of control including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, require training and supervision in order to adequately identify, respond to, and

detain individuals exhibiting obvious and apparent symptoms of severe mental health crisis.

286.    Defendant Turn Key knew or should have known that his failure to adequately train and/or supervise jailers and medical personnel under its exercise of control, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, posed a substantial and excessive risk to the health and safety of Tedder and would inevitably result in unconstitutional deprivation of medical care of the type that Tedder suffered.

287.    Defendant Turn Key failed to adequately train and/or supervise jailers and medical personnel, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, in how to identify, respond to, and detain individuals exhibiting obvious and apparent symptoms of severe mental health crisis.

288.    Dr. William Cooper, an official with Turn Key, gave a deposition as the corporate representative for Turn Key in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP, on February 8, 2021, wherein he admitted:

   a. Turn Key does not train its employees/nurses as to the specific policies and procedures of each jail, despite Turn Key's training materials indicating that such training is to be performed;

b.  Turn Key does not review a jail's policies and procedures to ensure their own policies and procedures align with those of the facility;

c.  Turn Key asks each jail to review Turn Key's policies and procedures to ensure they align with the jail's policies and procedures, but does nothing to follow up on that comparison or verify that it was done;

d.  That discrepancies between Turn Key's policies and procedures and a specific jail's policies and procedures could lead to confusion and mistakes;

e.  That these same failures to ensure similarity of jails' and Turn Key's policies and procedures existed as far back as 2018;

f.  That most Turn Key shifts in jails are covered by LPNs and that Turn Key does not train those LPNs to assess a medical condition;

g.  That Turn Key's orientation program is to be approved by each jail's administrator, but Turn Key does not even know if this was done at the Cleveland County Detention Center prior to January 2018;

h.  That Turn Key purportedly trains new hire LPNs on close to 80 categories of training topics in less than one day while on their first day on the job;

i.  That Turn Key does nothing to test or evaluate the nursing skill of new hire nurses prior to orientation;

j. That because LPNs are not trained to assess a medical condition, they may not know that an inmate is suffering a medical condition that should be referred to an RN, nurse practitioner, or physician;

k. That clinical decisions and actions regarding healthcare provided to inmates to meet their serious medical needs are solely the responsibility of LPNs when they are the only medical professional on duty even though Turn Key knows those LPNs are not qualified or trained to assess medical conditions;

l. That conducting a medical intake assessment of an inmate in a public area of the jail with multiple jailers or detention officers present is not a proper setting for an inmate or detainee to be able to communicate medical history and needs;

m. That Turn Key employees should not make assumptions about a detainee because it can interfere with proper medical screening;

n. That Turn Key considers a medical assessment at intake where the LPN on duty does not ask the detainee a single question as sufficient to make medical determinations about that detainee;

o. That on at least one occasion prior to November 7, 2019, Turn Key has failed to notify a jail that its on-site staff were not capable of providing contracted for services such as adequate screening and assessment of detainee's medical conditions on intake;

289.     Defendant Turn Key's failure to train and/or supervise jailers and medical personnel, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, exhibited deliberate disregard for the known and obvious excessive risk such policy and/or practice posed to Tedder's health and safety. The indifference exhibited by Turn Key employees violated 42 U.S.C. § 1983 for which Turn Key is liable under a doctrine of corporate constitutional liability that recognizes the absence of the *Monell* bar and supports § 1983 liability under a respondeat superior theory.

290.     Defendant Turn Key has a widespread and pervasive practice of failing to adequately train and supervise its employees, which has and continues to result in grave physical and constitutional injury to persons detained in jails across the state of Oklahoma and surrounding states where Turn Key does business, including:

   a. *Waddell v. Cleveland County*, U.S. District Court for the Western District of Oklahoma, Case No. 5:11-cv -1037 (as ESW Correctional Healthcare) - Lacee Danielle Marez was detained at the Cleveland County Jail in 2009. ESW Correctional Healthcare, now Turn Key Health Clinics, LLC, was the jail medical provider at the time. Marez, then 21, was taken into custody for missing a court appearance and allegedly struck her head on a concrete floor during a struggle with jail staff, causing a traumatic brain injury. Left in a holding cell for three days, Marez went into a coma and also suffered a heart attack, leading

her to live in a permanent vegetative state. Marez repeatedly asked for medical treatment over a period of several days. She began vomiting, urinating on herself, and laying lethargic on her cell bed. A critical care physician at Norman Regional Hospital wrote in a report filed with the court that jail medical staff neglected to treat Marez after a head injury. "Lack of medical care during this time indicates either direct disregard or inadequate recognition of this woman's progressive and ultimately nearly fatal illness," the doctor wrote.

b.  *Pruett v. Cleveland County*, U.S. District Court for the Western District of Oklahoma, Case No. 5:12-cv-947 (as ESW Correctional Healthcare) - In 2011, when Turn Key was known as ESW Correctional Healthcare, Curtis Gene Pruett, 36, died in a holding cell in October 2011 after jail staff allegedly ignored his repeated pleas for emergency medical attention. Pruett was booked into the jail after police arrested him on suspicion of public intoxication. Pruett told jail staff that he had high blood pressure and that he was in severe pain, but they ignored his requests. Surveillance video showed Pruett doubled over and clutching his chest at the jail, but an ESW nurse told him he was faking his condition. Pruett died of a heart attack, according to a medical examiner's report.

c.  *Autry v. Cleveland County Sheriff's Department*, U.S. District Court for the Western District of Oklahoma, Case No. 15-CV-1167-D, wherein Turn

71

Key was alleged to have been deliberately indifferent by allowing a sinus infection to remain untreated until it caused a brain infection leading to multiple emergency brain surgeries. Ultimately, the plaintiff was alleged to have been in a permanently incapacitated state as a result of his known, yet untreated condition.

d. *Jordanoff v. Turn Key Health,* et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-15-940-HE, wherein Turn Key was alleged to violate "HIPAA," in which Turn Key employees coerced Jordanoff, a detainee at Cleveland County Jail, into signing a release of "sensitive documents" directly related to Plaintiff's ongoing criminal legal proceedings in which Plaintiff claims he was not in his right mind to consent due to the medications he was under and in which he also expressed his wish for the medical staff to contact his attorney before he signed the release, but was pressured into signing the release instead. Turn Key was also alleged to have neglected Plaintiff's medical needs in which they denied to schedule a psychological appointment with a doctor for Plaintiff for over two months, in order for Plaintiff to regulate his medication.

e. *Mayfield v. Briann,* U.S. District Court for the Eastern District of Arkansas, Case No. 16-cv-736-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

f. *Moore v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-115-BRW, wherein Turn Key was alleged to have ignored an inmates' worsening hip pain and disfunction for eleven months, leading to difficulty walking and constant severe pain.

g. *Wedsted v. Lowerily*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-263-BSM, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

h. *Sawyers v. Edwards,* et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-17-52-HE, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of Sawyers, a plaintiff whom had underwent emergency back surgery after an auto accident who had been transported to the Canadian County Detention Center. The Turn Key staff received the medical records including Plaintiff's prescriptions and was also informed of the required two-week follow-up appointment, but failed to correctly administer Plaintiff's medications and failed to take Plaintiff to the required two-week follow-up appointment—which resulted in Plaintiff removing his own original dressing from surgery after five weeks. Plaintiff filed multiple requests for grievances and after two transfers saw his doctor for the follow-up visit eighty-nine days after surgery.

i. *Sam v. Virden,* et al., U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-415-TCK-FHM, wherein Turn Key was

alleged to have been deliberately indifferent to the medical needs of Sam, a detainee at Osage County Jail, who shattered his patella. Turn Key staff only provided ibuprofen and a medical request form to Sam two days later. After being detained at the Osage County Jail, Sam shattered his patella in a jail cell and then he was placed in isolation in order for the jail staff to "keep an eye on him." Three days later he received an x-ray and received no medical attention for ten days in which then only receives a knee brace. This was proceeded by another sixteen days of no medical attention, which resulted in the transfer of custody and led to an ultimate knee surgery.

j. *Smith v. Board of County Commissioners of Muskogee County*, U.S. District Court for the Eastern District of Oklahoma, Case no. 17-CV-90-KEW, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Smith, a cancer patient who had prostate cancer that had metastasized to his spine and pelvic bone causing him to undergo intensive and aggressive radiation and other treatments. After being detained at the Muskogee County Jail, Smith developed symptoms such as severe pain in his back and chest, numbness and a frost-bite feeling in his chest that spread down to his feet, ultimately turning into numbness and permanent paralysis. Despite the obvious symptoms of severe medical distress, Turn Key failed and refused to provide adequate medical care or transport Smith

to a hospital. Only upon bonding out of the jail did Smith receive adequate treatment; however, his paralysis was permanent.

k. *Foutch v. Turn Key Health, LLC*, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-431-GKF-mjx, wherein Turn Key was alleged to have failed and refused to provide access to a physician for Foutch and failed and refused to place him under medical observation despite shortness of breath, difficulty breathing, and coughing up blood. Turn Key was further alleged to have failed to provide Foutch with the prescribed number of breathing treatments from an examining physician, and to have failed to provide any medical care as Foutch's condition obviously worsened over several days until Foutch was found unresponsive in his cell after foaming at the mouth and coughing up blood. Foutch was pronounced dead 2 minutes after arrival at a hospital.

l. *Sanders v. Creek County Board of County Commissioners*, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-492-JHP-FHM, wherein Turn Key was alleged to have ignored and failed to provide medical care to decedent Sanders despite noting that she had been suffering from diarrhea and her mental state had been rapidly declining for two to three weeks. Turn Key failed to seek appropriate medical care for Sanders until the 35th day after she entered the Creek County Jail, when they transported her to the hospital fully

incapacitated and on the brink of death. At the hospital, Sanders was diagnosed with severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, and other serious conditions. Sanders died the day after arrival at the hospital.

m. *Allen v. Maruf,* et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-00863-SWW-JTR, wherein Turn Key was alleged to have refused to provide Allen, a jail detainee in Pulaski County Regional Detention Center, with medications that he had took since February of 2017 for degenerative bones, knee problems, disc problems, and also to keep the Plaintiff's arms, hands, legs, and feet from going numb that was prescribed by the Plaintiff's Doctor at the VA Hospital. Turn Key also denied the approval of a walking cane to prevent the plaintiff from falling.

n. *Davis v. Canadian County Board of County Commissioners,* U.S. District Court for the Western District of Oklahoma, Case No. 17-CV-807-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the behaviors that clearly and unambiguously showed the inmate was suffering from severe and acute mental and physical distress, including screaming and shouting, seizures and defecating in his cell. On the date of his death, the inmate was allegedly found lying naked on the floor, unresponsive, suffering from observable external injuries and covered in human feces.

o. *Williams v. Cleveland County Board of County Commissioners*, U.S. District Court for the Western District of Oklahoma, Case No. 17-CV-1051-C, wherein the inmate was arrested after being found dancing in the streets and hallucinating. The inmate was then allegedly hooded and restrained in a chair for an unknown amount of time. The officers allegedly used force on the inmate which caused him to exhibit symptoms of excited delirium. As a result of Turn Key's alleged deliberate indifference to the inmate's serious medical needs, the inmate died of cardiac arrest.

p. *Ellis v. Brown*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-545, wherein Turn Key was alleged to have denied medications for the plaintiff's diagnosed neuropathy, instead only providing medication for heartburn based on the Turn Key nurse's statements that she knew that was all the plaintiff's condition was.

q. *Yancy v. Turn Key Health*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-455, wherein Turn Key was alleged to have denied access to appropriate medical care with existing medical condition involving internal bleeding despite obvious signs of medical need including significant amount of blood in stool causing the plaintiff prolonged pain from his conditions.

r. *Alexander v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-0046-BSM, wherein the

inmate was alleged to have been 100% disabled, and suffered sickle cell anemia, asthma, and rheumatoid arthritis, conditions which were alleged to have been disclosed to Turn Key. The inmate was alleged to have been cold, shaking and had been throwing up. Turn Key's nurse was alleged to have disregarded calls for medical help by the inmate and deputies, including denying plaintiff her "asthma pump." On December 14, 2016, allegedly as a result of Turn Key's deliberate indifference to the inmate's medical needs, the inmate began convulsing and having difficulty breathing. The inmate died as a result.

s.  *McDonald v. Carpenter*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's anxiety medication needs, leading to elevated anxiety and an attempted suicide.

t.  *Royston v. Board of County Commissioners of the County of Bryan*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-265-RAW, wherein Turn Key was alleged to have failed to provide 24-hour access to a physician or midlevel provider for the Bryan County jail, failed to conduct a medical intake screening, failed to provide any care from a mental health provider, physician, midlevel provider, or a registered nurse despite obvious signs of medical distress, and failed to provide medical care after Royston hit her head against a concrete wall and despite obvious

signs of injury all over Royston's body. Royston ultimately fell into a coma for several days.

u.  *Bowen v. Ring*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein plaintiff alleged he was severely beaten by an officer during his arrest. At the jail, Turn Key was alleged to have been deliberately indifferent to obvious signs of severe brain injury and to have delayed medical care which was alleged to have resulted in permanent brain damage. Turn Key was alleged to have poorly trained and equipped its LPN to deal with critical, but predictable medical emergencies, commonly encountered in a jail setting.

v.  *Thompson v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5092-PKH, wherein Turn Key was alleged to have refused to administer plaintiff's prescription medications and refused to treat plaintiff's broken bones.

w.  *Buchanan v. Turn Key Health Clinics, LLC*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-171-RAW, wherein Turn Key was alleged to have failed and refused to provide medical observation, evaluation or access to medical care despite Buchanan's paralysis in his left arm beginning the day after his arrival at the Muskogee County Detention Center. Four days later Buchanan developed paralysis in his right arm. Despite these obvious signs of medical distress, Turn Key did not move him to medical observation,

schedule an appointment with a physician, or even check his vitals. Turn Key was alleged to essentially have provided no care to Buchanan even days later when Buchanan suffered paralysis of both legs as well. Turn Key medical staff was alleged to have failed and refuse to provide appropriate and immediate medical assistance when a Turn Key nurse finally evaluated Buchanan and noted his paralysis. Nine hours after that evaluation, another Turn Key nurse evaluated Buchanan and finally sent him to the hospital where he was diagnosed with quadriplegia and a cervical epidural abscess. Buchanan suffered permanent injury and paralysis as a result of Turn Key's failures.

x. *Graham v. Garfield County Detention Center*, U.S. District Court for the Western District of Oklahoma, Case No. 18-CV-634-SLP, wherein Turn Key was alleged to have failed to conduct an initial health assessment and the inmate was booked without prescribed medications for heart disease, hypertension, coronary artery disease and depression. As a result, the inmate started experiencing hallucinations and exhibiting delusions. Instead of appropriate medical treatment, the inmate was placed in a restraint chair where he remained until his death two days later.

y. *Avery v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5075-PKH, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

z. *Sanders v. Gifford, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-712, wherein Turn Key was alleged to have repeatedly given Sanders another inmate's medication, resulting in seizures, vomiting, and pain to the Plaintiff.

aa. *Nabors v. Humphrey, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-664, wherein Turn Key was alleged to have given inmate wrong amount of seizure medication, resulting in seizures and a busted lip. Inmate was ultimately taken to hospital twice, and had physical therapy prescription for trouble walking. Turn Key was alleged to have only provided a cane with no physical therapy.

bb. *Lee v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication  and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

cc. *Price v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by

failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

dd. *Davis v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-643-JM, wherein Turn Key was alleged to have deliberately disregarded plaintiff's severe medical condition by failing to provide plaintiff with necessary insulin causing a significant drop in plaintiff's blood sugar which caused plaintiff injuries, including a broken ankle which had to be surgically repaired with hardware.

ee. *Thompson v. Board of County Commissioners for Cleveland County*, U.S. District Court for the Western District of Oklahoma, Case No. 5:19-cv-113-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of an inmate who was brought in by police officers, allegedly sweating profusely, unable to speak or walk, with elevated blood pressure and pulse and delusional after overdosing on his prescribed medications and methamphetamine. The inmate died hours later from cardiac arrest.

ff. *Causey v. Pulaski County Medical, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-305, wherein Turn Key was alleged to have denied proper prescribed pain medications to partially paralyzed inmate with multiple injuries and chronic conditions. Turn Key was alleged to have failed to provide corrective footwear for inmate with injury to left foot, resulting in a fall and his left foot healing improperly.

gg. *Winningham v. Roberts, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-706, wherein Turn Key was alleged to have failed to provide treatment to inmate reporting a separated shoulder joint and/or broken clavicle after falling out of bunk bed.

hh. *Bowlds v. Turn Key Health*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-726-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Bowlds, a pretrial detainee at the Logan County Detention Center, when they refused to allow him access to the dentist—which resulted in acute pain. Bowlds experienced an extreme headache which lasted twenty-four hours due to a chipped tooth which allegedly left an exposed nerve. Turn Key only gave Bowlds the option to complete several treatments of medication prior to even being considered to see a dentist—which can take up to ninety days, unless Bowlds paid for the dentist visit with his

own money, which he did not have the means to do. Turn Key was also alleged to have violated the 8th Amendment ban against cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

ii. *Jones v. Boyd*, U.S. District Court for the Eastern District of Arkansas, Case No. 20-cv-265-DPM, wherein Turn Key was alleged to have failed to conduct an appropriate medical assessment and screening and deliberately disregarded plaintiff's broken arm.

jj. *Martinez v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 20-cv-1148-BSM, wherein Turn Key was alleged to have failed to conduct an appropriate medical assessment and screening and deliberately disregarded plaintiff's broken collarbone – an injury plaintiff alleges occurred as a result of excessive force by officers – leading to an unnecessary delay in obtaining surgical treatment and causing past, present and future pain and suffering.

kk. *Livingston v. Does*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:20-cv-736, wherein Turn Key was alleged to have failed to provide treatment to open wounds from a human bite and disregarded obvious infection for three days. The plaintiff ultimately had to have 4 surgeries and lost the use of his left hand.

ll. *Guffey v. Pulaski County Jail, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 3:20-cv-178, wherein Turn Key was alleged to have failed to provide access to medical care for inmate with

a stent in his urinary tract and 7 diagnosed kidney stones. Inmate was denied access to scheduled doctor's appointment and denied access to medical care for stent and stones for at least 14 months despite blood in the plaintiff's urine and signs of infection.

mm.     *Floyd v. Turn Key Health Care Provider, et al.*, U.S. District Court for the Western District of Oklahoma, Case No. CIV-20-842-HE, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Floyd, a pretrial detainee at Logan County Detention Center, when they refused to allow him access to the dentist—which resulted in acute pain in his jaw and teeth. Turn Key only gave Floyd the option to complete several treatments of medication prior to even being considered to see a dentist—which can take up to ninety days. Turn Key was also alleged to have violated the 8th Amendment ban against cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

nn. *Stewart v. Turn Key Health*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-20-957-D, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Stewart, a pretrial detainee at Logan County Detention Center, when they refused to allow him access to the dentist—which resulted in acute pain. Turn Key only gave Stewart the option to complete several treatments of medication prior to even being considered to see a

dentist—which can take up to ninety days, unless Stewart paid for the dentist visit with his own money, which he did not have the means to do. Turn Key was also alleged to have violated the 8th Amendment ban against cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

oo. *Kirk v. Stephens County OK*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-21-0004-J, wherein Turn Key was alleged to have removed Kirk's, a pretrial detainee at Stephens County, medical prescription without a physical exam and a review of Kirk's medical records.

pp. *Hall v. Turn Key Health Clinics, LLC*, U.S. District Court for the Eastern District of Arkansas, Case No. 21-cv-112-BSM, wherein plaintiff was a paraplegic and Turn Key was alleged to have disregarded numerous medical needs which led to severe skin deterioration and bed sores. Turn Key was also alleged to have done an insufficient initial medical screening and assessment and to have refused to administer necessary medications.

qq. *Connolly v. Turn Key Health*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-21-0026-SLP, wherein Turn Key was alleged to have committed malpractice by Connolly, a pretrial detainee at Stephens County Jail, when they failed to properly examine, diagnose, and treat his chronic bilateral ear ailment, in which Plaintiff

doctor visits were over video and the doctor relied on the nurse to inspect his ear. Connolly submitted eight sick-call slips for pain, fluid, and swelling and was prescribed the same ineffective treatment each time because the Turn Key Doctor never evaluated him in-person and his grievance to the nurse was never responded to.

rr. *Nunley v. McKinney*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-21-0287-J, wherein Turn Key was alleged to have been deliberately indifferent to Nunley, a handicap pretrial detainee with Dystonia at Stephens County Jail, in which they have failed to provide any special care for Nunley's disability where he is bedridden and experiences muscle spasms, seizures, constant cramps, constant pain, loss of balance resulting in falls—which lead to sprains, bruises, scratches and bumps. Other detainees have to bring him his food tray and submit sick calls for him because he is unable to move.

291.    Defendant Turn Key's failure to train and/or supervise jailers and medical personnel, including Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames, in reckless and conscious disregard to inevitable constitutional violations that would likely result constitutes the official policy and/or custom of Defendants County, Walton, and/or Guess.

292.    The deliberate disregard set forth above was directly caused by practices enacted and enforced by Turn Key, who developed them to maximize profits

under a capitated contract to provide medical care at the Amos G. Ward Detention Center. Upon information and belief, Turn Key knew from prior incidents that its practices caused constitutional violations, and that future constitutional violations were a highly predictable or plainly obvious consequence of enforcing them. With indifference to the consequences, Turn Key continued to enforce these practices, or took no reasonable steps to prevent them. These practices are the direct and proximate cause of the injuries and damages suffered by Tedder for which Turn Key is liable under 42 U.S.C. § 1983.

293.    Defendant Turn Key's failure to train and/or supervise subordinate jailers and medical personnel, and thereby the official policies and/or custom of Defendants County, Walton, and/or Guess, was the direct and proximate cause of Tedder's deprivation of medical care which resulted in his death.

294.    Defendant Turn Key's failure to train and/or supervise subordinate jailers and medical personnel, and thereby the official policies and/or custom of Defendants County, Walton, and/or Guess, was the direct and proximate cause of Tedder's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

295.    Defendant Turn Key's failure to train and/or supervise subordinate jailers and medical personnel, and thereby the official policies and/or custom of Defendants County, Walton, and/or Guess, was the direct and proximate cause

of damages suffered by Tedder's heirs, including, but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain and suffering.

296.     Furthermore, Defendant County, Walton, and/or Guess' decision to employ Defendant Turn Key as the medical provider in its jail despite widespread evidence of Turn Key's deliberate indifference to the medical needs of detainees around Oklahoma exhibits deliberate indifference to the medical needs of detainees in the Amos G. Ward Detention Center, including Tedder.

## COUNT VIII: FAILURE TO INTERVENE TO PREVENT USE OF EXCESSIVE FORCE IN VIOLATION OF 42 U.S.C. § 1983

297. Plaintiffs incorporate all previous allegations and statements as if fully restated herein.

298. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames were present at the scene of and/or personally involved in the use of excessive force on Tedder.

299. Based on their presence at the scene and their proximity to the officers using excessive force on Tedder, Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and/or Hames observed or had reason to know that excessive force would be or was being used by other jailers and had a reasonable opportunity and the means to intervene to prevent or stop the excessive use of force against Tedder.

300. There was sufficient time during the restraint for Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and/or Hames separately to stop the other jailers from the continued use of excessive force yet

each failed to take any action to stop the excessive force and actively participated in the excessive force.

301. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and/or Hames did not believe the use of force was necessary at the time of the use of such force.

302. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames had an affirmative duty to prevent another law enforcement officer's use of excessive force. *Mick v. Brewer*, 76 F.3d 1127 (1996); *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008); *Jones v. Norton*, 809 F.3d 564 (10th Cir. 2015).

303. Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames negligently, recklessly, deliberately and/or unlawfully failed to take any reasonable steps to prevent or stop the use of excessive force on Tedder.

304. The above-described failure of Defendants Zandbergen, Ellenburg, Ferguson, Shields, Foster, Hubbard, Emery, Kennell and Hames was a direct and proximate cause of the deprivation of Tedder's clearly established Fourteenth Amendment rights, as well as the resulting injuries and damages described below.

305. The actions and omissions of the jailers and jail medical staff complained of herein, were unlawful, conscience shocking, and unconstitutional; such acts were performed maliciously, recklessly, sadistically, retaliatorily, intentionally,

90

willfully, wantonly and in such a manner as to entitle the Plaintiffs to punitive damages.

## CAUSATION OF PLAINTIFFS' INJURIES AND DAMAGES

306. Plaintiffs incorporate all previous allegations and statements as if fully restated herein.

307. The injuries and damages sustained by Lorri Tedder, and her heirs, were produced in a natural and continuous sequence from defendants' violation of one or more of the above describe independent constitutional and/or state law duties.

308. The injuries and damages sustained by Lorri Tedder, and her heirs, were a probable consequence from Defendants' violation of one or more of the above-described independent duties.

309. Defendants should have foreseen and anticipated that a violation of one or more of the above-described independent duties would constitute an appreciable risk to harm of others, including Lorri Tedder and her heirs.

310. If Defendants had not violated one or more of the above-described independent duties, then Lorri Tedder's death and damages, and the damages of her heirs, would not have occurred.

## COMPENSATORY DAMAGES SUSTAINED BY PLAINTIFFS

311. Plaintiffs incorporate all previous allegations and statements as if fully restated herein.

312. The injuries and damages sustained by Lorri Tedder as a result of the Defendants' violations include but are not limited to the following:

a. Lorri Tedder's physical pain and suffering;

b. Lorri Tedder's mental pain and suffering;

c. Lorri Tedder's age;

d. Lorri Tedder's physical condition immediately before and after the incident;

e. The nature and extent of Lorri Tedder's injuries;

f. Loss of earnings; and,

g. The reasonable expenses of the necessary medical care.

313. The Plaintiffs' injuries and damages include all wrongful death damages pursuant to 12 O.S. § 1053, including but not limited to: (1) medical and burial expenses, (2) loss of consortium and grief, (3) mental pain and anguish of the decedent, (4) conscious pain and suffering of the decedent, and (5) grief and loss of companionship to children and parents of the decedent.

314. Plaintiffs seek all damages available under federal and state law for the claims alleged herein.

## AMOUNT OF DAMAGES

315. The Plaintiffs' injuries and damages are in excess of the amount required for diversity jurisdiction under 28 U.S.C. § 1332 (currently $75,000.00), plus attorney fees, interest, costs and all such other and further relief for which should be awarded as judgment against Defendants in an amount to fully and fairly compensate Plaintiffs for each and every element of damages that has been suffered.

## PUNITIVE DAMAGES

316. Plaintiffs incorporate all previous allegations and statements as if fully restated herein.

317. Plaintiffs are entitled to punitive damages on claims brought against individual Defendants pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts, and omissions alleged herein constitute reckless or callous indifference to Lorri Tedder's federally protected rights.

318. Plaintiffs are entitled to punitive damages on claims brought against individual Defendants on state law claims where said individual Defendants were acting outside the scope of their employment, as Defendants' conduct, acts, and omissions alleged herein constitute reckless or callous indifference to Lorri Tedder's protected rights.

319. Plaintiffs are entitled to punitive damages on all other claims pursuant to 12 O.S. § 1053.

## DEMAND FOR JURY TRIAL

320. Plaintiffs demand a jury trial for all issues of fact presented by this action.

## RESERVATION OF ADDITIONAL CLAIMS

321. Plaintiffs reserve the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

WHEREFORE, Plaintiffs pray for judgement against Defendants in a sum excess of the amount required for diversity jurisdiction under 28 U.S.C. § 1332 (currently

$75,000.00) plus interests, costs, and all such other relief as to which Plaintiffs may be entitled.

Respectfully Submitted,

Laird Hammons Laird, PLLC

Chris Hammons, OBA #20283
Jason M. Hicks, OBA #22176
Jonathan Ortwein, OBA #32092
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone: 405.703.4567
Facsimile: 405.703.4067
E-mail:     chris@lhllaw.com
            jason@lhllaw.com
            jonathan@lhllaw.com
*Attorneys for Plaintiffs*