```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3
     ASHLEY MYERS, Individually and )
 4   as Co-Personal Representative  )
     of the Estate of Lorri Gayle   )
 5   Tedder; and COURTNEY VAUGHN,   )
     Individually and as Co-Personal)
 6   Representative of the Estate   )
     of Lorri Gayle Tedder,         )
 7                                  )
                  Plaintiffs,       )
 8                                  )Case No.
     vs.                            )4:2022cv00119-JDR-JFJ
 9                                  )
     BOARD OF COUNTY COMMISSIONERS  )
10   OF ROGERS COUNTY, et al.,      )
                                    )
11                Defendants.       )

12                    CERTIFIED COPY

13                     *   *   *   *

14            VIDEOCONFERENCE DEPOSITION

15           OF BROOKS MYRICK WALSH, M.D.

16         TAKEN ON BEHALF OF THE DEFENDANTS

17   TURN KEY HEALTH CLINICS, LLC AND KYLEE FOSTER

18                  ON MARCH 26, 2024

19   WITH THE WITNESS LOCATED IN NEW HAVEN, CONNECTICUT

20         COMMENCING AT 9:01 A.M. CENTRAL TIME

21                     *   *   *   *

22                  INSTASCRIPT, L.L.C.
                125 PARK AVENUE, SUITE LL
23           OKLAHOMA CITY, OKLAHOMA   73102
                     405.605.6880
24              schedule@instascript.net

25   REPORTED BY:  THERESA L. McDANIEL, C.S.R.
```

EXHIBIT 1

```
 1    A    I can assure you, I am not going to use the
 2  phrase "deliberate indifference".
 3    Q    That's what I was curious about.  Thank you,
 4  Doctor.
 5         However, it's my understanding you do intend
 6  on offering some standard of care opinions.  So with
 7  that in mind, how would you define the standard of
 8  care?
 9    A    In this case, where a member of the nursing
10  profession or the highest -- someone who is CPR
11  trained, trained as a medical care technician,
12  trained as a nurse, sees someone who does not appear
13  to be breathing or moving, they should assess their
14  breathing and their pulse and immediately start
15  interventions if they don't find compelling evidence
16  that these are present.
17    Q    Let's go about it this way.  I -- Doctor,
18  the way I interpreted that answer was that that's
19  your opinion with regard to the standard of care
20  here, fair?
21    A    Yeah.
22    Q    Okay.
23    A    Yeah, well -- yeah.
24    Q    Right.  So bigger picture, if someone were
25  to ask you, "Hey, Doc, I'm looking into getting
```

1   believed was unsafe, right?
2       A    I would never ask -- if a nurse said they
3   felt unsafe approaching a patient, I would not ask
4   that they continue with that approach.
5       Q    In a correctional setting, Doctor, would you
6   agree with me that if a nurse gets involved in a use
7   of force before the scene is safe and secure, that
8   could make things worse for everyone involved?
9       A    That seems too broad.  I don't -- I mean,
10  yes, it could or it could not, depending --
11      Q    Okay.
12      A    -- on the -- you know.
13      Q    Okay.  So, Doctor, we'll -- we'll go about
14  it this way.  You know, again, I'm a -- I'm a simple
15  guy.  I like to have things kind of outlined.
16           So if we were going to say Opinion No. 1
17  that Dr. Walsh is intending on offering at the time
18  of trial, how would you articulate Opinion No. 1?
19      A    Ms. Tedder died after not receiving
20  appropriate medical care following the use-of-force
21  incident, which was fully observed by Ms. Foster.
22      Q    Okay.  So it's your opinion that Ms. Tedder
23  did not receive appropriate medical care at the
24  Rogers County Jail.  And as a result, that's what
25  caused her death; is that what you're saying?

```
 1     A    Yes.
 2     Q    Okay, okay.  So the next question that I
 3   would say is let's talk about what you believe was
 4   inappropriate care.
 5          You have kind of outlined it as maybe
 6   factors that support this judgment.  I -- I don't
 7   know the best way to go about this, Doctor.  I want
 8   to be as aware of your time and as effective with my
 9   time to kind of figure out what it is that you base
10   that opinion on.
11          So, first off -- I just don't know any
12   better way to do this.  According to your opinion, at
13   what point was the scene safe and secure enough that
14   Nurse Foster should have done an evaluation, an
15   assessment, a screening of Ms. Tedder?
16     A    I haven't talked about scene safety since I
17   was a paramedic, but I think there is lots of ways to
18   judge the safety of a scene and lots of ways to do an
19   assessment from different distances.
20          I think Nurse Foster was able to evaluate
21   the patient from a safe distance, observe breathing,
22   respiratory distress, absence of respiration, all
23   from a distance that would not involve a risk of
24   being kicked or hit.
25          I think a lot of the time during which she
```

```
 1   first opinion, if I had to sum it up, is Ms. Foster
 2   died because of -- Ms. Tedder died because of prone
 3   restraint, and I was describing that in case there
 4   was any question, you know, whether it was illegal
 5   drugs or her heart having some preexisting condition.
 6           I believe it's more likely than not that she
 7   died because of prone restraint.  I -- I -- I just
 8   wanted to establish that.
 9      Q    Thank you.
10      A    My second opinion is that despite that cause
11   of death, there was a -- to a reasonable degree of
12   medical certainty, Ms. Tedder could have recovered
13   from her cardiac arrest if Ms. Foster had responded
14   appropriately and quickly.
15      Q    Okay.  We will go through those in great
16   detail and I appreciate it.  Like I said, I'm a
17   simple guy.  I like to have it broken down like that.
18           So, again, with regard to Opinion No. 1,
19   that Ms. Tedder's death, more likely than not, was
20   caused as a result of the prone restraint, just so
21   I'm crystal clear, you don't intend on offering
22   opinions at the time of trial that Nurse Foster
23   should have directed or somehow told the jailers
24   about what type of restraint to use or not use with
25   regard to Ms. Tedder?
```

```
 1   he felt a pulse, true?
 2        A    He --
 3             MR. HAMMONS:  I think it's right here.
 4             THE WITNESS:  I -- I believe you said do I
 5   think that he believed he found a pulse?  Yes.
 6        Q    (By Mr. Winter)  Yes, and that's what the
 7   testimony -- his sworn testimony was that he did, in
 8   fact, find a pulse, fair?
 9        A    That's what he's saying, yes.
10        Q    And --
11        A    I agree with that, clearly.
12        Q    Perfect.  And to put a finer point on that,
13   you disagree with him, based on your review of the
14   video, because you think his positioning on
15   Ms. Foster's [sic] neck, when he was attempting to
16   get the pulse, was incorrect?
17        A    Yes.
18        Q    Okay.
19        A    It's difficult to get the correct position,
20   especially when someone is facedown, and especially
21   when there is perhaps some excess neck tissue.
22        Q    Was it reasonable for Nurse Foster to have
23   taken some comfort in the fact that at that minute,
24   at that moment in time, she is being informed by the
25   jailer that, "Hey, we have got a pulse," so the
```

```
 1    patient is breathing?
 2              Regardless of whether or not -- I know you
 3    believe it wasn't correct.  Was it reasonable for
 4    Nurse Foster to be -- to have been comforted by that
 5    fact?
 6              MR. HAMMONS:  Object to the form.
 7              THE WITNESS:  I -- I -- I don't think so.
 8    At the time, I -- I don't know if anybody at the time
 9    said that they found a pulse.
10              I -- I think Zandbergen was going through
11    the motions of looking for a pulse, but then he --
12    that person said, "Yeah, she's breathing," as I wrote
13    down in my report.
14              So I -- I don't think that should
15    necessarily give -- should have given Ms. Foster
16    confidence that that DO looked for a pulse and said,
17    "Yeah, she's breathing."
18              And I think she should also know she was the
19    one who is CPR certified, that he was looking in the
20    wrong spot for a pulse, so I don't think there should
21    have been much comfort for Ms. Foster at that point.
22       Q      (By Mr. Winter)  You believe it was
23    unreasonable for her to have been comforted by the
24    fact that someone, who is immediately next to
25    Ms. Tedder, stated out loud Ms. Tedder is breathing?
```

1    A    You know, it goes back to -- let me back it
2    up.  These -- these situations, someone's life is too
3    important to risk on one isolated finding.  Their
4    life or limb, we can't risk it based on one isolated
5    finding.
6         One person says they find a pulse.  Even if
7    he had said, "I found a pulse," which I don't think
8    he did.  We can go over the transcript from --
9    from -- from the thing.
10        The totality of the picture, she wasn't
11   moving.  She wasn't making any respiratory effort.
12   In that circumstance, where they have already
13   discussed, they have had concerns about whether or
14   not she is breathing, they have voiced these
15   concerns, that DO, Zandbergen, I guess, he had enough
16   concern about her condition to go ahead and check the
17   pulse.
18        If you have enough concern that you're going
19   and checking the pulse, it almost doesn't matter what
20   the result is because there is so many other factors,
21   the whole picture, the totality, pushing you to
22   better evaluate.
23        I'll give you an example.  I had a young
24   lady come in in the emergency department a couple of
25   days -- last month.  Her leg was all twisted around.

1   but if we assume that it was correct, and she's got

2   concerns about whether or not the patient is

3   breathing and whether or not the patient has a pulse,

4   and she confirms that both the patient has a pedal

5   pulse and breathing, albeit shallow, or whatever the

6   descriptors were, would it not be appropriate to then

7   go about getting a set of vital signs?

8           MR. HAMMONS:  Object to the form.

9           THE WITNESS:  We make -- we try to make

10  medicine simple.  It's not the vital signs at this

11  point.

12          If you have a concern about the breathing,

13  you first start with A, then B, then C.  If she had

14  the world's best and strongest pulse found in the

15  foot, unambiguous, even at that point she needed to

16  get that patient -- she needed to get Ms. Tedder into

17  a better position to breathe.

18          And then if it was still uneven and shallow,

19  clearly that person -- Ms. Tedder needed assistance

20  with her breathing, whether it's mouth-to-mouth, a

21  face mask, other resuscitation equipment, airway

22  breathing circulation.

23          MR. WINTER:  Okay.  Doc, I want to take one

24  more quick restroom break.  I don't think I have got

25  a heck of a long time remaining with you.