IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

ASHLEY MYERS, ET AL.,                   )
                                        )
            Plaintiffs,                 )
                                        )   
vs.                                     )   No. 22-CV-00119-TCK-JFJ
                                        )
BOARD OF COUNTY                         )
COMMISSIONERS OF ROGERS                 )
COUNTY, ET AL.,                         )
                                        )
            Defendants.                 )



VIDEO DEPOSITION OF WILLIAM COOPER, DO

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON JANUARY 5, 2024

INSTASCRIPT, L.L.C.
125 PARK AVENUE, SUITE LL
OKLAHOMA CITY, OKLAHOMA 73102
405.605.6880
schedule@instascript.net

REPORTED BY:  LOGAN K. SAYLOR, CSR #1985



EXHIBIT

6

```
 1              THE WITNESS:  Yes.
 2      Q    (BY MR. HICKS) In other words, did it lay
 3   out who's responsibility it was to do specific tasks
 4   at Rogers County?
 5      A    Yes.
 6      Q    Okay.  And is it your understanding that
 7   Rogers -- or excuse me -- Turn Key was solely
 8   responsible for the provision of medical care at
 9   Rogers County?
10      A    Yes.
11      Q    Was there any person or entity that had any
12   responsibility for the provision of care at Rogers
13   County as of November of 2019?
14              MR. WINTER:  Form.
15              THE WITNESS:  No.
16      Q    (BY MR. HICKS) Okay.  There was no
17   requirement that Rogers County have some sort of
18   in-house medically trained staff?
19              MR. WINTER:  Form.
20              THE WITNESS:  As a county employee?
21      Q    (BY MR. HICKS) Right.
22      A    No.
23      Q    All medical decisions made at Rogers County
24   jail were made by Turn Key and its staff?
25              MR. WINTER:  Same.
```

| 1 | THE WITNESS: Yes. |
| 2 | Q (BY MR. HICKS) Rogers County, pursuant to a |
| 3 | contract, was required to or -- was required to defer |
| 4 | to Turn Key regarding medical and clinical judgment |
| 5 | related to detainees and inmates at Rogers County? |
| 6 | A Correct. |
| 7 | Q To be clear. So that I don't keep talking |
| 8 | about the date. But we're all talking about and I |
| 9 | will be talking about prior to -- or excuse me. The |
| 10 | relationship or the contract or in previously the |
| 11 | policies. Everything I'm talking about deals with |
| 12 | November 7th, 2019, as our -- the day that Ms. Tedder |
| 13 | died would be the policies, the provisions, the |
| 14 | contract, everything is related to that date. |
| 15 | Do you understand? |
| 16 | A I do. |
| 17 | Q Okay. So if I'm asking a question like |
| 18 | coordination between Turn Key and Rogers County, I'm |
| 19 | not talking about today. I'm talking about then. |
| 20 | Does that make sense? |
| 21 | A Yes. |
| 22 | Q Okay. Would that include the coordination |
| 23 | of intake at Rogers County? So -- excuse me. Intake |
| 24 | of detainees, the medical screening that occurs at |
| 25 | intake, that is purely Turn Key's responsibility under |

1    the contract between Turn Key and Rogers County.

2            True?

3            MR. WINTER:  Same.

4            THE WITNESS:  Yes.

5    Q    (BY MR. HICKS) That would include any sort

6    of medical assessments that would have to be made on

7    that detainee after intake, true, that is purely Turn

8    Key's responsibility.

9            True?

10   A    Yes.

11   Q    The determination of whether a particular

12   detainee needs to be sent for outside care, whether it

13   be physical or mental, medical or mental health type

14   care, that judgment call and determination is purely

15   the responsibility of Turn Key.

16           True?

17           MR. WINTER:  Same.

18           THE WITNESS:  No.

19   Q    (BY MR. HICKS) Okay.  Explain.

20   A    Officers can decide if someone needs to be

21   sent out too.

22   Q    Okay.  If an officer decides that someone

23   should be sent out for medical care, what is the

24   process the officer would go through?  Do they need to

25   run that through Turn Key first or they have the

1    end of the world thing, is it?

2            MR. WINTER:  Form.

3            THE WITNESS:  True.

4    **Q**    (BY MR. HICKS) But if I delayed in providing

5    care for you not breathing, that could be a real big

6    problem, isn't it?

7            MR. WINTER:  Form.

8            THE WITNESS:  True.

9    **Q**    (BY MR. HICKS) And so when you're setting

10   forth the policies, procedures, and training for your

11   staff, it's important that you consider those

12   situations, including the consequences of their

13   failure to act timely and effectively.

14           True?

15           MR. WINTER:  Form.

16           MR. HICKS:  Okay.  Does that help?

17           MR. WINTER:  Yeah.  Thank you.

18   **Q**    (BY MR. HICKS) Would you agree that while

19   somebody is suffering -- excuse me.  While somebody is

20   not conscious and is breathing -- either not breathing

21   or breathing erratically or, you know, gasping for

22   breath, that going to obtain paperwork -- your Turn

23   Key medical staff obtaining paperwork to give to an

24   ambulance service is -- instead of providing CPR does

25   not meet Turn Key's internal standards.

1           True?

2              MR. WINTER:  Form.

3              THE WITNESS:  If someone else is doing it

4    then that's reasonable that they would do that.

5       Q    (BY MR. HICKS) Okay.  But if no one else is

6    doing it, that would not meet Turn Key's internal

7    standards, would it?  Right?

8              MR. WINTER:  Form.

9              THE WITNESS:  I agree.

10      Q    (BY MR. HICKS) You agree that -- well, let

11   me ask you.

12             You would rather have your trained medical

13   staff who's solely responsible for the provision of

14   healthcare in there providing healthcare and having

15   someone else go get pieces of paper.

16             True?

17             MR. WINTER:  Form.  Misstates the evidence.

18             THE WITNESS:  True.

19             MR. HICKS:  Of course it misstates the

20   evidence because it was actually your nurse that was

21   off getting pieces of paper.

22             MR. WINTER:  Form.  Misstates the evidence.

23             MR. HICKS:  I want to get this clarified.  I

24   apologize.  I have this in order of the way I want to

25   go, but -- here it is.  We're going to change it a

```
1      Q    And I didn't ask it for the other ones, but

2    upon looking at this policy and procedure, does that

3    refresh your memory in any way as to any of the NCCHP

4    policies that you may have relied upon in forming this

5    one?

6      A    The only one that comes to mind is suicide

7    prevention training.

8      Q    Okay.  Anything else that you can think of

9    right now?

10      A    No.

11            MR. WINTER:  Same.

12      Q    (BY MR. HICKS) Okay.  Is there a place

13    where -- the documentation, I guess, where -- of any

14    policies that you relied on, model policies that you

15    relied on, for the creation of this specific Turn Key

16    policy?  So in other words, do you have like notes

17    or -- you know, we looked at the -- this policy for

18    the NCCHP and we're going to use that to create J-2

19    and you just made a note of it?

20            MR. WINTER:  Form.

21            THE WITNESS:  No.

22      Q    (BY MR. HICKS) No?  Okay.  At the top of

23    this it states:

24            "Medical personnel, including part-time and

25             per-diem, receive immediate basic
```

```
1              orientation to the correctional

2              environment, job expectations, and job

3              responsibilities."

4         Do you see that?

5    A    Yes.

6    Q    What is included in the basic orientation?

7    A    The things listed in No. 2 below.

8    Q    Okay.  So why is it important that the

9  things listed in No. 2 -- or is it important that the

10 things listed in No. 2 are provided -- training on

11 those things are provided immediately?

12             MR. WINTER:  Form.

13             THE WITNESS:  Yes.

14   Q    (BY MR. HICKS) Okay.  Why?

15   A    So they know how to do their job.

16   Q    Okay.  You wouldn't want somebody working in

17 a jail facility without having obtained this

18 knowledge?

19   A    That's correct.

20   Q    Because you want your LPNs, for example, to

21 do things pursuant to their training at Turn Key.

22             True?

23             MR. WINTER:  Form.

24             THE WITNESS:  True.

25   Q    (BY MR. HICKS) You want to do it immediately
```

```
 1    so that they don't start developing bad habits and

 2    doing it in other ways?

 3              MR. WINTER:  Form.

 4        Q    (BY MR. HICKS) True?

 5        A    True.

 6        Q    So if I had done something for five months

 7    at a job before I'm trained on a Turn Key way, it

 8    becomes a lot harder to break my other habits, the bad

 9    ones; right?

10              MR. WINTER:  Form.

11              THE WITNESS:  Could be.

12        Q    (BY MR. HICKS) And so a failure to do it

13    immediately may have a consequence of having LPNs or

14    medical staff who disregard their training and go back

15    to their old bad ways.

16              True?

17        A    That's possible.

18              MR. WINTER:  Same.

19              THE WITNESS:  Possible.

20        Q    (BY MR. HICKS) And that is why in when

21    creating this policy you use the word "immediate" as

22    opposed to just do it sometime?

23              MR. WINTER:  Form.

24        Q    (BY MR. HICKS) True?

25        A    True.
```

1      Q     Are there any other reasons why you would do

2   it immediately?

3      A     Well, it would certainly impact the

4   employee's satisfaction with their job if they know

5   how they're supposed to be doing it.

6      Q     Okay.  So employee satisfaction and then

7   just making sure that employees are not learning bad

8   habits that they won't break are the two reasons;

9   right?

10            MR. WINTER:  Same.

11            THE WITNESS:  Most -- yeah.

12      Q     (BY MR. HICKS) And we know that if people

13   aren't doing it, doing their training immediately, and

14   develop those bad habits, that those bad habits may

15   result in deaths or serious injuries in emergency

16   situations, such as Lorri Tedder's where someone's

17   maybe struggling to breathe?

18            MR. WINTER:  Form.

19      Q     (BY MR. HICKS) True?

20      A     Possible.

21            MR. WINTER:  Jason, when you get done with

22   this line of questioning, could we take a restroom

23   break?

24            MR. HICKS:  Yeah.

25            MR. WINTER:  Please.

1    documentation kept by Turn Key as to when that

2    actually occurred?

3        A    It should be documented, yes.

4        Q    Would that be in the Orientation and

5    Training for Health Care Staff form?

6        A    Yes.

7        Q    Okay.  In looking at this form -- we're

8    going to mark it here in a second, but it states three

9    sections.  Employees Initials, so that would just be

10   the employee who's being trained.

11             MR. WINTER:  Form.

12             THE WITNESS:  True.

13       Q    (BY MR. HICKS) True?

14       A    True.

15       Q    Okay.  Proctor Initials, is that the

16   trainer?

17       A    Yes.

18       Q    Okay.  So in this instance -- I think we've

19   mentioned Dustin Powers before.

20             Feel pretty safe to assume that DP is Dustin

21   Powers?

22       A    I would -- I would think so.

23       Q    Okay.  And then finally, Day Completed.  And

24   that is the date that the training is actually

25   completed.

1          True?

2          MR. WINTER:  Form.

3          THE WITNESS:  Should be, yes.

4     Q    (BY MR. HICKS) Okay.  And so what we would

5     expect to see is that within the first day of an

6     employee's taking the job, that the portions of this

7     form that are designated to be part of the immediate

8     basic orientation would have a date approximately

9     close to their first day of the job?

10    A    Yes.

11    Q    And if they -- if it doesn't, then the

12    consequences of bad habits and things like that that

13    we talked about could be in play here?

14         MR. WINTER:  Form.

15         THE WITNESS:  Possible.

16    Q    (BY MR. HICKS) Okay.  And Turn Key was aware

17    of that prior to May of 2019 because this policy was

18    actually made in April of 2019.

19         True?

20    A    True.

21    Q    And what is done -- what kind of supervision

22    above Dustin Powers -- or let me rephrase.

23         Who is responsible, if anybody, for

24    supervising whether Dustin Powers provides the

25    immediate basic orientation in or around -- or really,

1   how to do an exam is provided?

2        A    That occurs during nursing school.

3        Q    Okay.  No -- other than watching them on the

4   job, no verification of their actual abilities is done

5   by Turn Key?

6             MR. WINTER:  Same.

7             THE WITNESS:  Yeah.  We don't retest them.

8        Q    (BY MR. HICKS) Okay.  Describe -- I mean,

9   when you say watching on the job.

10       A    Uh-huh.

11       Q    Is the nurse supervisor -- so in this

12  instance Dustin Powers.

13            How often is Dustin Powers expected to be at

14  a facility supervising an LPN?

15       A    I know Dustin was there five days a week.

16       Q    Okay.  Besides supervising a -- was Dustin

17  employed as of November 7th, 2019?

18       A    I believe so.

19       Q    Okay.  So would Dustin Powers have been

20  there when this Lorri Tedder incident occurred?

21            MR. WINTER:  Form.

22            THE WITNESS:  It depends on what time this

23  occurred and what time his shift ended.  I don't know.

24       Q    (BY MR. HICKS) What other responsibilities

25  did Dustin Powers or a nurse supervisor have around

1    Q    And then over a two-week period.  Is it

2   supposed to be like the next couple of weeks or just

3   any two weeks?

4            MR. WINTER:  Form.

5            THE WITNESS:  The next two weeks.

6    Q    (BY MR. HICKS) Okay.  So over the next two

7   weeks we would expect to see, you know, sporadically

8   like on such-and-such date we did these three topics.

9   And then so then there would be another date for a

10  different topic; right?

11   A    Yeah.  Right.

12   Q    And if we don't see that, is -- we have a

13  pretty good idea that the training's not being done

14  correctly.

15           True?

16           MR. WINTER:  Form.

17           THE WITNESS:  Well, we would ask them if --

18  if it wasn't done that way why it wasn't.

19   Q    (BY MR. HICKS) Okay.  Did you ask Dustin

20  Powers about Kylee Foster's training in this case?

21   A    I did not.

22   Q    Okay.  Were you aware that all of her

23  training is listed as being completed on 10/2/2019?

24           MR. WINTER:  Form.

25           THE WITNESS:  Yes.

1     Q    (BY MR. HICKS) Okay. And that would not be

2  the first day of her employment, would it?

3     A    No.

4     Q    She started back in May, didn't she?

5     A    Yes.

6     Q    So five months went by before she had her --

7  according to this form, her immediate basic training.

8          True?

9          MR. WINTER:  Form.

10         THE WITNESS:  According to this form.

11    Q    (BY MR. HICKS) Okay. And that is the only

12  proof that we have outside of their word as to when

13  this training is done.

14         True?

15         MR. WINTER:  Form.  There's sworn testimony.

16    Q    (BY MR. HICKS) There's sworn testimony.  I

17  said the word.  I don't know what the difference is.

18  But there's sworn word.

19     A    Uh-huh.

20     Q    That's the only evidence we have of when

21  this is done?

22         MR. WINTER:  Form.

23         THE WITNESS:  Correct.

24    Q    (BY MR. HICKS) This is the only objective,

25  formed at the time evidence that exists of when

1    training for Kylee Foster was done.

2            True?

3            MR. WINTER:  Same.

4            THE WITNESS:  True.

5        Q    (BY MR. HICKS) Okay.  And we have -- Turn

6    Key did nothing to -- once -- well, let me back this

7    up.

8            When did you first learn that Kylee Foster's

9    date of completed training was uniformly listed as

10   10/2/2019 on this form?

11       A    When I was reviewing this.

12       Q    In preparation for this deposition?

13       A    Yes.

14       Q    So as of November 7th, 2019, you had -- you,

15   being Turn Key, had no idea whether this training was

16   even completed at all, did you?

17           MR. WINTER:  Form.

18           THE WITNESS:  The regional manager may have

19   known, but I didn't.

20       Q    (BY MR. HICKS) Okay.  If the regional

21   manager did know, they never reported that to you, did

22   they?

23       A    That's correct.

24       Q    Are you aware of any actions taken by Turn

25   Key in response to the date listed for training being

```
1              Can we go back?  I apologize.  You're

2     probably like going crazy over here.

3              THE REPORTER:  Oh, no.  It's okay.  Give me

4     a second.

5              Question:  "Have you ever learned of an

6     incident at Turn Key where someone was not timely

7     trained outside of the process of being sued?"

8        Q    (BY MR. HICKS) Okay.  I'm asking you that

9     question.  If he wants to tell you not to answer, then

10    I'll ask you later.  That is fine.  It does not matter

11    to me.  But I'll let ---

12             MR. WINTER:  Does -- I'm going to instruct

13    you not to answer.  Does Turn Key know of any

14    instances where whatever Jason was asking you about

15    occurred at the Rogers County jail?

16             THE WITNESS:  Not to my knowledge.  But I

17    know we have found them during audits, so...

18             MR. WINTER:  Thank you.

19       Q    (BY MR. HICKS) Audits of what?

20       A    Audits of the facility.

21       Q    Okay.  And you're speaking of facilities

22    other than Rogers County?

23       A    I don't remember which one specifically.  It

24    may have been Rogers.  It may have been another one.

25       Q    I mean, since you haven't found it at Rogers
```

1    County the only answer is, it has to be audits of

2    facilities other than Rogers County.

3          True?

4       A    I don't know which facilities.

5       Q    Okay.  In response to finding this in

6    audits, did Turn Key take any actions to correct --

7    let me strike that.  Let me go backwards here real

8    quick.  You just said you found it in audits.

9          Did you find it in audits before or after,

10   if you recall, November 7 -- or excuse me.  10/2 of

11   2019?

12          MR. WINTER:  Form.

13          THE WITNESS:  Before or after, is that what

14   your question was?

15      Q    (BY MR. HICKS) Yes.  The audits that you

16   found that in, was that before 10/2 of 2019?  Did you

17   find any audits before then?

18      A    Not that I recall.

19      Q    Okay.  So all audits occurred afterward?

20      A    That I remember.

21      Q    And where would be the best place to obtain

22   these -- are these audits held, like kept by Turn Key?

23      A    I would think so.

24      Q    Okay.  So if we did a request for production

25   of these audits, we could see the audits that were

```
 1   performed?

 2              MR. WINTER:  Form.

 3              THE WITNESS:  If they're kept, yes.

 4        Q    (BY MR. HICKS) Okay.  Is there any reason

 5   why Turn Key would not keep the audits?

 6              MR. WINTER:  Form.

 7              THE WITNESS:  No.

 8        Q    (BY MR. HICKS) Did Turn Key take any actions

 9   upon finding these audits to change the way the

10   training is done prior to 10/2 of 2019?

11              MR. WINTER:  Form.

12              THE WITNESS:  No.

13        Q    (BY MR. HICKS) Okay.  Has Turn Key taken any

14   actions at any point to change the way the training is

15   done or documented as a result of these audits?

16              MR. WINTER:  Same.

17              THE WITNESS:  No.

18        Q    (BY MR. HICKS) Does Turn Key do -- really,

19   on I -- I(I), Policies and Procedures (acknowledgment

20   form), Page 1.

21        A    Yes.

22        Q    The acknowledgment form -- and I'll just go

23   ahead and hand it to you.

24              MR. HICKS:  What number are we on now?

25              THE REPORTER:  7.
```

1    Q    Okay.  How do we -- but we don't know --

2    strike that.

3         The 90-day trial period is where someone

4    like Dustin Powers would be observing someone like

5    Kylee Foster?

6    A    Yes.

7    Q    But we have no idea whether that actually

8    even occurred in this case, do we?

9         MR. WINTER:  Form.

10   Q    (BY MR. HICKS) Because we have no

11   documentation for it.

12   A    Correct.

13        MR. WINTER:  Same.

14        THE WITNESS:  Correct.

15   Q    (BY MR. HICKS) Okay.  Likewise, we have no

16   actual -- other than the fact that Kylee Foster signed

17   something saying that she did, we have no actual idea

18   whether Kylee Foster has any working knowledge of Turn

19   Key's policies and procedures, do we?

20        MR. WINTER:  Form.

21   A    Correct.

22   Q    (BY MR. HICKS) Under I(J)(1) on the first

23   page it says:  Initial.  And it's under the

24   subcategory of Training.

25   A    Uh-huh.

```
 1                MR. WINTER:  Okay.

 2                MR. HICKS:  -- are both unique health needs

 3   of incarcerated population?

 4                MR. WINTER:  Thank you.  Form.

 5                THE WITNESS:  Probably more common in that

 6   setting, but you see it in the ER too.

 7      Q    (BY MR. HICKS) Sure.  Okay.

 8                Any other training on how to identify and

 9   respond to -- we'll just start with identifying.  How

10   to identify the unique needs of an incarcerated

11   population?

12                MR. WINTER:  Same.

13                THE WITNESS:  No.

14      Q    (BY MR. HICKS) Any materials with substance

15   on it?

16      A    No.

17      Q    Okay.  II(C) says: Boundaries and

18   Responsibilities.

19                What is that?

20      A    That's interactions with the inmates.  You

21   know, don't bring them a cell phone, don't bring drugs

22   in.  That sort of thing.

23      Q    Okay.  Going back to B, the unique needs.

24                Are you aware whether or not nursing school

25   addresses the unique needs of an incarcerated
```

1     population?

2          A     Not to my knowledge.

3          Q     Okay.  You're saying to your knowledge they

4     don't address it or you're saying you're not aware one

5     way or the other?

6                MR. WINTER:  Form.

7                THE WITNESS:  I'm saying, to my knowledge

8     they don't address it.

9          Q     (BY MR. HICKS) Okay.  So you would agree

10    that if they don't address it that just simply relying

11    on the fact that they went to nursing school and got a

12    license does in no way prepare them for the unique

13    needs of an incarcerated population.

14               MR. WINTER:  Form.

15               MR. HICKS:  True?

16               THE WITNESS:  True.

17         Q     (BY MR. HICKS) And other than what we've

18    talked about, Turn Key does nothing further to prepare

19    them for the unique needs of the incarcerated

20    population.

21               True?

22               MR. WINTER:  Form.

23               THE WITNESS:  Well, this training that we're

24    talking about.

25         Q     (BY MR. HICKS) Right.  The training we've

```
 1      Q    Do you verify that they actually know how to
 2   use the equipment that's available, say, like oxygen?
 3      A    No.
 4      Q    Do you verify that they actually know when
 5   to use the equipment that's available, say, like
 6   oxygen?
 7           MR. WINTER:  Form.
 8           THE WITNESS:  No.
 9      Q    (BY MR. HICKS) Okay.  And I assume like the
10   rest, there's no testing or verification that they
11   actually have any idea how to prepare their unit or
12   make sure the supplies are ready?
13           MR. WINTER:  Same.
14           THE WITNESS:  Yeah.  Other than that
15   two-week time period where they're observed --
16      Q    (BY MR. HICKS) Okay.
17      A    -- by their trainer.
18      Q    Okay.  So the observation period is a
19   two-week period?
20      A    That's part of their training.
21      Q    Okay.
22      A    Yeah.
23      Q    After the two-week period, the observation,
24   does it end?
25      A    Well, it could happen periodically if the
```

1    supervisor think's it's necessary.

2        Q    Okay.  So after the two-week period it's

3    only if something comes about that makes the

4    supervisor go, hey, I need to take another look at

5    this person?

6        A    Correct.

7        Q    Otherwise, we're done after two weeks.

8        A    Right.

9        Q    True?

10       A    True.

11       Q    For Kylee Foster and Amy Moore, are you

12   aware of any additional observations done after the

13   first two-week period?

14       A    Not to my knowledge.

15       Q    And the documentation of when that two-week

16   period occurred would be on this form right here?

17       A    Yes.

18       Q    And so if that --

19            MR. WINTER:  Form.

20       Q    (BY MR. HICKS) -- documentation shows one

21   day that it all occurred, we would have no idea of

22   whether Kylee Foster, for example, was observed for a

23   full two-week period, would we?

24            MR. WINTER:  Same.

25            THE WITNESS:  Correct.

1     Q     (BY MR. HICKS) In fact, the evidence would

2     suggest that she was observed for one day.

3             MR. WINTER:   Form.

4     Q     (BY MR. HICKS) True?

5     A     According to that form it looks like it,

6     yes.

7     Q     Okay.  Admission process, screening, that

8     would be the initial paperwork we talked about; right?

9     A     Yes.

10     Q     Okay.  We're going to get into that

11     paperwork maybe right now.  Well, we'll wait.  It's in

12     this folder.  So we'll talk about that in more detail

13     when we get into it.  Emergency room.  Inmate

14     Transfers, Emergency room, that is something that you

15     would not learn in nursing school is when to transfer

16     an inmate as opposed to a non-detained person to an

17     emergency room.

18             True?

19             MR. WINTER:   Form.

20             THE WITNESS:   Well, it's the same.

21     Q     (BY MR. HICKS) Okay.  But you don't have --

22     in a jail situation, you've got the security aspects

23     to know -- to consider.

24     A     True.

25     Q     So it's different, isn't it?

1    whether the person failed just that part but was great

2    at everything else and so they passed, do you?

3              MR. WINTER:  Form.

4              THE WITNESS:  No.

5        Q    (BY MR. HICKS) Okay.  Any other substantive

6    training provided to an LPN hired at Rogers County on

7    or prior to November 7, 2019, regarding Emergency

8    Care/AED/CPR/Oxygen as far as like actually how or

9    when to use it?

10             MR. WINTER:  Same.

11             THE WITNESS:  No.

12       Q    (BY MR. HICKS) Okay.  Any other verification

13   that your LPNs are capable of properly using any of

14   those things other than the fact that they passed

15   nursing school?

16             MR. WINTER:  And his other testimony.

17             THE WITNESS:  And their observation period.

18       Q    (BY MR. HICKS) And the observation period?

19       A    Right.

20       Q    And so if during the observation period no

21   one needed an AED, CPR, or oxygen, there would be no

22   observation of whether that person can actually do

23   that function, would there?

24       A    Correct.

25       Q    So in this instance, unless somebody had a

1    answers that you want to change, didn't understand a

2    question, need to amend, do anything with?

3        A    No.

4        Q    Okay.  Sticking with what we've said so far?

5             MR. WINTER:  Form.

6             THE WITNESS:  Yes.

7             (Plaintiffs' Exhibit 8 was marked for

8              identification)

9        Q    (BY MR. HICKS) Okay.  Good.  All right.

10   I've just handed you what we've marked as 8, I

11   believe.

12       A    Yes.

13       Q    It is titled: Intake Health Screening,

14   Policy Number: J-9.  There's four pages total and it

15   starts at TK 250.  Starting on the first page under

16   Policy section it says:  "Screened upon arrival --

17   inmates are screened upon arrival."

18       A    Yes.

19       Q    Why, when you created the policy, did you

20   request that or want inmates screened on arrival?

21       A    To see if there's anything that maybe they

22   need to go straight to the hospital for.

23       Q    Okay.  It says:

24             "At the jail by health trained personnel or

25              qualified health care personnel."

```
 1              I assume that would include your LPNs

 2   on-site?

 3       A    Yes.

 4       Q    That would not include security?

 5       A    It can.

 6       Q    Well, technically there's another -- I'm not

 7   trying to trick you here.  There's a subpart,

 8   Procedure 3, that deals with what to do with security

 9   personnel.

10       A    Yes.

11       Q    So they would not be a health trained

12   personnel, though, typically?

13       A    Well, they're trained on the screening.

14       Q    Okay.  So part two of that policy, it says:

15              "Those with positive findings on receiving

16               screening will be referred for additional

17               evaluation."

18              Is that -- that would deal with acute

19   medical problems.  Would that also include mental

20   health issues?

21              MR. WINTER:  Same.

22              THE WITNESS:  It can.

23       Q    (BY MR. HICKS) Okay.  And so if we have a

24   positive finding related to mental health issues, they

25   should be referred for additional evaluation.
```

1   where the Fit screening is done.

2        Q    Okay.  I don't know about what Fit screening

3   you -- I understand what you're saying.  But if I'm a

4   new employee and you say, here's the policies.  And

5   I'm going to try to live up to your policies and do

6   what it says, when do I do subpart 4 right here?

7             MR. WINTER:  Procedures.

8             THE WITNESS:  Under policy or ---

9        Q    (BY MR. HICKS) No.  The procedure.

10       A    Oh, procedure.

11            MR. WINTER:  Yes.

12       Q    (BY MR. HICKS) Procedure 4 on --

13       A    Okay.

14       Q    -- TK 251.

15       A    Yeah.  This -- that's when -- after they're

16  booked in.

17       Q    Okay.  Is there a form for that?

18       A    Yes.

19       Q    Okay.  Was that basic receiving screening

20  done on Lorri Tedder?

21       A    Not this long one, no.

22       Q    Okay.  Why not?

23       A    She wasn't able to answer questions.

24       Q    Okay.  That someone is unable to answer

25  questions, is that any indication of their mental or

```
 1    medical needs?

 2                 MR. WINTER:  Form.

 3                 THE WITNESS:  Yes.

 4        Q    (BY MR. HICKS) And what does that tell an

 5    LPN, pursuant to your policies, about their mental or

 6    medical needs for care?

 7        A    When they're not able to answer questions

 8    then we usually wait to see if they're going to sober

 9    up and then be able to answer questions.

10        Q    Okay.  How do we know that the reason

11    they're unable to answer questions is alcohol or drug

12    related?

13        A    Well, we don't know -- we may not know, but

14    we can suspect.

15        Q    Okay.

16        A    Go to the next page, Procedure 5:

17                 "Reception personnel record, on the

18                  receiving screening form, their screening

19                  observations of the inmate's:  Appearance,

20                  Behavior, State of consciousness, Ease of

21                  movement, Breathing, and Skin."

22             Do you see that?

23        A    Yes.

24        Q    I didn't read the parts that go behind it,

25    but giving you the topics.
```

```
1              MR. WINTER:  Form.

2              THE WITNESS:  Possible.

3      Q    (BY MR. HICKS) If that question was asked

4   but not answered, the same thing could be true.

5   Someone who doesn't need to be there should -- could

6   be booked in the jail when they actually need mental

7   or medical attention?

8              MR. WINTER:  Same.

9              THE WITNESS:  That's possible, yes.

10     Q    (BY MR. HICKS) As to the immediate health

11  needs or problems.

12             If the inmate doesn't respond, wouldn't the

13  correct practice be to assume that there is a mental

14  or a medical reason behind it that may need further

15  evaluation and attention?

16             MR. WINTER:  Form.

17             THE WITNESS:  Yes.

18     Q    (BY MR. HICKS) Wouldn't want to just throw

19  them in a cell and see what happens under a

20  circumstance like that, would we?

21     A    We -- that's what we usually do.

22     Q    Throw them in a cell and see what happens?

23     A    Uh-huh.

24             MR. WINTER:  Form.

25     Q    (BY MR. HICKS) And in doing so, that's a
```

1      A     It would -- it would depend on the

2    situation.

3      Q     What situation -- how about somebody who

4    comes in and I can go back through them if we want,

5    but do you recall me going through various conditions,

6    urinating pants, defecation, needed assistance

7    walking, things like that?  Do you recall all those?

8      A     Yes.

9      Q     What if someone came in in that condition?

10   Would that be the time where we go ahead and call an

11   HCP to...

12     A     I would ---

13            MR. WINTER:  Form.

14            THE WITNESS:  I would expect one to be

15   called, yes.

16     Q     (BY MR. HICKS) And failure to do so could

17   expose that person to additional risk of death or

18   serious injury?

19     A     That's possible.

20     Q     And if that's the result of mental health

21   conditions, the erratic and violent behavior that was

22   exhibited in the initial screening periods and early

23   observation times would be really substantially likely

24   to result in some sort of, say, use of force incident

25   or something like that?

```
 1              MR. WINTER:  Form.

 2              THE WITNESS:  Yeah.  It would increase the

 3   risk of that, yes.

 4       Q    (BY MR. HICKS) And we know that when we're

 5   doing these intakes that those kind of things are

 6   likely to -- you know, have a high likelihood of

 7   happening in situations where the person can't respond

 8   and is acting erratically and acting in the ways that

 9   we described at that point, at the initial screening.

10   We've -- we've recognized that at that point or at

11   least we should have; right?

12              MR. WINTER:  Form.

13              THE WITNESS:  Yes.

14       Q    (BY MR. HICKS) Okay.  And so putting

15   somebody, whether it be a cell or a SPAR, like the

16   restraint chairs or anything like that under those

17   circumstances would be reasonably likely to result in

18   a bad situation, really, for that detainee and

19   potentially officers around because they're dealing

20   with somebody who probably shouldn't be there in the

21   first place who may need mental health instead.

22              True?

23              MR. WINTER:  Form.

24              THE WITNESS:  It's possible.

25       Q    (BY MR. HICKS) And that's why when we have
```

1    somebody with those conditions who doesn't answer or

2    is not asked that question No. 1, that's why we need

3    to consult someone who's at least a nurse practitioner

4    up to get a determination of what to do?

5                    MR. WINTER:  Form.

6                    THE WITNESS:  I agree.

7        Q    (BY MR. HICKS) And if there is a pattern at

8    Turn Key of not making those consultations, that would

9    be reckless, wouldn't it?

10                   MR. WINTER:  Form.

11                   THE WITNESS:  Yes.

12       Q    (BY MR. HICKS) In fact, even if it happened

13   one time prior and it wasn't corrected, that could be

14   reckless, wouldn't it?

15                   MR. WINTER:  Form.

16                   THE WITNESS:  Could be considered that, yes.

17       Q    (BY MR. HICKS) And that would include No. 4

18   too:

19                   "Are you suicidal or thinking of hurting

20                    yourself?"

21                   True?

22       A    True.

23       Q    Same considerations and same risk?

24       A    Yeah.

25       Q    And the same response, which is contact

 1    think this is related to any of your topics.  I'm

 2    going to let him answer this one question and then

 3    we're going to move on.

 4            MR. HICKS:  Well, we'll see.

 5        Q   (BY MR. HICKS) Go ahead.

 6        A   Would you repeat it?

 7            MR. HICKS:  Yeah.  Could you read that back?

 8            THE REPORTER:  Question: "Well, from a

 9    medical standpoint, getting proper treatment timely

10    increases the likelihood of being alive, doesn't it?"

11            THE WITNESS:  For serious conditions, yes.

12        Q   (BY MR. HICKS) Right.  And you reviewed the

13    videotape of Lorri Tedder's time at Rogers County that

14    day; right?

15        A   Yes.

16        Q   And do you agree as -- especially as both --

17    really, under intake and as time went on through her

18    changing and her inability to do things and all the

19    list we gave, defecation, urination, walking, talking,

20    the whole thing, that that was the type of serious

21    medical condition that probably required an HCP call?

22            MR. WINTER:  Form.

23        Q   (BY MR. HICKS) Or it did require an HCP

24    call?

25            MR. WINTER:  Same.

1              THE WITNESS:  Yes.  It should have.

2      Q     (BY MR. HICKS) And certainly that would be

3    the type of situation where this form should be filled

4    out correctly and accurately based on the actual

5    responses given and the actual questions given in the

6    situation?

7              MR. WINTER:  Same.

8              THE WITNESS:  Correct.

9      Q     (BY MR. HICKS) And doing so creates a false

10   medical record, doesn't it?  Or excuse me.  Failing to

11   do so, failing to accurately do this creates a false

12   medical record.

13             True?

14             MR. WINTER:  Form.

15             THE WITNESS:  Well, it's incomplete.

16     Q     (BY MR. HICKS) Well, it's false because this

17   says no.

18             MR. WINTER:  He's answered the question.

19     Q     (BY MR. HICKS) And if she didn't answer that

20   question no, then that would be a false statement.

21   She never said no.

22             Would you agree with that?

23             MR. WINTER:  Form.

24             THE WITNESS:  Well, like I said, it's

25   incomplete because it doesn't give the source of the

 1   consistency?

 2        A    Yeah.   That's something they usually kind of

 3   learn.

 4             (Plaintiffs' Exhibit 11 was marked for

 5             identification)

 6        Q    (BY MR. HICKS) Okay.   I'm going to hand you

 7   11.   This is titled: Custody Ordered Restraint.   It's

 8   Number: J-25.   It's two pages beginning at Turn Key

 9   280.

10        A    Yes.

11        Q    And if you'll go to Policy No. 3.   It says:

12             "If medical personnel note improper use of

13             restraints that is jeopardizing the health

14             of an inmate, they communicate their

15             concerns as soon as possible to appropriate

16             security personnel."

17             Why is that important?

18        A    To maintain the health of the inmates.

19        Q    So in other words, if somebody is being

20   restrained in a way that is in -- basically putting

21   them at risk for, say, death or serious injury, that

22   this policy requires your LPNs so step in and say,

23   hey, what you're doing is going to hurt this person,

24   stop?

25             MR. WINTER:   Form.

1           THE WITNESS:  Yes.

2      Q    (BY MR. HICKS) And if they don't do that,

3  they would be in violation of this policy?

4      A    True.  This is mostly applying to like if

5  they are restrained and, you know, their circulation

6  is cut off or something like that.

7      Q    Uh-huh.

8      A    Then they're like, hey, you're going to have

9  to loosen this.

10     Q    So, for example, restraint can be all kinds

11 of restraint.  It can be in handcuffs, it can be in a

12 SPAR, it can be being held down by an officer.  That's

13 all forms of restraint.

14          True?

15          MR. WINTER:  Same.

16          THE WITNESS:  True.

17     Q    (BY MR. HICKS) So if an officer is laying on

18 top of an inmate and that inmate's struggling to

19 breathe and eventually becomes limp, this policy would

20 require the LPN to communicate their concerns as soon

21 as possible to the appropriate security personnel?

22          MR. WINTER:  Same.

23          THE WITNESS:  True.

24     Q    (BY MR. HICKS) Why?  Oh, I already asked you

25 why.

1   just the hiring process.

2           Does Turn Key ask about previous work

3   history?

4       A   Yes.

5       Q   Okay.  Does Turn Key call references?

6       A   Yes.

7       Q   Okay.  Did Turn Key, to your knowledge or

8   Turn Key's knowledge, I guess, call references

9   regarding Kylee Foster?

10      A   That, I don't know.

11      Q   How would we determine whether references

12  were actually called?

13      A   We'd have to ask Nicole Cobb.

14      Q   Okay.  Did Turn Key ask or do they ask for a

15  list of facilities, whether jail or otherwise, that

16  the person, nurse, LPN, has worked at prior to Turn

17  Key?

18      A   Yeah.  It should be on their resume.

19      Q   Does Turn Key take any other actions to

20  verify a potential LPN hiree, verify their background?

21      A   We do a criminal background check.

22      Q   Okay.  And I assume a licensure one?

23      A   Yes.  Definitely.

24      Q   Okay.  Anything else to determine whether

25  they're actually qualified to do their job besides