1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

ASHLEY MYERS, et al.,              )
4                                  )
       Plaintiffs,                 )
5                                  )
-vs-                               )  No. 22-CV-00119-TCK-JFJ
6                                  )
BOARD OF COUNTY COMMISSIONERS )
7 OF ROGERS COUNTY, et al.,        )
                                   )
8          Defendants.             )

9

10                 **CERTIFIED COPY**

11

12                 *  *  *  *  *

13          DEPOSITION OF DONNA ROBERTS

14       TAKEN ON BEHALF OF THE PLAINTIFFS

15          IN OKLAHOMA CITY, OKLAHOMA

16             ON APRIL 2, 2024

17          COMMENCING AT 10:30 A.M.

18                 *  *  *  *  *

19

20

21             INSTASCRIPT, L.L.C.
             125 PARK AVENUE, SUITE LL
22         OKLAHOMA CITY, OKLAHOMA   73102
                  405.605.6880
23           schedule@instascript.net

24

25   REPORTED BY:  BETH A. McGINLEY, CSR, RPR, RMR

**EXHIBIT**
**1**

1      Q      What is your position with Turn Key?

2      A      Chief nursing officer.

3      Q      Okay.  And how long have you been employed

4   with Turn Key in that capacity?

5      A      I've been chief nursing officer coming up on

6   two years, I believe.

7      Q      Okay.  So it's 2024.  You're saying you became

8   chief nursing officer in 2022 sometime?

9      A      I believe it was around May of '22, yes.

10      Q      Okay.  Prior to May of '22, were you employed

11   with Turn Key?

12      A      Yes, sir.

13      Q      What capacity?

14      A      I was the VP of operations from September of

15   2019 until the -- May of '22, when I promoted to CNO.

16      Q      Okay.  So -- I don't know why I cannot

17   remember this.

18              But this event occurred on November 7th of

19   2019.  You would have been employed at Turn Key as the

20   VP of operations during that time.  True?

21      A      Yes.

22      Q      Okay.  And prior to September of 2019, were

23   you employed at Turn Key?

24      A      Yes.  I hired on in March of 2018.  I started

25   as CQI nurse, then promoted to DON, and then to HSA, and

```
 1              So you would agree that the Turn Key nurses,
 2      the LPNs that are in there doing the bookings, observing
 3      the -- the incarcerated individuals, they need to be
 4      able to identify and distinguish the difference between
 5      someone who's under the influence and just being
 6      obstinate versus somebody who is suffering from a
 7      serious physical or mental health condition which may
 8      require treatment, even emergency treatment?
 9              MR. WINTER:  Form.
10      A    Yes.  I would expect my nurses to be able to
11      ask some questions, take some vital signs and -- and get
12      a -- some information.  If they are not comfortable
13      being able -- you know, if they don't feel like they
14      have the information, you know, they need to make the
15      decision, like, "Yes, this person is cleared to -- we
16      can take them," or, "No, they need to go to the hospital
17      for clearance."  They have a provider that they can
18      call for -- to ask for guidance and further assistance.
19              But, initially, yes, they -- they should be
20      able to -- to do that.
21      Q    (By Mr. Hicks) Okay.  And why -- and that's
22      important, because not being able to do that may lead
23      to --
24      A    Someone coming into the facility who's not
25      medically stable.
```

1      Q    Right.  Who could then have a serious injury

2    or die --

3      A    Correct.

4           MR. WINTER:  Form.

5      Q    (By Mr. Hicks) -- theoretically?

6           Are Turn Key LPNs qualified to make those

7    assessments?

8      A    Yes, sir.

9      Q    And you expect -- Turn Key expects -- or you,

10   as the chief nursing officer, expects that those LPNs

11   will make those assessments between someone who has a

12   serious mental or physical condition versus someone

13   who's just intoxicated and obstinate?

14           MR. WINTER:  Form.

15     A    Well, they're not mental health professionals,

16   so they can't make any kind of mental health diagnosis.

17   But I do expect them to be able to look at a situation

18   and be able to determine whether, "Yes, they can come

19   in," or, "No, they know that this is above what we can

20   do" inside the facility.

21           While we try to keep people in-house as much

22   as we can, we are not an emergency room, we are not --

23   you know, there are just some things that we cannot take

24   care of, and I expect them to be able to make that

25   decision.

1             And, again, if they have questions and need,

2     you know, some further guidance, they have people

3     available to them to ask for assistance.

4        Q    (By Mr. Hicks) And certainly somebody who's

5     showing signs of mental instability, like they're

6     talking to themselves, they're not coherent, they have

7     defecated or urinated themselves, they just appear to be

8     unstable in that way, it would be required that the LPN

9     contact a healthcare provider to obtain some guidance.

10    True?

11             MR. WINTER:   Form.

12       A    Yes, they can always contact a provider with

13    any questions.   They have a medical provider they can

14    contact.   If they have a seriously mental ill patient,

15    we have mental health providers that we can contact as

16    well.

17       Q    (By Mr. Hicks) And certainly you wouldn't

18    expect -- you would expect them to contact those

19    providers to obtain that guidance.   True?

20             MR. WINTER:   Form.

21       A    Yes, sir.

22       Q    (By Mr. Hicks) And the failure to do so would

23    be against Turn Key's standards.   True?

24             MR. WINTER:   Same.

25       A    Yes.   My expectation is that those resources

```
 1   are available to them, I want them to use them.
 2        Q    (By Mr. Hicks)  Why is that important, that,
 3   say, an LPN, who comes across somebody, you know,
 4   exhibiting those signs and symptoms, contacts someone
 5   like an RN or, I guess -- well, let me back up.
 6             What is an HCP?
 7        A    Healthcare provider.  It could be our nurse
 8   practitioners or our physicians.
 9        Q    Okay.  So at least a nurse practitioner,
10   possibly a doctor?
11        A    Correct.
12        Q    RNs would not qualify as an HCP?
13        A    No.
14        Q    Okay.  So why is it important for an LPN to
15   contact an HCP under the circumstances that I described?
16             MR. WINTER:  Form.
17        A    If they are seeing something that... on our
18   fit guidelines, we have criteria, say, for someone
19   having chest pain.
20             Well, a lot of our people that we have coming
21   in, they have -- they don't take their med --
22   medications, they're homeless, you know, they're not
23   taking care of themselves, so they -- they may acclimate
24   and it may be normal for them to run, say, a blood
25   pressure of 150 or 160 over 130 or 80 or 90.
```

```
 1    sure they understood the question and determining

 2    whether they're incapable of doing -- answering the

 3    question or they're just refusing.

 4             I mean, they should be able to tell the

 5    difference between someone that's under the influence

 6    and is not processing, at the moment, the answer, as to

 7    someone who's mad and is just refusing to answer, you

 8    know.

 9             So I expect them to be able to -- to note that

10    difference.  And if an officer said, "Well, they said

11    this," then I would expect a follow-up, yes.

12        Q    You certainly wouldn't expect them just to

13    check the "no" box in order just to --

14        A    No.

15             MR. WINTER:  Form.

16        Q    (By Mr. Hicks) -- move them down the line?

17        A    Correct.

18        Q    And why is that?  Why would you want them to

19    follow up, as opposed to just simply checking on the

20    "no" box?

21        A    Because when we don't gather all the

22    pertinent, correct information, we don't have the tools

23    we need to make sure that that patient is getting the

24    services that they need.

25        Q    Right.  And those type of people who are
```

```
 1    suffering from apparent mental health issues, who have

 2    either not answered or even, potentially, said "yes" to

 3    thinking of hurting themselves, there's a greater

 4    likelihood that they're going to hurt themselves while

 5    they're incarcerated, that something is going to happen.

 6    True?

 7              MR. WINTER:  Form.

 8       Q    (By Mr. Hicks) I mean, we have to be aware

 9    that we've got somebody in a situation and we're trying

10    to avoid having that person be hurt or hurt someone

11    else?

12       A    Correct.

13              MR. WINTER:  Same.

14       Q    (By Mr. Hicks) And that's why we're asking the

15    question?

16       A    Correct.

17       Q    Because that puts us on notice that, "Hey,

18    there could be an incident where this person acts

19    erratically and does something that could cause injury

20    to themselves or others down the -- down the road, you

21    know, during their incarceration, and we want to know

22    that stuff ahead of time"?

23       A    Yeah, I expect --

24              MR. WINTER:  Same.

25       A    -- my nurses to be as thorough as possible
```

1    when answering -- or asking the questions.

2        Q    (By Mr. Hicks) And simply to say "no", in a

3    section like that, would leave that individual, the

4    mentally ill person, who's maybe suffering a mental

5    health crisis at that point -- would leave them more

6    vulnerable to subsequent uses of, say, excessive force

7    or incidences where they might act out in a way that

8    would cause injury to themselves or others?

9            MR. WINTER:   Form.   Calls for speculation.

10       A    I mean, it's -- it's hard to determine what a

11   person might do, but I do expect my nurses to be as

12   thorough as possible.   And, you know, the nurse can ask

13   all the right questions and a patient can be

14   incarcerated and still, you know, make a decision later.

15       Q    (By Mr. Hicks) Uh-huh.

16       A    And the nurse did everything right.

17           But my expectation is that my nurses are

18   thorough, that they ask the questions, that we are not

19   just checking yeses or nos, because that -- that's not

20   acceptable.

21       Q    And I guess my question is, is why -- I am

22   thinking that's not acceptable because it leads to a

23   likelihood of injury or death or something bad happening

24   to either the incarcerated person or to the staff and

25   jailers.

1       A     That is correct, it could --

2             MR. WINTER:   Form.

3       A     It could happen, yes.

4       Q     (By Mr. Hicks) Okay.  I mean, I guess the

5    other way of saying it is:  Why are we asking those

6    questions?

7       A     To prevent.

8       Q     To prevent what?

9       A     To prevent -- or to try to prevent injury to

10   one's self or injury to, you know, another person.

11            We -- our job is to try to keep them safe and

12   provide the medical care that -- that they deserve and

13   require.

14            The nurses are taught that, specific in

15   suicides, if they make one thing -- if they make one

16   statement that gives you cause that -- "would they

17   stop -- would they hurt themselves" -- my thing is to

18   err on the side of caution and, yes, if they made you

19   pause to think, "Are they thinking about hurting

20   themselves?" then, yes, I'm going to put them on suicide

21   watch.  Just --

22      Q     Uh-huh.

23      A     -- it's better to be safe than, you know, get

24   home and come in the next day and say, "Hmm, they said

25   that and I just -- I thought maybe they didn't and they

1    wouldn't, but" -- you know.

2        Q    Uh-huh.

3        A    So that's how I -- when I'm talking to my

4    nurses about it, that's how I educate.

5        Q    And so, certainly, a failure to do those

6    things would be a violation of the Turn Key policies, as

7    you understood them as VPO back then?

8        A    Yes.

9             MR. WINTER:   Same.

10       Q    (By Mr. Hicks) And it would be a violation of

11   nursing standards, in general, as you understood them as

12   a registered nurse?

13            MR. WINTER:   Same.

14       A    Yes.

15       Q    (By Mr. Hicks) And since you had mentioned,

16   you know, "We don't want to be the next day having

17   assumed something, it's better just to take the safest

18   approach" --

19       A    Uh-huh.

20       Q    -- "if somebody is not answering, we don't

21   want to just assume that they're okay and go ahead and

22   book them in or accept them in, we want to take the

23   safest approach."

24            MR. WINTER:   Form.

25       Q    (By Mr. Hicks) True?

```
1    uses to verify what training is provided and when it's

2    provided to a new hire?

3           MR. WINTER:  Form.

4      A     Yes, this is our checklist from 2019 that we

5    were using.

6      Q     (By Mr. Hicks) And you would agree that the

7    category that says "day completed" is -- shows when the

8    actual training was completed, the day it was

9    completed --

10          MR. WINTER:  Form.

11     Q     (By Mr. Hicks) -- for each category?

12     A     It says "date completed," but it could have

13   been maybe that's just the date they completed signing

14   off when they did their follow-up on it.  Sometimes,

15   they do it as they're going through it right then.

16     Q     Uh-huh.

17     A     Sometimes, depending on the nurse and her

18   orientation and her -- you know, that they -- as they go

19   through things and they complete it, they will date it

20   then.  But it looks like they just signed off on this

21   all on the same day.

22     Q     You would agree with Dr. Cooper that it's

23   important to -- I deposed him, as well, in this -- it's

24   important to do this training at the beginning of

25   employment.  True?
```

```
1                MR. WINTER:  Form.

2        A    Yes.  Orientation is at the beginning of their

3   employment, yes.

4        Q    (By Mr. Hicks) And that failure to do it at

5   the beginning of employment could allow a new hire to

6   develop certain habits and practices that are in

7   violation of Turn Key standards --

8                MR. WINTER:  Same.

9        Q    (By Mr. Hicks) -- as they've worked there over

10   a period of months, without the orientation?

11                MR. WINTER:  Same.

12        A    Yes, all of our staff should go through the

13   orientation before they're working on the floor.

14        Q    (By Mr. Hicks) And that this form is the only

15   way to verify what training is provided and when it's

16   provided?

17                MR. WINTER:  Form.

18        A    At this point in time, I believe this was the

19   only form that they're using for orientation, yes.

20        Q    (By Mr. Hicks) So the only written

21   documentation that would exist regarding whether -- in

22   this instance, Ms. Kylee Foster -- when and what she was

23   trained on, is contained in this form?

24                MR. WINTER:  Form, foundation.

25        A    Correct, this is the only document that I --
```

```
 1      Q    (By Mr. Hicks) And --

 2      A    -- that we have, as to my knowledge.

 3      Q    And the third column is indicated that it

 4   should be the date that the actual training is

 5   completed.  True?

 6           MR. WINTER:  Same.

 7      Q    (By Mr. Hicks) It says -- it, literally, says

 8   "day completed"?

 9      A    Yes.

10      Q    And so based on all of the written

11   documentation available, it appears that the date

12   completed, for all of these categories of training,

13   would be 10/2/19?

14           MR. WINTER:  Same.

15      A    According to this, yes.

16      Q    (By Mr. Hicks) And doing so would be in

17   violation of Turn Key's policies and practices.  True?

18           MR. WINTER:  Sorry.  Doing -- doing --

19      A    Yes, this --

20           MR. WINTER:  -- doing so?  Is that what you

21   said?

22           MR. HICKS:  That's what I said.

23           MR. WINTER:  Okay.  Form.

24           MR. HICKS:  You know that I'm referring to --

25   let me -- I'll just ask it a different way --
```

```
 1   where she's already -- she's observed it and she's felt

 2   comfortable enough for her safety to approach the

 3   situation and give advice on how to restrain the

 4   individual.

 5        A     Okay.

 6              MR. WINTER:  Form.

 7        Q     (By Mr. Hicks) Okay?

 8              Under that circumstance, would you agree that

 9   this policy, if during that conversation about

10   restraint, she noticed that there was -- that the health

11   of the inmate was being jeopardized, that under this

12   policy, she would have a duty to communicate that?

13              MR. WINTER:  Same.

14        A     Yes.

15        Q     (By Mr. Hicks) She can't just sit idly by

16   while somebody, who is notably struggling and moving and

17   loudly snorting, when they're in a prone restraint

18   situation, then goes limp, is no longer making breathing

19   sounds, is no longer moving, is no longer talking, and

20   has become to the point where even the nurse and other

21   officers are questioning whether she's breathing or is

22   conscious, she cannot just stand --

23        A     No --

24              MR. WINTER:  Form.

25        Q     -- by --
```

```
 1       A     She has to be involved in that point.

 2             MR. WINTER:  Again, I don't know if he was

 3   finished or not.

 4             THE WITNESS:  Sorry.

 5             MR. WINTER:  Make sure he's finished.  I think

 6   you knew where he was going, but so the record's clear.

 7             MR. HICKS:  You're doing fine.  I thought you

 8   were -- I was finished.  I thought you did fine.  But he

 9   did want to say "form," so...

10             MR. WINTER:  And I thought you were still

11   going and I didn't mean it as a slight.  I just thought

12   you were still going, so I didn't want her to step on

13   your toes.

14       Q     (By Mr. Hicks) She should step in at that

15   point, is what you said.  Right?

16             MR. WINTER:  Form.

17       A     Yes.

18       Q     (By Mr. Hicks) Okay.  And what would you --

19   you would expect her to -- well, let me back up.

20             Does Turn Key provide -- you're aware of the

21   dangers of prone restraint --

22       A     Uh-huh.

23       Q     -- true?

24             MR. WINTER:  Same.

25       A     Yes, sir.
```

1       A      Uh-huh.

2       Q      (By Mr. Hicks) They talk about, you know, kind

3    of the dangers of -- to the person being restrained?

4       A      Right.

5       Q      Did they tell you about that when you were

6    being on-boarded?

7              MR. WINTER:   About the George Floyd situation

8    or just generally?

9              MR. HICKS:   Well, as I mentioned, that hadn't

10    occurred there, but I was just trying to use it as a

11    descriptive way of --

12             MR. WINTER:   Okay.   Form.

13      A      I don't remember specifically what all was

14    involved in the training in -- I mean, I -- to speak

15    specifically to that, I don't recall.

16      Q      (By Mr. Hicks) As of September of 2018, when

17    you were VPO, did you expect that the new hires, new

18    LPNs would be taught about the specific dangers to the

19    person being held in a prone restraint, including

20    asphyxiation and cardiac arrest, under certain

21    circumstances?

22             MR. WINTER:   Form.

23      A      As part of their orientation, yes, we should

24    be -- they should be covering restraints.   And when

25    they're used -- medical doesn't order restraints, we

```
 1    just monitor the patient when detention uses them.

 2              And, yes, that should have been part of her

 3    on-boarding orientation in regards to that.

 4        Q    (By Mr. Hicks) Would there be any

 5    documentation, PowerPoints, you know, things of -- to

 6    show the substance of what would have been told to a new

 7    LPN like Ms. Foster, for example --

 8              MR. WINTER:  Same.

 9        Q    (By Mr. Hicks) -- regarding that prone

10    restraint situation?

11        A    I would have to review our orientation stuff

12    from that time period, because I don't recall, off the

13    top of my head, specifically what it talks about when it

14    covers restraints.

15        Q    Okay.  But there -- there is substantive

16    training that's provided in their packets or PowerPoints

17    or things --

18        A    We do discuss restraints with them, yes.

19        Q    And that was back in 2019, as well?

20        A    It should be, because it should be in here, as

21    well, I think.

22        Q    And I can look for it later --

23        A    Yeah, I don't see it on here, but I know that

24    it should be part of -- whenever we do our training and

25    we go through that and our policies, I -- they -- I
```

```
 1    mean, it should be covered with them.

 2            But I don't see restraints specifically on

 3    here.

 4        Q    So -- and the reason you discussed that with

 5    the new hire and the new nurses would be so that if they

 6    encounter or witness, come upon, after the fact, a

 7    situation where a prone restraint is being used, they

 8    know what to look for to determine whether the

 9    individual is in a serious medical -- something bad is

10    happening?

11            MR. WINTER:  Same.

12        A    Correct.

13        Q    (By Mr. Hicks) So, as of November 7th, even if

14    Ms. Foster was trained only on 10/2, by that point, she

15    was aware of the things to look for to determine whether

16    Ms. Tedder -- let me strike that.

17            She was -- per Turn Key's requirements for

18    training, she should have been told what to look for to

19    determine whether Ms. Tedder was suffering from some

20    sort of a serious medical condition as a result of being

21    in a prone restraint?

22            MR. WINTER:  Same.

23        A    I would think that, yes, that should have been

24    covered in her orientation.

25        Q    (By Mr. Hicks) And what would we be -- as VPO
```

1    know, if they see the patient is getting where they

2    can't talk or they can't breathe.  Those are the things

3    that they should be looking for.

4        Q    So if we have a patient who is obviously very

5    verbal, very loud talking -- saying lots of stuff, who

6    then goes silent, that should be a clue.  True?

7            MR. WINTER:  Form.

8        A    It depends on the situation.

9        Q    (By Mr. Hicks) The situation of a prone

10   restraint, being held down with an officer on their

11   back, and then we have a patient who's -- I'm going to

12   go through a number of things, so it's not the only

13   clue.

14           But we have a patient, you said they should

15   recognize whether they're talking and they don't.  So if

16   we have someone who is in a prone restraint, an officer

17   on their back, they have previously been very verbal,

18   very loud, talking, and then, all of a sudden, they're

19   silent.  That should at least be kind of --

20       A    Then that would trigger me to have --

21       Q    -- a clue?

22       A    -- someone try to talk to her, ask her some

23   questions, is she still with us, you know, start

24   gathering some information.

25       Q    If they are making loud breathing noises, you

 1   know, snorting sounds, and then, all of a sudden, there

 2   are no more breathing sounds, an LPN observing this,

 3   that would be another clue that maybe this person is in

 4   medical distress.   True?

 5          MR. WINTER:   Form.

 6   A    Yes.

 7   Q    (By Mr. Hicks) If they're moving and fighting

 8   and then, all of the sudden, they're limp, they're not

 9   moving at all, their arms are just, you know --

10   A    Uh-huh.

11   Q    -- that would be -- and, again, we have an LPN

12   observing this -- that would be another clue that that

13   person could be in medical distress?

14          MR. WINTER:   Same.

15   A    Again, I would ask what they are seeing.   Are

16   they -- are they -- are they just tired?  Did they just

17   give up?  Because sometimes they just work themselves up

18   to a -- did they just quit?  And then there's a

19   difference of someone who quit because they're not

20   breathing.

21   Q    (By Mr. Hicks) Sure.  But it's at least enough

22   to trigger --

23   A    Yes.

24   Q    -- thinking that, and then trigger, as well,

25   taking action to determine which it is?

```
 1      A     Yes.

 2            MR. WINTER:  Same.

 3      Q     (By Mr. Hicks) And we would at least want,

 4      expect our LPN to step up, under that circumstance, and

 5      say, "Hey, this person is -- they're not moving, they're

 6      not breathing, they're not saying noises, let's get them

 7      flipped over and figure out -- let's assess them or

 8      evaluate them," or whatever the correct word is.  But,

 9      "Let's take a look at them."  Right?

10            MR. WINTER:  Same.

11      A     Yes, I feel that's reasonable.

12      Q     (By Mr. Hicks) And a failure to do that would

13      be a violation of Turn Key's policies and practices, in

14      your expectations, as the VPO at the time?

15            MR. WINTER:  Same.

16      A     Yes, I expect my nurses to -- if they see

17      that, that they're to say something.

18      Q     (By Mr. Hicks) Okay.

19            MR. HICKS:  You got something --

20            MR. WINTER:  Break?

21            MR. HICKS:  Yeah.

22            (Recess was had from 12:44 p.m. to 12:58 p.m.)

23      Q     (By Mr. Hicks) We're back on.  Is there

24      anything about your prior answer you want to change or

25      state differently?
```

```
 1    talking about the facts of what we're doing when I use

 2    the word, whether it be assess, evaluate.

 3         A    Okay.

 4         Q    I'm just trying to say take a look at, you

 5    know.

 6         A    Right.

 7         Q    Figure out what's going on.

 8         A    Uh-huh.

 9         Q    So we were talking about that.

10              Why is it important that that occur, that

11    assessment for -- I know not the Nursing Practice Act

12    assessment, but just that that evaluation occurs right

13    there at that point?

14         A    Why the pre-book occurs?

15         Q    No.   No, we're talking about -- we're in the

16    prone restraint --

17         A    Uh-huh.

18         Q    -- we've witnessed certain things -- or

19    certain things have occurred while we're there

20    observing, we've asked, you know, as the LPN, if --

21    whether the person is conscious, there's --

22         A    Right.

23         Q    -- questions of whether she's breathing.   And

24    we talked about the -- that the LPN should have said,

25    "Hey, I need to take a look at this person.   We need to
```

```
 1   hold on."

 2              Why is that important?

 3              MR. WINTER:  Form.

 4      Q    (By Mr. Hicks) And I guess I'll fill in the

 5   blank and see if you disagree with me.

 6              I think it's important because it's to prevent

 7   death or serious injury to the person being restrained.

 8              Do you agree with that?

 9              MR. WINTER:  Form.

10      A    Yes.

11      Q    (By Mr. Hicks) We want to make sure that this

12   person is not going without oxygen, for example, for an

13   extended period of time, due to being restrained in that

14   way.  True?

15      A    True.

16      Q    And so failing to do that -- well, strike

17   that.

18              Now, moving forward with the situation,

19   regardless of whether that occurred, say we get

20   Ms. Tedder into a -- another room, we have her laid out,

21   we -- what are you expecting your nurse to do at that

22   point?  Ms. Tedder, at this point, is still motionless

23   and nonresponsive.

24              What's the next action that they should do,

25   according to their training at Turn Key?
```

1    you know, just first-aid type stuff.

2        Q    Uh-huh.

3        A    Some of them will have, like, the CPR guard

4    mask and it -- it comes with a -- a sheet of, you know,

5    what we expect them to have in those bags.

6        Q    Okay.  In her deposition, Ms. Foster said she

7    was going to go get a vital machine -- vitals machine.

8        A    Uh-huh.

9        Q    What is that?

10       A    I would guess that she's either talking about

11   what they call a nurse on a stick -- which is a machine

12   that's on wheels that takes your blood pressure, your

13   pulse, those kind of things.

14            I don't know if Creek County didn't -- or not

15   Creek County -- Rogers, if they had that, or she was

16   just talking about getting, like, an electronic vital

17   sign machine, or she was just getting a blood pressure

18   cuff and a stethoscope to do it manually.

19            But that's -- that's what she was referring

20   to, was getting that.

21       Q    Certainly you wouldn't want her to leave an

22   unresponsive patient, who's not breathing and doesn't

23   have a pulse, to get a vitals machine, unless she's

24   directed someone else to begin CPR?

25            MR. WINTER:  Form.

1      A      If there is an officer that is performing the

2      CPR, then, yes, if she needs to go get that -- as long

3      as she knows that they've started it and they're in the

4      process of that and she needs that, then, yes, as long

5      as that CPR has initiated and taken -- taken place.

6              But it could have went either way, where she

7      was doing CPR and directed the officer, either way.  As

8      long as CPR was being done, is what was important.

9              In our smaller sites, where we don't have

10     multiple nurses on -- on site, the detention officers do

11     play a bigger role in, like, performing CPR and doing

12     those things, because the nurse can't be everywhere,

13     doing everything.

14     Q      (By Mr. Hicks) So, certainly, CPR is priority

15     Number 1, getting the machine is priority Number 2?

16             MR. WINTER:  Form.

17     A      Correct.

18     Q      (By Mr. Hicks) And when you were VPO back

19     then, what, if anything, was expected to be reported to

20     you regarding whether a particular new hire is competent

21     to perform their job functions?

22     A      When does a regional manager reach out to me

23     about a -- a new employee?

24     Q      Yeah.  Is there a requirement that the

25     regional manager report up to you and say, "Hey, here's