# United States District Court
## for the Northern District of Oklahoma

---

### Case No. 22-cv-119-JDR-JFJ

---

ASHLEY MYERS, *individually and, as Co-Personal Representative of the Estate of Lorri Gayle Tedder*; and COURTNEY VAUGHN, *individually and as Co-Personal Representative of Estate of Lorri Gayle Tedder*,

*Plaintiffs,*

*versus*

TURN KEY HEALTH CLINICS, LLC, *an Oklahoma limited liability corporation*, and KYLEE FOSTER, *individually*,

*Defendants.*

---

### OPINION AND ORDER

---

In an emergency, seconds count; it is only when the emergency is over that a court is tasked with counting seconds. That is the Court's unenviable job following the tragic death of Lori Gayle Tedder, who went into cardiac arrest while detained at the Rogers County Jail. Ms. Tedder's representatives, Plaintiffs Ashley Myers and Courtney Vaughn, claim that jail nurse Kylee Foster was not only negligent but also deliberately indifferent to Ms. Tedder's medical needs, giving rise to liability under both Oklahoma common law and 42 U.S.C. § 1983. Dkt. 21. Plaintiffs further claim that Defendant Turn Key Health Clinics, LLC is liable for Ms. Tedder's death under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and is liable for negligence under Oklahoma law. Defendants have moved for summary judgment on each of Plaintiffs' claims. Dkts. 92,

Case No. 22-cv-119

93.[1] For the reasons set forth below, Defendants' motions are GRANTED with respect to Plaintiffs' federal claims. The Court DECLINES JURISDICTION over the remaining state-law claims.

## I.

On November 7, 2019, Ms. Tedder was arrested at the Hard Rock Casino in Catoosa, Oklahoma, and was taken in a police car to the Rogers County Jail. She arrived at the jail at around 8:15 a.m.[2] An officer opened the door of the police car and indicated she should get out, but Ms. Tedder remained seated while rapidly shaking her head back and forth. Two officers then began pulling Ms. Tedder from the car by her upper arms; Ms. Tedder made no attempt to support herself, allowing her body to fall to the floor. When the officers tried to lift Ms. Tedder to her feet, they noticed that her foot was stuck inside the vehicle.[3] While the officers tried to dislodge her foot, Ms. Tedder remained on the ground, where she alternated between shaking her head rapidly and staring wide-eyed at the ceiling. Once her foot was freed, however, she stood up and generally cooperated in the officers' efforts to guide her to a desk in the jail's booking area[4]

Inside the jail, Nurse Amy Moore, a Turn Key employee, asked Ms. Tedder a series of questions.[5] Ms. Tedder did not respond verbally.[6] She

---

[1] Plaintiffs initially asserted claims against the Board of County Commissioners of Rogers County, Scott Walton, Kellie Guess, Shawn Zandbergen, Daniel Ellenburg, Haley Hames, Isaac Shields, Myles Ferguson, B. Hubbard, William Emery, K. Kennell, Thomas Grimsley, and Sheldon Morgan. Plaintiffs have dismissed their claims against those defendants. Dkt. 73.

[2] The facts set forth in this paragraph are drawn from the following: Dkt. 92-3 (08:16:24-08:19:01); Dkt. 92-4 (08:17:06-08:18:58); Dkt. 92-5 (08:17:15-08:18:31).

[3] One officer suggested that Ms. Tedder was "hooking her feet on the seat." Dkt. 92-4 (08:18:01-08:18:10).

[4] *But see* Dkt. 92-6 (08:18:39-08:18:44) (depicting Ms. Tedder briefly halting before entering the main booking area).

[5] The facts set forth in this paragraph are drawn from the following: Dkt. 92-3 (08:19:01-08:22:11); Dkt. 92-4 (08:18:58-08:22:00); Dkt. 92-9 (full video).

Case No. 22-cv-119

remained handcuffed with her hands behind her back and her upper arms restrained while officers located a change of clothes for Ms. Tedder and a trash bag for her belongings. In footage from the restraining officer's body camera, Ms. Tedder can be seen trying to push her arms apart despite the officer's restraint.

The audio portion of the recordings provided to the Court suggest that two female officers took Ms. Tedder to change her clothes, in which Ms. Tedder had urinated and defecated.[7] Ms. Tedder was either unwilling or unable to undress herself or keep herself upright during that process; she did, however, begin providing verbal responses to some of the officers' questions and instructions.[8] The officers removed Ms. Tedder's clothes, washed the feces off her body, and told her she could take another shower when she was more alert. After she had been rinsed off, Ms. Tedder thanked the officers, denied that she was "on" anything, stated she did not want to wear shoes, and said that she was hurt, scared, and cold.[9] The officers responded that they would give Ms. Tedder a blanket and take her to a cell where she could rest; when an officer asked Ms. Tedder if she wanted to try to lie down and take a nap, Ms. Tedder responded "yes."

---

[6] Nurse Moore indicated that she thought she saw head movement in response to at least one question. She ultimately asked nearby officers whether Ms. Tedder was on drugs and whether she had been in a car accident. Dkt. 92-3 (08:19:01-08:19:55); Dkt. 92-4 (08:21:27-08:21:40) (indicating that "she shook her head yes and no…on some of the questions").

[7] The facts set forth in this paragraph are drawn from the following: Dkt. 92-3 (08:22:11-08:33:07) (audio only); Dkt. 92-4 (08:22:00-08:22:12). The officer's body camera was directed away from Ms. Tedder during this portion of the recording. Dkt. 92-4 (08:22:00-08:22:12).

[8] See Dkt. 92-3 (08:22:30-08:24:20) (audio only). One of the officers indicated Ms. Tedder was "falling over" while changing. Id. (08:25:20-08:25:25) (audio only).

[9] Ms. Tedder also said that she was afraid, that she had been abused, and that she wanted the officers who had helped her to stay with her. It is not clear from the audio portion of the recording who Ms. Tedder was afraid of, or who she believed had abused her.

Although Ms. Tedder did not admit to taking drugs, several officers believed Ms. Tedder was under the influence. *See* Dkt. 92-8 at 3-4; Dkt. 92-13 (15:14:00-15:14:10); Dkt. 93-4 at 4. Ms. Tedder's behavior prevented the officers from formally completing the intake process, and the officers elected to place Ms. Tedder in a holding cell in the jail's booking area to allow her time to calm down. Dkt. 92-8 at 2-3. Ms. Tedder remained in the holding cell for approximately six-and-a-half hours. *Compare* Dkt. 92-26 *with* Dkt. 92-12.

By about 3:00 p.m., the officers learned that Ms. Tedder had removed her clothes while in her holding cell. Dkt. 92-12 (full video). Three officers went into the cell and attempted to dress Ms. Tedder; Ms. Tedder yelled at the officers and physically resisted their attempts to restrain her. *Id.*; Dkt. 92-13 (full video). Ms. Tedder was restrained, covered in a "suicide smock," and moved to a restraint chair in the jail's central booking area. Dkt. 92-12 (full video); Dkt. 92-13 (full video). One of the five officers involved in restraining Ms. Tedder in the chair expressed concern that, even though Ms. Tedder appeared cooperative, she might "hit somebody." Dkt. 92-13 (15:13:20-15:13:25). Ms. Tedder apologized and said she was "coming off of some bad stuff." *Id.* (15:14:00-15:14:10). An officer agreed that she was "coming off something, that's right." *Id.* A short time later, Ms. Tedder again indicated that she was "coming off" of something, but when asked what she took, Ms. Tedder responded that she had "no idea, honestly." *Id.* (15:15:25-15:15:40).[10]

Ms. Tedder remained in the restraint chair until about 6:14 p.m., when four officers began the process of releasing her.[11] Ms. Tedder appeared cooperative at first, but she began hitting and screaming at the offic-

---

[10] Once Ms. Tedder was fully restrained, Nurse Moore checked the restraints. Dkt. 92-13 (15:15:50-5:16:20).

[11] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:13:30-18:17:42).

Case No. 22-cv-119

ers once her hands were released. She was taken to the ground, but she retained her grip on one of the officers. Once the officer was freed, Ms. Tedder was held in a prone position on the floor with her hands cuffed behind her; her breathing at this point was loud and harsh.

While one officer went to get a spit hood, Ms. Tedder resumed yelling, demanding that the officers get off of her, claiming to be queen of the world, and, at points, screaming unintelligibly.[12] The spit hood was placed on Ms. Tedder's head, and the officers lifted her to her feet and began walking her to a holding cell. At first, Ms. Tedder slumped forward, with her head and upper body hanging loosely. Then, she began resisting again. During the struggle that followed, Ms. Tedder was pinned against a window and her head collided with the glass;[13] she could be heard breathing loudly and heavily, speaking unintelligibly to the officers, and screaming.

At approximately 6:20:16 p.m., one of the officers indicated they should return Ms. Tedder to the restraint chair.[14] At this point, Ms. Tedder stopped supporting herself with her legs and either slid or was taken down to the floor. Once she was on the floor, she began kicking and resisting the officers. The officers subdued her once again. Upon discovering that Ms. Tedder had managed to jump over her handcuffs, which were now in front of her body, the officers began discussing how to re-position the handcuffs. During this interval, which lasted approximately one minute and ten seconds, Ms. Tedder can be seen struggling against the officers; her breathing is at some points inaudible and at other points loud and labored; and she can occasionally be heard grunting, yelling, or moaning through the spit mask.

---

[12] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:17:30-18:20:20).

[13] Although the strike is not clear from the video, footage shows what appears to be blood from Ms. Tedder on the window. *See* Dkt. 92-15 (18:48:00-18:48:20).

[14] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:20:10-18:21:26).

Case No. 22-cv-119

At 6:21:24 p.m., one of the officers noticed that Ms. Tedder had urinated on the floor.[15] The officers asked defendant Kylee Foster, a Turn Key nurse who had arrived early for her 6:30 shift, to retrieve paper towels and clean up the urine. Nurse Foster returned with paper towels at about 6:22:24 p.m. During this one-minute interval, Ms. Tedder can be heard grunting and can be seen moving her head on the body camera footage.

While Nurse Foster was cleaning the urine, the officers continued to restrain Ms. Tedder and discussed how to return her to the restraint chair.[16] The officers shackled Ms. Tedder's feet at approximately 6:23:21 p.m., and then focused on securing Ms. Tedder's hands behind her back. As they did so, one officer checked to see if Ms. Tedder was responsive, tapping her shoulder and calling her name; another responded that Ms. Tedder was "playing games" and would not respond.

At 6:25:06 p.m., one of the officers felt Ms. Tedder's neck and verbally indicated that she was breathing.[17] The officers lifted Ms. Tedder from the floor and directed her to stand; she did not do so, and her head and body remained limp. The officers then discussed placing Ms. Tedder in a nearby holding cell rather than moving her back to the restraint chair. While doing so, they expressed concern that Ms. Tedder was still a safety risk, suggesting that she would "punch the next officer in the face" like she "just did" if they removed the handcuffs to put her in the restraint chair, and might begin kicking when they entered the holding cell. After discussing how to move and secure Ms. Tedder, the officers lifted her up, carried her to the

---

[15] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:21:20-18:22:24).

[16] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:22:06-18:25:48).

[17] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:24:55-18:27:04).

holding cell, and placed her on a bench. Ms. Tedder's head can be seen falling backward as the officers set her down.

At approximately 6:26:54 p.m., the officers summoned Nurse Foster into the cell and directed her to check Ms. Tedder's restraints.[18] While Nurse Foster was doing so, one of the officers noticed Ms. Tedder was bleeding. The officers removed the spit hood, revealing a cut on Ms. Tedder's forehead. Nurse Foster can be seen looking at the cut at 6:27:18 p.m. One of the officers suggested that emergency medical services be called,[19] and Nurse Foster asked if Ms. Tedder had been checked in; she received a negative response. Body camera footage indicated that Nurse Foster then took a pedal pulse on Ms. Tedder's feet from about 6:27:45 to 6:27:59. During that timeframe, an officer can be heard requesting emergency services.

Nurse Foster left the cell at 6:28:03 p.m. to collect documentation, a vital sign machine, and supplies to clean and cover the wound.[20] Dkt. 93-11 (statement of fact no. 20); Dkt. 93-4 at 13-14; Dkt. 101 at 8, 14 (admitting that Nurse Foster left the cell without denying her reasons for doing so); Dkt. 101-11 at 3-4.[21] Three officers remained in the cell with Ms. Tedder, while a fourth made a call concerning the situation; that officer reported "a laceration, pretty deep to [Ms. Tedder's]...forehead" and indicated they should let "Pafford" know.[22] The officer did not report any concerns regarding Ms. Tedder's breathing or pulse.

---

[18] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:26:50-18:28:03).

[19] Paramedics were called at approximately 6:28 p.m., before Nurse Foster left the cell. Dkt. 93 at 11 (statements of facts no. 22-23); Dkt. 101 at 7 (admitting statements of facts nos. 22-23).

[20] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:28:00-18:29:00).

[21] All citations utilize CMECF pagination.

[22] Pafford Medical Services is an organization that provides emergency medical responses and transportation in Rogers County, Oklahoma.

Case No. 22-cv-119

At 6:29:02, one of the officers that remained in the cell stated that Ms. Tedder was "not blinking."[23] She called out to Nurse Foster, indicating that Ms. Tedder had not blinked "in a hot minute." Nurse Foster was not nearby, so the officer left to relay the concern.[24] Nurse Foster returned to the cell entryway at 6:29:48 p.m. and indicated that the ambulance should "come hot." She then entered the cell, observed Ms. Tedder, and reacted by moving her arms upward and saying "Oh, Jesus." Dkt. 92-15 (18:29:50-18:29:55). Nurse Foster asked the officer next to her for a flashlight and detected that Ms. Tedder's eyes were nonreactive to light. Dkt. 101-11 at 5. Soon after, Nurse Foster instructed the officers to retrieve an oxygen tank. By 6:30:24 p.m.—approximately thirty seconds after she observed Ms. Tedder's condition and said "Oh Jesus"—Nurse Foster had begun performing what appear to be chest compressions on Ms. Tedder.

Nurse Foster instructed one of the officers to continue CPR and again called for the oxygen tank.[25] CPR was interrupted while an officer removed Ms. Tedder's handcuffs, and Nurse Foster began preparing the Automatic External Defibrillator. The AED was applied to Ms. Tedder; at approximately 6:32:59 p.m., it indicated that no shock was advised, and CPR should continue. Nurse Foster directed an officer to continue CPR while she connected the oxygen tank.

Emergency responders arrived at 6:33:40 p.m.[26] When they reached the cell where Ms. Tedder lay, Nurse Foster left the cell. The first responders took over, removing Ms. Tedder from the room and continuing CPR.

---

[23] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:29:00-18:30:30).

[24] Dkt. 101-11 at 4.

[25] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:30:24-18:33:32).

[26] The facts set forth in this paragraph are drawn from Dkt. 92-15 (18:33:40-18:57:52).

Case No. 22-cv-119

Paramedics ultimately resuscitated Ms. Tedder, achieving spontaneous circulation and voluntary heart rhythm, but Ms. Tedder never regained consciousness. She died at a hospital on November 9, 2019, at 4:00 p.m. Dkt. 95-2 at 1.

It is undisputed that Nurse Foster was not present for most of the events recited above. When Nurse Foster arrived at the jail prior to the start of her 6:30 shift, Ms. Tedder was in the restraint chair. Nurse Moore provided Nurse Foster with information concerning why Ms. Tedder was brought to the jail, her general conduct, and the belief that Ms. Tedder was "on something."[27] Ms. Tedder was removed from the chair "before [Nurse Foster's] shift started." Dkt. 93-4 at 4-5. Nurse Foster heard the altercation between Ms. Tedder and the officers from the jail's medical office and left the office to observe. Dkt. 101-7 at 8-9. The camera footage reveals that she observed many, and perhaps most, of the events that followed.[28] For purposes of this opinion, the Court assumes that Nurse Foster observed all of the events that took place between 6:13:30 p.m. and 6:28:03 p.m.

## II.

As a pretrial detainee, Ms. Tedder was entitled to custodial medical care under the Due Process Clause of the Fourteenth Amendment. *See Estate of Beauford v. Mesa County*, 35 F.4th 1248, 1262 (10th Cir. 2022) (indicating that the "right to custodial medical care is well settled").[29] A jail offi-

---

[27] Dkt. 93-4 at 4-5; Dkt. 101-7 at 8-9 (discussing both erratic and cooperative behavior exhibited by Ms. Tedder, and that Ms. Tedder had asked to have the restraints removed).

[28] There are brief exceptions, such as when Nurse Foster left the room to obtain paper towels.

[29] There is no difference between the standard of medical care owed to convicted inmates under the Eighth Amendment and the standard applicable to pretrial detainees under the Due Process Clause. *Estate of Beauford*, 35 F.4th at 1262. Because the analysis applied when reviewing violations of these provisions is the same, the Court relies on authority concerning both types of cases. *Id.*

9

cial—or, in this case, an employee contracted to provide medical care for a jail—violates the Due Process Clause by acting with "deliberate indifference to an inmate's serious medical needs." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

To establish a right to relief for deliberate indifference under 42 U.S.C. § 1983, a plaintiff must first show that he or she suffered from a sufficiently serious medical need. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023). This component, which is viewed objectively, is satisfied if the detainee can point to a medical need that "has been diagnosed by a physician as mandating treatment or…is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1980)).

Next, the plaintiff must show that the medical provider subjectively "kn[ew] of and disregard[ed] an excessive risk" to the detainee. *Lucas*, 58 F.4th at 1137 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). When a claim concerns a medical provider's failure to properly treat a detainee, this component can be satisfied in one of two ways: (1) by establishing that the medical professional failed to properly treat the serious medical condition; or (2) by demonstrating that the medical professional prevented or denied access to additional treatment or another physician who could have provided the detainee with appropriate care. *Id.* (citing *Sealock*, 218 F.3d at 1211).

To prevail on their motions for summary judgment, Defendants must either (1) produce affirmative evidence negating either the objective or the subjective component, or (2) show that there is no evidence from which a jury could conclude that both components are satisfied. *See Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008); Fed. R. Civ. P. 56. If Defendants carry this burden with respect to either component, it then falls to Plaintiffs to point to evidence that creates a triable issue of fact with respect to that

component. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986); *see also* Fed. R. Civ. P. 56.

Nurse Foster agrees that death is an objectively serious harm that satisfies the first component. Dkt. 93 at 18. The only question in this case is, therefore, whether Nurse Foster knew of and disregarded an excessive risk of death to Ms. Tedder. *Id.* Because the information known and available to Nurse Foster changed over time, the Court will consider Plaintiffs' claims against her in stages: First, the Court will consider whether Nurse Foster was deliberately indifferent between her arrival at the jail for her shift and 6:26:54 p.m., when the officers summoned her into a cell to check Ms. Tedder's restraints. Second, the Court will consider the period beginning when Nurse Foster entered the cell at 6:26:54 p.m. and when she left for supplies at 6:28:03 p.m. Third, the Court will consider the period beginning at 6:28:03 p.m. and ending when first responders arrived and assumed responsibility for Ms. Tedder's care.

## A.

When Nurse Foster arrived at the jail, she had little time, if any, to settle into her work before a struggle broke out between Ms. Tedder and the officers.[30] Plaintiffs do not seriously suggest that Nurse Foster had a duty to provide care while that struggle—which continued until at least 6:22:24 p.m.[31]—was ongoing. Dkt. 101 at 22. Instead, they suggest that a duty to

---

[30] It is undisputed that Ms. Tedder was in the restraint chair when Nurse Foster came on to her shift, and that Ms. Tedder "immediately" struck a detention officer after the officers began the process of removing her from that chair. Dkt. 93 at 9, 13 (statements of facts nos. 6, 38); Dkt. 101 at 7 (declining to dispute statement of fact no. 6); *id.* at 9 (indicating that Nurse Foster was aware of Ms. Tedder's history but failing to dispute the remainder of statement of fact no. 38).

[31] Plaintiffs suggest that, once Ms. Tedder urinated, it became "clear" that Ms. Tedder was "no longer resisting." Dkt. 101 at 11. The Court disagrees. The video evidence establishes that approximately one minute passed between the point where an officer noticed Ms. Tedder had urinated and the point where resistance could last be observed. Dkt. 92-15 (18:21:20-18:22:24). While the Court would ordinarily adopt Plaintiffs'

provide care arose at or around the time that Ms. Tedder stopped visibly resisting and appeared limp. They maintain that, when Ms. Tedder was handcuffed and raised to a sitting position, Nurse Foster knew that Ms. Tedder had urinated on the floor, was no longer resisting and appeared limp, and was not responding to the officers' verbal commands and inquiries. Plaintiffs argue that, based on that information, Nurse Foster should have expressed her concerns about the risks associated with the holds used by the officers, advised the officers of her need to check for breathing and a pulse, and asked Ms. Tedder questions designed to assess her condition. Dkt. 101 at 11-13, 22.

The Court rejects Plaintiffs' contention that Nurse Foster had a constitutional obligation to advise of the risks associated with the holds being used by the officers. In substance, this is not a claim that Nurse Foster failed to provide medical care to Ms. Tedder; it is, instead, a claim that Nurse Foster failed to intervene during an ongoing use of force. *E.g., O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (recognizing that law enforcement officers have "an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers"). But Plaintiffs have disclaimed any intent to seek relief under a failure-to-intervene theory and, even if they had not, such claims cannot be asserted against medical providers. Dkt. 25 at 6; Dkt. 26 at 7. *See Ali v. McAnany*, 262 F. App'x 443, 446 (3d Cir. 2008) (concluding that the claim against nurse Hoffman was "subject to dismissal because she [was] not a corrections officer and thus did not have a duty to intervene").[32] Plaintiffs cannot prevail on their claim that Nurse Foster should have intervened by advising

---

version of the facts, it need not do so where there is clear video evidence contradicting Plaintiffs' characterization. *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010).

[32] *E.g., Drumm v. Valdez*, No. 3:16-cv-3482-M-BH, 2019 WL 7494443, at *7 (N.D. Tex. Dec. 3, 2019) (collecting cases); *Smith v. Donate*, No. 4:10-CV-2133, 2012 WL 1899323, at *6 (M.D. Pa. Apr. 5, 2012), report and recommendation adopted, No. CIV. 4:10-2133, 2012 WL 1899318 (M.D. Pa. May 24, 2012).

Case No. 22-cv-119

the officers to stop using a particular hold or advise of the risks associated with their use of force.

Plaintiffs' argument that Nurse Foster should have conducted a verbal assessment or asked to check on Ms. Tedder stands on equally shaky ground. Plaintiffs have pointed to no case law within the Tenth Circuit suggesting that a nurse has an affirmative duty to interrupt officers who are engaged in restraining and securing an individual. And, generally speaking, prison medical officers do not have a "legal duty to intervene on behalf of an inmate in the midst of physical altercations against staff." *Drumm*, 2019 WL 7494443, at *7. It would be an odd result to conclude that Nurse Foster had no duty to step into an ongoing use of force to stop an officer from *causing* harm but nevertheless had an obligation to insert herself in the same situation to *treat* the harm once it occurred.

Furthermore, a medical provider's duty to provide care in a correctional facility is subject to correctional officers' responsibilities for ensuring safety and security. This balance is recognized by the parties, who agree that Turn Key nurses do not get involved in active uses of force, do not give guidance to officers about the type of force to use, and are trained not to get involved in an unsafe situations.[33] The determination of when and how a medical professional should be permitted to access an inmate is—and must be—within the purview of law enforcement. *E.g., Est. of Beauford*, 35 F.4th at 1273-74 (detailing a nurse's care for patient and indicating that access was provided by correctional staff). Indeed, claims that detainees have been denied access to medical care are typically asserted against the officers who provide access to that care, rather than the medical providers whose access is subject to the discretion of the correctional officers. *See Sealock*, 218 F.3d at 1211 (recognizing that medical providers will not ordinarily be liable under a gatekeeper theory, but that an exception arises where "the medical

---

[33] See Dkt. 93 at 13 (statements of facts nos. 43-45); Dkt. 101 at 7 (admitting statements of facts nos. 43-45).

professional knows that his role in a particular medical emergency is solely to serve as a gatekeeper'').

Neither existing precedent nor prudential considerations regarding the role of medical providers in detention centers supports the conclusion that a jail nurse should be constitutionally required to insert herself into a use-of-force scenario before an officer indicates it is proper to do so. This Court declines to hold that Nurse Foster had any duty to provide medical care to Ms. Tedder before 6:26:54 p.m., when the officers had secured Ms. Tedder and asked Nurse Foster to check the restraints. This Court has not identified any authority suggesting that a medical professional with ''no law enforcement or corrections standing, status, responsibilities, duties, or training'' should ''intervene in correctional matters'' without authorization. *Donate*, 2012 WL 1899323, at *6 (dismissing failure-to-intervene claim and noting the limited authority of the medical contractor). Nor has the Court been provided with any authority suggesting that a medical officer should attempt to assess a detainee after a use of force but before the officers expressly permit her to do so. If authority on this proposition is to be created, it must originate with a Court higher than this one. To the extent Plaintiffs' claims rest on a theory that Nurse Foster had a duty to provide care before Ms. Tedder was restrained in the holding cell at 6:26:54 p.m., their claims are DENIED.

### B.

Once Nurse Foster was invited into the cell, the emergent nature of the situation became very clear, very quickly, as evidenced by the fact that paramedics were called less than one minute after Ms. Tedder's spit hood was removed. *See* Dkt. 92-15 (18:26:50-18:28:03); Dkt. 93 at 11 (indicating paramedics were called at 6:28 p.m.). It is undisputed that Nurse Foster began providing *some* medical care at this point. *See* Dkt. 92-15 (18:27:45-18:27:59) (depicting Nurse Foster taking a pedal pulse); Dkt. 101 at 8 (admitting, in response to statement of fact no. 18, that Nurse Foster ''touched

[Ms. Tedder's] feet for a pulse and noted that Tedder had 'shallow' and 'uneven' breath"). The question is whether this care was so deficient that it amounts to deliberate indifference to the risk of death faced by Ms. Tedder. *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999).

To address this question, the Court must first determine whether the facts alleged by Defendants have been sufficiently refuted by Plaintiffs. Specifically, Defendants assert that, before leaving the cell to get supplies, Nurse Foster (1) examined Ms. Tedder and concluded she was breathing and had a pulse, and (2) believed Ms. Tedder had a pulse and was breathing when she left the cell to retrieve bandages and a machine to obtain Ms. Tedder's vital signs. Dkt. 93 at 11 (statements of facts nos. 18-21). Although Plaintiffs purport to dispute these facts, they have not pointed to any evidence that controverts Defendants' averments. Indeed, Plaintiffs appear to agree, at least for purposes of Defendants' Motions, that Nurse Foster observed Ms. Tedder breathing and believed she was breathing when she left the cell to retrieve supplies. Dkt. 101 at 8 (response to statements of facts nos. 18, 20, 21).

The only evidence cited in support of Plaintiffs' claim that Ms. Tedder had no pulse when Nurse Foster left the cell is a progress note prepared after the incident. Dkt. 101 at 8 (response to statement of fact no. 19). But the progress note does not contravene Defendants' position. The note, which describes the sequence of events over the course of the evening, shows that an ambulance was called at 6:27 p.m.,[34] and that Nurse Foster left the holding cell to collect supplies but was "called back to check [Ms. Tedder's] breathing." Dkt. 101-11 at 4. The note then states that, at 6:29,[35] Ms. Tedder's eyes were fixed and dilated, Ms. Tedder was "not responsive," her eyes were not reactive to light, her skin had "become cool" and

---

[34] This is designated as "1827" in the note.

[35] This is designated as "1829" in the note.

Case No. 22-cv-119

Nurse Foster was "not able to find a pulse." Dkt. 101-11 at 3-4. The adjacent margin of the note shows that chest compressions and CPR began at 6:30 p.m. *Id.* at 4.

Plaintiffs ask the Court to conclude that the progress note shows that Nurse Foster could not find a pulse *before* she left the cell to retrieve supplies, rather than *after* she returned.[36] But that is not what the note says. The note says that, at "1829," Nurse Foster could not find a pulse. *Id.* The video evidence establishes that *all* of the visible events that follow the designation "1829" occurred upon or immediately following Nurse Foster's return to the cell. None of them took place before she left to collect supplies. [37] The inference that Plaintiffs are asking this Court to draw—that most of the events listed after "1829" occurred after Nurse Foster returned, but one of them did not—is manifestly unreasonable. *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (recognizing that "an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility" (citation and quotation marks omitted) (alteration in original)). This Court is required to draw all reasonable inferences in favor of Plaintiffs; it is not required to create issues of fact where none exist. The Court concludes there is no dispute as to whether

---

[36] Plaintiffs submit that, because the video only shows Nurse Foster checking Ms. Tedder's pulse on one occasion—at 6:27 p.m.—the note *must* indicate that Nurse Foster failed to find a pulse before she left the cell at 6:28:03. But the videos do not show the full scope of Nurse Foster's activities while she is bending over Ms. Tedder after returning to the cell. The Court rejects Plaintiffs' suggestion that, because Nurse Foster was only recorded checking Ms. Tedder's pulse at one point, the Court must assume that she never checked her pulse at any other point.

[37] The note's sequence of events does not precisely line up with the sequence on the video. For example, the note suggests Nurse Foster requested that the emergency responders should "come hot" after she used the flashlight; the video indicates Nurse Foster made this request at the time she returned to the cell. *Compare* Dkt. 92-15 (18:29:40-18:30:35) *with* Dkt. 101-11 at 4-5.

Case No. 22-cv-119

Nurse Foster subjectively believed Ms. Tedder had a pulse when she left the holding cell to retrieve supplies.[38]

Plaintiffs suggest that, considering Ms. Tedder's shallow breathing, Nurse Foster acted indifferently when she left to collect supplies because the only medically acceptable option was to initiate CPR right away. They criticize Nurse Foster for gathering supplies when, in their opinion, "starting CPR…should have been priority number 1 and obtaining supplies should have been priority number 2." Dkt. 101 at 24. In making this argument, Plaintiffs engage in post-hoc second guessing that is wholly inappropriate in deliberate indifference cases. The question is not whether Plaintiffs—or even medical professionals—could disagree as to whether Nurse Foster should have re-sorted her priorities when providing care to Ms. Tedder. *Est. of Beauford*, 35 F.4th at 1274 (concluding that the estate's opinion that the only medically acceptable option was to call paramedics reflected, at most, a difference of opinion, a scenario which "[could not] support deliberate indifference"). Nor is the question whether Nurse Foster's care was negligent. *See Mata*, 427 F.3d at 752. The question is, instead, whether the evidence shows that Nurse Foster subjectively believed or drew the inference that CPR should be started right away, and nevertheless failed to begin CPR. *E.g., Est. of Beauford*, 35 F.4th at 1274 (finding no deliberate indifference where the nurse, who had observed the decedent's seizure, "believed his seizure had resolved and he was no longer in medical distress").

The undisputed facts show that Nurse Foster observed Ms. Tedder, believed she had a pulse and was breathing, and left to gather materials to provide further medical care. To confirm this, it is not necessary to look any further than Nurse Foster's response—and her immediate change in behavior—when she was called back to the cell. *See Mata*, 427 F.3d at 760-61 (concluding that the nurse's statement that the inmate "was not having a

---

[38] This conclusion is corroborated by Nurse Foster's visible and audible reaction to Ms. Tedder's condition upon returning to the cell. Dkt. 92-15 (18:29:50-18:29:55).

heart attack" and directing the inmate to return if her pain increased gave "direct insight" to the nurse's state of mind and showed that the nurse subjectively believed the inmate was not having a heart attack, and holding that no jury could find the nurse was deliberately indifferent to the inmate's medical needs). The fact that Nurse Foster subjectively believed Ms. Tedder did not need CPR when she left the holding cell and immediately came to a different conclusion upon her return is apparent from the evidence.

Plaintiffs argue that Nurse Foster's conduct is analogous to that of the officers in *Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014). This Court holds otherwise. In *Estate of Booker*, the decedent was placed in a carotid neck hold for two-and-a-half minutes, even though the hold was known to cause brain damage in as little as one minute. *Id.* at 425. Four deputies then lifted the decedent to a cell and placed him face-down on the floor. *Id.* at 415. They left him there, alone, without checking his vital signs or even attempting to determine whether he needed immediate medical attention. *Id.* One officer did walk to the nurse's station to request a medical evaluation, but only after storing his taser. *Id.* The deputies' failure to check the decedent's vital signs or seek immediate medical attention after placing him in a carotid neck hold and rendering him unconscious were sufficient to create a triable issue as to whether the deputies were deliberately indifferent to the decedent's serious medical needs. *Id.* at 431-32.

The facts of *Booker* stand in stark contrast to the facts here. The officers in *Booker* failed to immediately check the decedent's vital signs; Nurse Foster, in contrast, took a pedal pulse within seconds of observing Ms. Tedder's face. The officers in *Booker* left the decedent alone in the cell; Nurse Foster left Ms. Tedder under the supervision of officers who could (and did) alert her to changes in Ms. Tedder's condition. The officers in *Booker* were lackadaisical about requesting medical care; here, emergency services were called soon after Ms. Tedder's forehead cut was discovered, and Nurse Foster knew this before she left the cell. The officers in *Booker*

Case No. 22-cv-119

left the room *without* providing emergency care; Nurse Foster, in contrast, left to gather supplies *so that she could continue* providing medical care. The contrast between these cases could not be more apparent.

"Although medical judgment and misdiagnosis can cross the line into a denial of care amounting to deliberate indifference," Nurse Foster's treatment of Ms. Tedder "did not go so far." *Est. of Beauford*, 35 F.4th at 1274. This Court's "subjective inquiry is limited to consideration of [Nurse Foster's] knowledge at the time [she decided upon the] treatment for the symptoms presented, not to the ultimate treatment necessary." *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006). At the time Nurse Foster left to retrieve supplies, she subjectively believed that Ms. Tedder had a large laceration to her forehead, that she had a pulse and was breathing, and that emergency responders were on the way. Under these circumstances, Nurse Foster did not engage in constitutionally deficient care by leaving Ms. Tedder under the supervision of multiple officers while she gathered supplies to treat Ms. Tedder's wound and obtain a machine to record her vital signs prior to the arrival of emergency services. Even when the facts are taken in Plaintiffs' favor, no jury could conclude that Nurse Foster subjectively "kn[ew] of and disregard[ed] an excessive risk" to Ms. Tedder between 6:26:54 p.m. and 6:28:03 p.m. *Lucas*, 58 F.4th at 1137.

## C.

It does not appear that Plaintiffs' claim turns on the time period following Nurse Foster's departure from the cell. Although Plaintiffs take issue with the fact that chest compressions were performed while Ms. Tedder was restrained and were interrupted so that officers could remove the restraints and set up the AED, they do not appear to argue that Nurse Foster acted with deliberate indifference during the administration of CPR, the use of the AED, or the provision of oxygen. Instead, the crux of Plaintiffs' argument appears to be that Nurse Foster should have evaluated Ms. Tedder

19

Case No. 22-cv-119

sooner, reached a different conclusion following her evaluation, and started CPR more promptly. *See generally* Dkt. 101 at 23-38.

Even if Plaintiffs had challenged Nurse Foster's conduct following her return to the cell, the Court would not find deliberate indifference. The facts, when taken in Plaintiffs' favor, demonstrate that Nurse Foster was performing chest compressions within thirty seconds of returning to the cell, after which she directed the provision of CPR, the collection of medical supplies, the administration of oxygen, and the use of the AED. Dkt. 92-15 (18:30:24-18:34:17). To the extent Plaintiffs suggest this care should have been provided differently, their mere disagreement with the care provided does not establish deliberate indifference. *See Perkins*, 165 F.3d at 811. Because the facts of this case do not establish that Nurse Foster was deliberately indifferent to Ms. Tedder's medical needs at any point during the time she was present at the jail, Nurse Foster's Motion for Summary Judgment [Dkt. 93] is GRANTED with respect to Plaintiffs' § 1983 claim.

## III.

Having resolved Plaintiffs' constitutional claim against Nurse Foster, the Court now turns to their *Monell* claim against Turn Key. Because Nurse Foster did not commit a constitutional violation with respect to her provision of medical care to Ms. Tedder, the Court holds, by extension, that Turn Key is not liable for the injuries allegedly resulting from Nurse Foster's conduct. *See Crowson v. Washington County*, 983 F.3d 1166, 1191 (10th Cir. 2020) (recognizing that, except in limited cases where the violation is the result of multiple officials' actions or inactions, a municipality will be liable under a *Monell* theory of liability "only where an individual officer commits a constitutional violation").[39]

---

[39] Plaintiffs elected not to dispute the claim that Turn Key's liability depended upon establishing a constitutional violation by its employees. Dkt. 103 at 25. *See id.* at 37 (arguing that Turn Key's actions led to constitutional violations by Nurse Moore).

Case No. 22-cv-119

This does not end the Court's inquiry, however, because Plaintiffs now claim that Nurse Moore—who is not a defendant in this case—documented and observed Ms. Tedder's concerning behavior at intake but failed to reach out to a healthcare provider and failed to recommend a mental health evaluation despite evidence that Ms. Tedder was facing a mental health crisis. Plaintiffs argue that Nurse Moore's failure left Ms. Tedder at an increased risk of injury, death, and "use of force" situations. Dkt. 103 at 30-32.

Assuming, without deciding, that Plaintiffs have alleged a *Monell* claim based upon Nurse Moore's purportedly deficient intake practices, the Court finds no support for the proposition that Nurse Moore was subjectively aware that Ms. Tedder faced a substantial risk of suffering the harm alleged in this case. Even if Nurse Moore was *generally* aware that Ms. Tedder may have been in the middle of a mental health episode, the facts do not establish that she was subjectively aware that Ms. Tedder was at risk of the *specific harm* of death resulting from use of force. *Estate of Hocker ex rel. Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1995) (rejecting contention that an officer's knowledge of an inmate's intoxication could confer knowledge that the inmate was a suicide risk and concluding that plaintiffs must establish knowledge of "the specific risk" of the harm that ultimately resulted). And there is no evidence of record that would permit a jury to conclude that Ms. Tedder faced a *substantial* risk of becoming involved in a use-of-force scenario, suffering cardiac arrest, and dying. *Cf. Barrie v. Grand County*, 119 F.3d 862, 868-69 (10th Cir. 1997) (concluding that, where the inmate was intoxicated but did not indicate he was suicidal, the officers' decision to place the inmate in the drunk tank instead of providing mental-health treatment was not deliberately indifferent to a substantial risk of suicide). Absent such evidence, the Court simply cannot hold that Nurse Moore subjectively knew that Ms. Tedder faced a substantial risk of injury and death and consciously disregarded that risk when performing the intake

screening. Without Nurse Moore's subjective knowledge of the risk, she had no obligation to seek additional medical care for Ms. Tedder.

Plaintiffs suggest that, regardless of whether Nurse Moore and Nurse Foster individually committed constitutional violations, Turn Key is nevertheless liable under a *Monell* theory of liability because Turn Key's insufficient employee training and improper policies exposed individuals, including Ms. Tedder, to the risk of serious injury, death, or use of force. Dkt. 103 at 36-37, 39-46. Because these claims allege that Turn Key "has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure [that Turn Key] is not held liable solely for the actions of its employee[s]." *Waller v. City & County of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (quoting *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997)).

For claims of inadequate training, a plaintiff must establish that the defendant acted with deliberate indifference to the "known or obvious consequences" of its failure to train. *Id.* (quoting *Brown*, 520 U.S. at 407)). Turn Key can only be held liable for failure to train its employees if that failure "amounts to deliberate indifference to the rights of [those] with whom [its employees] come into contact." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 773 (10th Cir. 2013) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). The need for more or different training must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [Turn Key] can reasonably be said to have been deliberately indifferent to the need." *Id.* (quoting *Harris*, 498 U.S. at 390). This showing can ordinarily be established by demonstrating a "pattern of tortious conduct" or by showing that the consequences of a municipality's action are highly predictable or plainly obvious. *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998).

Case No. 22-cv-119

Plaintiffs have failed to show that Turn Key was deliberately indifferent to the need to provide more or different training to Nurse Foster. They have not pointed to a pattern of violations that would have put Turn Key on notice that its training on prone restraint, the signs of asphyxiation, and the unique needs of inmates were deficient. *E.g.*, *Barney*, 143 F.3d at 1308 (granting summary judgment where the record contained no evidence of any complaints of prior abuse of female inmates at the jail). And, while Plaintiffs have set forth a number of alleged deficiencies in Turn Key's training,[40] they have not shown that additional training would have changed the outcome in this case, where Nurse Foster provided medical care immediately upon being authorized to do so, and subjectively believed Ms. Tedder was breathing and had a pulse when she left to gather supplies to treat Ms. Tedder's head wound. In short, Plaintiffs have not established that any additional training by Turn Key to Nurse Foster would have changed the outcome here. *See Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999) (recognizing that a plaintiff must identify a specific training deficiency that is "closely related to his ultimate injury, and must prove that the deficiency in training actually caused [an employee] to act with deliberate indifference to his safety"), *abrogated in part on other grounds, Brown v. Flowers*, 974 F.3d 1178, 1182 (10th Cir. 2020).[41]

With respect to Plaintiffs' claims that Turn Key implicitly permitted its employees to take a "wait and see" approach with unstable inmates and failed to train its employees regarding intake screenings and mental health referrals,[42] Plaintiffs have failed to point to any evidence of a direct, causal

---

[40] *E.g.*, Dkt. 103 at 22-24 (discussing alleged failures to ensure competency of staff, to provide timely training, to conduct observations of its recent hires, and to provide training on specific issues such as dangerous restraint, prone restraint, the signs of asphyxiation, and the challenges of medical care in the jail context).

[41] *See also, e.g., Barney*, 143 F.3d at 1308 (affirming summary judgment when it was not "plainly obvious" that the "consequence of a deficient training program would be the sexual assault of inmates").

[42] *See* Dkt. 103 at 35-37, 39.

link between Turn Key's actions (or inactions) and the harm that befell Ms. Tedder. It is not enough to show that Turn Key had a de facto policy that permitted its employees to "wait and see" whether an inmate exhibiting erratic behaviors would calm down with time; Plaintiffs must also show that Turn Key had actual or constructive notice that its policy (or its failure to provide proper training) was substantially certain to cause a constitutional violation, and that Turn Key disregarded that risk. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1318 (10th Cir. 2002). Absent some evidence that Turn Key knew that its informal "wait and see" policy and its policies pertaining to intake screening and mental-health care "reflected a conscious disregard for a high risk" that Ms. Tedder would become involved in a use of force that would result in injury or death, Plaintiffs cannot obtain relief against Turn Key. *E.g., Brown*, 520 U.S. at 415 (holding the county was not liable for a sheriff's inadequate employment screening where there was no evidence that the decision reflected a "conscious disregard for a high risk" that the employee would use excessive force).

In sum, the evidence does not support the conclusion that either Nurse Moore or Nurse Foster engaged in conduct that deprived Ms. Tedder of her constitutional rights, that Turn Key's policies and training contributed to a violation of Ms. Tedder's rights, or that Turn Key consciously disregarded a high risk that its policies and training would lead to the harm that ultimately resulted in this case. Accordingly, Plaintiffs have no basis for recovering against Turn Key under a *Monell* theory of liability. Turn Key's Motion for Summary Judgment on Plaintiffs' § 1983 claim is GRANTED.

## IV.

For the reasons discussed above, the Court GRANTS Defendants' Motions for Summary Judgment with respect to Plaintiffs' § 1983 claims. This leaves only Plaintiffs' state-law claims for resolution by the Court. Because at least some of those claims are likely to be affected by appeals currently before Oklahoma Supreme Court, *see* Dkt. 103, the Court DE-

Case No. 22-cv-119

CLINES to exercise supplemental jurisdiction over those claims and will dismiss those claims by separate order.

DATED this 30th day of August 2024.

JOHN D. RUSSELL
*United States District Judge*